BLANK ROME, LLP
Attorneys for Defendants
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EXMAR SHIPPING N.V., <br><br> Plaintiff, <br><br> v. <br><br> POLAR SHIPPING S.A., *et al.*, <br><br> Defendants. | 06 CIV 12991(HB) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REDUCE OR VACATE ORDER OF MARITIME ATTACHMENT AND GARNISHMENT OBTAINED UNDER SUPPLEMENTAL RULE B OF THE SUPPLEMENTAL RULES OF F. R. CIV. P. FOR CERTAIN ADMIRALTY AND MARITIME CLAIMS AND/OR IN THE ALTERNATIVE FOR COUNTER-SECURITY UNDER SUPPLEMENTAL RULE E**

*Jeremy J.O. Harwood*
*Blank Rome LLP*
*The Chrysler Building*
*405 Lexington Avenue*
*New York, NY 10174*
*(212) 885-5000*

129071.00601/6609696v.2

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................2

THE BASIC FACTS................................................................................................................2
I. THE PROCEDURAL STATUS........................................................................................2
II. THE CLAIMS IN LONDON ARBITRATION...............................................................2

    A.    THE CLAIMS UNDER THE SALE AND PURCHASE AGREEMENTS FOR M/V POLAR BELGICA AND B/V POLAR DISCOVERY......................................................... 3
        (i)    THE M/V POLAR BELGICA.................................................................3

        (ii)    THE M/V POLAR DISCOVERY ...........................................................4

        (iii)    EITZEN'S IMPROPER DEDUCTIONS OR "CLAIMED ... DEDUCTION" FROM ITS TERMINATION FEE OBLIGATIONS ARE DISPUTES UNDER THE TERMINATION AGREEMENTS ....................................................................................5

    B.    THE CHARTER HIRE CLAIM ............................................................... 6

    C.    THE SPEED CLAIMS ............................................................................ 7

ARGUMENT ...........................................................................................................................8

POINT I ...................................................................................................................................8

EXMAR CARRIES THE BURDEN TO SHOW WHY THE ATTACHMENTS SHOULD BE MAINTAINED; OTHERWISE THE COURT IS REQUIRED TO VACATE THE ATTACHMENTS..................................................................................................................8

POINT II ..................................................................................................................................9

EXMAR'S APPLICATION FOR A RULE B ATTACHMENT IN RESPECT OF ITS INDEMNITY CLAIMS WAS PREMATURE........................................................................9

    A.    THE APPLICABLE STANDARD ............................................................ 9
    B.    JUDGE KAPLAN'S DECISION ............................................................. 10
    C.    SDNY RULE B CASES HOLDING AN INDEMNITY CASE IS "RIPE"................. 12
    D.    THE ISSUE OF WHETHER EXMAR PLEADED VALID ADMIRALTY CLAIMS MUST BE DECIDED UNDER ENGLISH LAW ...................................................... 13
    E.    APPLICATION OF ENGLISH LAW TO EXMAR'S STATED CAUSES OF ACTION UNDER THE MOAS AND CHARTER.................................................................. 13

POINT III ..................................................................................................................................15

IF THE ATTACHMENT IN RESPECT OF THE SPEED CLAIMS IS NOT VACATED THEN, IN THE ALTERNATIVE, POLAR IS ENTITLED TO COUNTER-SECURITY UNDER SUPPLEMENTAL RULE E ..................................................................................................15

CONCLUSION .........................................................................................................................16

129071.00601/6609696v.2

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Aqua Stoli Shipping Ltd. v Gardner Smith Pty. Ltd.*, 460 F.3d 434 (2d Cir. 2006)..............8

*Bottiglieri di Navigazione SPA v. Tradeline LLC*, 472 F. Supp.2d 588 (S.D.N.Y. 2007) .......................................................................................................................10, 11, 12

*Greenwich Marine, Inc. v. S.S. ALEXANDER*, 339 F.2d 901 (2d Cir. 1965) ......................9

*Mitsui Steamship Co. Ltd. v. Jarka Corp.*, 218 F. Supp. 424 (E.D.PA. 1963) .....................9

*Naias Marine S.A. v. Trans Pacific Carriers Co. Ltd.*, 2008 U.S. Dist. LEXIS 2438 (S.D.N.Y. January 9, 2008) .......................................................................................13

*Patricia Hayes & Associates, Inc. v. Cammell Laird Holdings U.K.*, 339 F.3d 76 (2d Cir. 2003) ...............................................................................................................9, 10

*Salazar v. THE ATLANTIC SUN*, 881 F.2d 73 (3d Cir. 1989) .............................................8

*Seaplus Line Co. v. Bulkhandling Handymax*, 409 F. Supp. 2d 316 (S.D.N.Y. 2005) ....................................................................................................................................8

*Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp. 2d 532 (S.D.N.Y. 2007) ..................................................................................................................9, 10

*Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp. 2d 532 (S.D.N.Y. 2007) .......................................................................................................................13

*Staronset Shipping Ltd. v. North Star Nav. Inc.*, 659 F. Supp. 189 (S.D.N.Y. 1987) ..................................................................................................................................12

*T&O Shipping, Ltd. v. Lydia Maritime Shipping Co. S.A.*, 415 F. Supp. 2d 310 (S.D.N.Y. 2006) ...............................................................................................................13

## INTRODUCTION

Defendant Polar Shipping S.A. *et al.* (individually and/or collectively "Polar") respectfully submits this memorandum of law in support of its motion to reduce and/or vacate the order of maritime attachment and garnishment obtained under supplemental Rule B of the Supplemental Rules of F. R. Civ. P. for Certain Admiralty And Maritime Claims ("Supplemental Rules") and/or in the alternative for counter-security under Supplemental Rule E.

## THE BASIC FACTS

### I. THE PROCEDURAL STATUS

Plaintiff Exmar Shipping N.V. ("Exmar") obtained an <u>ex parte</u> Process of Maritime Attachment and Garnishment pursuant to its verified complaint dated November 9, 2006 ("Complaint"). Exmar attached $1,604,540.14. Polar filed its first motion dated January 31, 2007 to direct Exmar accept substitute security on the basis that, despite an offer, no agreement had been reached in respect of proposed substitute security for that cause of action (the "Unpaid Charter Hire" Claim, as described below) covered by Polar's protection and indemnity insurer. In addition, Polar requested that the balance of its funds be paid into the Court's registry so as to earn interest. Polar did not seek to vacate or reduce the attachment at that time.

A letter of undertaking dated February 26, 2007 was eventually issued in exchange for a release of attached funds in the amount of $275,000 (the "LOU"). Ex. 1 to the Harwood Affidavit.

The balance of $1,304,540.14 was deposited into the Court's Registry.

### II. THE CLAIMS IN LONDON ARBITRATION

The facts relating to the present status of Plaintiff's claims, all of which are governed by English law and subject to London arbitration, is set out in full in the accompanying Declaration

2

of Nicholas Burgess dated February 15, 2008 ("Burgess Dec.") pursuant to Polar's F. R. Civ. P. Rule 44.1 Notice.

A. **THE CLAIMS UNDER THE SALE AND PURCHASE AGREEMENTS FOR M/V POLAR BELGICA AND B/V POLAR DISCOVERY**

    (i)    **THE M/V POLAR BELGICA**

1. As alleged in the Complaint, Polar Shipping Co. Ltd. entered into a memorandum of agreement with Exmar for the sale and purchase of the M/V POLAR BELGICA (the "Belgica MOA") dated September 12, 2006.

2. The Belgica MOA is governed by English law.

3. Exmar contracted, it alleges, "on the same date," September 12, 2006 to sell the M/V POLAR BELGICA to a third-party, Sigas (Singapore) Pte Ltd. (respectively "Sigas/Belgica MOA" and "Sigas").

4. The Complaint alleges that:

> Both Memoranda of Agreement [the Belgica MOA and the Sigas/Belgica MOA] were back-to-back transactions and contained similar contract terms.

Id., ¶ 9.

5. The Complaint further alleges the existence of a "Tripartite Termination Agreement," dated September 12, 2006 (the "Termination Agreement No. 1"). Under the TT Agreement No. 1 an affiliate of Sigas, Eitzen Gas A.S. ("Eitzen"), was to pay Exmar $3,990,000 as a "termination fee" upon Sigas accepting the M/V POLAR BELGICA. Complaint, ¶ 11. A true copy is Exhibit 1 to the Burgess Declaration.

6. Exmar alleges the Sigas found "several deficiencies" with the M/V POLAR BELGICA, allegedly in breach of the Sigas/Belgica MOA. Id., ¶¶ 12,13.

7. Exmar claims that as a result Eitzen failed to pay or deducted $275,000 from its termination fee payment obligation under TT Agreement No. 1.

8. The Complaint alleges that Sigas' surveyors' findings leading to Eitzen's deduction is the consequence of Polar's breach of the Belgica MOA for which it "has suffered damages" in the amount of $275,000. Id. ¶ 15.

9. Exmar has attached the sum of $275,000 for that claim, plus alleged interest and attorneys' and arbitrators' fees thereon which, based on the claim's percentage of the principal claim is $53,786 and $21,850, respectively.

### (ii) THE M/V POLAR DISCOVERY

10. The same set of facts is applicable mutatis mutandis to the sale and purchase of the M/V POLAR DISCOVERY under a memorandum of agreement dated September 12, 2006 by and between Polar Shipping Co. Ltd. and Exmar. Complaint, ¶ 17.

11. Exmar alleges that it similarly arranged to sell that vessel to Sigas under a sale agreement dated September 12, 2006 (the "Discovery Agreement") and that Sigas found "several deficiencies". Complaint ¶¶ 18, 22. There was a separate "Tripartite Termination Agreement" in respect of the M/V POLAR DISCOVERY, ("Termination Agreement No. 2"), also dated September 12, 2006. A true copy is exhibit 2 to the accompanying Burgess Declaration.

12. Eitzen's termination fee obligation under TT Agreement No. 2 was to pay Exmar a "Termination Fee" of $3,820,100

13. Exmar alleges, that as a result of the alleged "deficiencies" Eitzen failed to pay or deducted $430,000 from its termination fee obligation under the TT Agreement No. 2.

14. The Complaint alleges that Sigas' surveyors' findings leading to Eitzen's deduction is the consequence of Polar's breach of the Discovery MOA for which it has "suffered damages in the amount of $705,000." Id. ¶ 15.

4

15. Exmar has attached the sum of $705,000 for that claim plus alleged interest and attorneys' and arbitrators' fees thereon which, based on the claim's percentage of the principal claim amount is $84,113 and $34,170, respectively.

    (iii) **EITZEN'S IMPROPER DEDUCTIONS OR "CLAIMED ... DEDUCTION" FROM ITS TERMINATION FEE OBLIGATIONS ARE DISPUTES UNDER THE TERMINATION AGREEMENTS**

16. Eitzen's unilateral deduction of $705,000[1] from the sums it owed under the Termination Agreements does not, as a matter of English law, give rise to a valid maritime claim for which Exmar is entitled to Rule B security.

17. Exmar's counsel, pursuant to the Court's direction, wrote a status letter report dated December 20, 207 (the "Status Report"). Burgess Dec., Ex. 3.

18. The Status Report states in respect of Sigas' claims against Exmar under the Sigas/Belgica MOA and Sigas/Discovery MOA:

> STATUS OF THE MOA CLAIMS
>
> We have been advised by London counsel for EXMAR that arbitrators had been appointed to resolve the EXMAR/SIGAS MOAs dispute concerning the POLAR BELGICA and POLAR DISCOVERY. In turn, EXMAR and POLAR had appointed their arbitrators under their MOAs relating to the same vessels and claims, but the third arbitrator in these two MOA disputes has not yet been selected. Given the fact that these arbitrations will prove costly, we understand that settlement discussions are ongoing among London counsel representing al of the parties.

19. Further, on information and belief, although Exmar has invoked arbitration under the Polar/Sigas MOAs no substantive steps of any kind have been taken since the initial appointment of arbitrators, despite the passage of time. Burgess Dec. ¶ 13.

---

[1] It is unclear if the $430,000 deduction was only "claimed" or made. See Burgess Declaration, ¶ 8.

20.  Unless and until Sigas establishes its damages under the Exmar/Sigas MOAs for Exmar's alleged breach in delivering the vessels with "deficiencies", and Exmar pays those damages, Exmar has only a contingent indemnity claim.  See, Burgess Declaration, ¶¶ 34-36.

### B.   THE CHARTER HIRE CLAIM

21.  Exmar claims, as disponent owner, that it chartered the vessel M/V POLAR ENDURANCE to an unidentified third party (the "Polar Charterer"), Complaint, ¶ 28.

22.  The Polar Charterer allegedly "deducted charter hire which was owed and due to Exmar in the sum of $179,528.45."  Id., ¶ 29.

23.  Exmar claims that Polar is liable to Exmar for the Polar Charterer's improper deduction from hire which was a "result of [Polar's] breach of a charter party between them dated April 20, 2004."

24.  Exmar has failed to advise Polar whether the Polar Charterer has brought a timely claim for cargo damage.

25.  The Status Report states in respect of the Cargo Claim:

> Cargo Claim Re: Polar Endurance
>
> A cargo claim under the charter party had been submitted against EXMAR in the sum of $179,528.45 for alleged loss/damage of ethylene.  This claim was then asserted by EXMAR against POLAR as reflected in the Amended Verified Complaint.  As POLAR apparently had P & I insurance covering this claim, EXMAR agreed to accept a P & I letter of Undertaking (LOU) as substitute security of $275,000 in attached funds.  Consequently, by Order of this Court, the $275,000 were released and EXMAR was provided with the aforementioned LOU

26.  Exmar attached the sum of $179,528.45 plus alleged interest and attorneys' and arbitrators' fees thereon which sum was replaced by a Club letter of undertaking which reserved all of Polar's rights, claims and defenses, including to move to vacate the underlying attachment by which the Club LOU was obtained.

6

129071.00601/6609696v.2

C.  **THE SPEED CLAIMS**

27.  As set out in the Complaint, Exmar alleges that it chartered, as disponent owner, three vessels under three separate charter parties with Eitzen. Id., ¶¶ 34, 35 (the "Three Charters").

28.  The Complaint alleges that:

> Eitzen has presented claims to Exmar based on the alleged breach by Exmar of [the Three Charters].

Id., ¶ 37.

29.  The Complaint further alleges "Eitzen's speed claims against EXMAR total the amount of $373,850.00." Id., ¶ 38.

30.  The Status Report alleges in respect of the Speed Claims:

> Arbitration Panels have been formed in these arbitrations and log books for each of the three vessels had been provided by POLAR and are being reviewed by EXMAR's experts to determine whether, in fact, all three vessels underperformed. In the EXMAR/POLAR arbitration proceedings, POLAR has made a counter-claim alleging that the vessels actually over-performed and contend that there is a sum due POLAR of $400,000 in relation to the three vessels.
>
> Once the vessel log books are reviewed by EXMAR's experts, claim submissions will be served against POLAR in the arbitrations. POLAR has forwarded to EXMAR their claim for overperformance contending there is a sum due to them of over U.S. $400,000 in relation to the three vessels. POLAR has not yet served any claim submissions against EXMAR for this sum.

Burgess Dec. Ex. 3.

31.  Exmar has attached the sum of $373,850 plus alleged interest and attorneys' fees thereon in respect of the Speed Claims.

7

## ARGUMENT

### POINT I

### EXMAR CARRIES THE BURDEN TO SHOW WHY THE ATTACHMENTS SHOULD BE MAINTAINED; OTHERWISE THE COURT IS REQUIRED TO VACATE THE ATTACHMENTS

An order of maritime attachment and garnishment pursuant to Rule B is typically issued upon a minimal prima facie showing, usually made ex parte. See, e.g., Seaplus Line Co. v. Bulkhandling Handymax, 409 F.Supp.2d 316 (S.D.N.Y. 2005). Once property has been restrained:

> Any person claiming an interest in it shall be entitled to a prompt hearing at which *the plaintiff shall **be required to show why the arrest or attachment should not be vacated*** or other relief granted consistent with these rules.

Rule E(4)(f) (emphasis supplied).

The Second Circuit has found that Rule E(4)(f) is clear and the burden is on the plaintiff to show the attachment "was properly ordered and complied with the requirements of Rules B and E." Aqua Stoli Shipping Ltd. v Gardner Smith Pty. Ltd., 460 F.3d 434, 445 n.5 (2d Cir. 2006).[2] Rule E does not specify what form the post-attachment hearing must follow and the nature and scope of the hearing depends entirely upon the issues in controversy. Salazar v. THE ATLANTIC SUN, 881 F.2d 73, 79 (3d Cir. 1989).

Accordingly, the burden is now on Plaintiff to establish why the attachments in respect of its three separate causes of action should be maintained. Exmar must carry its burden, failing which the attachments should be vacated.

---

[2] To the extent the attachment is to be vacated on an equitable ground, however, the burden is on the defendant to establish any equitable grounds for vacatur. Id.

8

## POINT II

## EXMAR'S APPLICATION FOR A RULE B ATTACHMENT IN RESPECT OF ITS INDEMNITY CLAIMS WAS PREMATURE

**A.   THE APPLICABLE STANDARD**

The touchstone case for any discussion as to when and whether a maritime plaintiff's claim is too premature to sustain an application for an attachment is Greenwich Marine, Inc. v. S.S. ALEXANDER, 339 F.2d 901 (2d Cir. 1965). In Greenwich, the District Court was called upon to determine whether there was just cause for arresting and attaching the defendant vessel. The District Court held that the plaintiff's claim was premature. The Second Circuit agreed because "no judgment had been entered against Greenwich for the cargo damage, and no suit had been instituted against Greenwich for the cargo damage". Id. at 905. The Second Circuit affirmed.

The Second Circuit recognized that occasionally some district judges were willing, under certain circumstances, to ignore the prematurity of a claim, but "this does not mean that all doctrines of accrual have been abrogated in admiralty." Id. The Greenwich Court gave as an example the decision by Judge Kraft in Mitsui Steamship Co. Ltd. v. Jarka Corp., 218 F.Supp. 424 (E.D.PA. 1963) in which an indemnity cause of action in a maritime case was dismissed for failure to state a cause of action because it was premature and "nothing more than an abstraction" **even though** suit against the party seeking indemnification was pending in another court. Greenwich, 339 F.2d at 905.

In Patricia Hayes & Assocs., Inc. v. Cammell Laird Holdings U.K., 339 F.3d 76, 82-83 (2d Cir. 2003), the Court held that "a district court may in some circumstances disregard the prematurity of a plaintiff's claim as a matter of *discretion*" (emphasis in original).

In Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd., 478 F.Supp.2d 532, 540-41 (S.D.N.Y. 2007), however, the Court found that "courts in this circuit have not been receptive to contingent indemnity claims as bases for maritime arrests [or] attachments" and found that to the extent that the Court still has discretion to disregard the prematurity of a plaintiff's claim, such discretion "should only be exercised under compelling circumstances". Id. at 543-44.

Indeed, the Greenwich Court noted that objections to prematurity are ignored "only in isolated situations under peculiar factual circumstances." Greenwich, 339 F.2d at 905. Such a peculiar factual circumstance may arise where a claim might have been premature when filed but was certain to mature shortly (i.e., within a matter of hours), as was the case in Patricia Hayes, 339 F.3d at 82-83. The time to measure whether a claim is "ripe enough" to sustain an attachment is as of the time of the filing of the complaint. Absent such a fairly anticipated maturity of a claim within a very brief period of time, the Greenwich Court held that later events, including the protraction of litigation, cannot serve to ripen a claim that was premature at the time the application for the attachment was made. Greenwich, 339 F.2d at 908-909 ("a concern for future cases leads us to squelch all hope that a litigation may become sufficiently protracted so as to enable a premature claim to ripen just before judgment is rendered on appeal").

**B.   JUDGE KAPLAN'S DECISION**

In Bottiglieri di Navigazione SPA v. Tradeline LLC, 472 F. Supp.2d 588 (S.D.N.Y. 2007) there was a charter party claim between the "vessel's actual owner" (known as "Head Owner") and Bottiglieri as "disponent" or chartered owner and its charterer, Tradeline. As stated by the court: "[t]he substantive provisions of the two charter parties are substantially the same". Id. Both the head charter and the sub-charter called for London arbitration, under English law, of any disputes.

The Head Owner settled a cargo receiver's claim and "announced its intention to commence arbitration against plaintiff [Bottiglieri] for breach of their charter party." Id. Bottiglieri "in turn, announced its [own] intention" to arbitrate against Tradeline. The Court noted that "[t]he arbitrations have not progressed much over the years" and:

> It is uncontested ... that there has been no settlement in the dispute between plaintiff and [Head] Owner, no finding that plaintiff is liable to the Owner for damages, and no award against plaintiff [in favor of the Head Owner].

472 F. Supp.2d at 589.

Tradeline moved to vacate a Rule B attachment of approximately $3 million of its funds brought by Bottiglieri for its potential liability in the arbitration with Head Owner. The "principal argument is that plaintiff's indemnity claim is unripe under English law ...". Id.

(1) **Discussion of English Law**

The Court first reviewed the parties' agreement that English law governed the nature of the claims:

> The parties agree that the seminal English case addressing when indemnity claims accrue is *Telfair Shipping Corp. v. Intersea Carriers S.A. (The "Caroline P")*, The Caroline P, after an exhaustive survey of the case law, concluded that:
>
> > it is possible to identify at least three ways in which a person (A) who has become liable to (B) may be able to obtain redress from (C). The first way is by an action for damages for breach of contract (or warranty). In such a case (A) will be in a position to claim that the incurring of his liability to (B) flowed directly from an act of (C) which constituted a breach of a contract between (A) and (C) or of a warranty given by (C) to (A) .... The cause of action will date from the date of breach.
>
> > \* \* \*
>
> > The third way in which (A) may clam against (C) in respect of sums which he has had to pay to (B) is under an implied indemnity. As I understand the matter, such an implied indemnity would prima facie be a general indemnity of the

11

> kind recognized by the common law .... [and A()] could not sue [(C)' unless he could aver payment to [(B)]."
>
> *The Caroline P* does not precisely lay out how to distinguish between these theories. It appears, however, that the former contemplates a contract defining A's potential liability to B and a breach by C that expands the scope of that potential liability. Thus, the mere exposure to grater liability is the injury to A. The latter, in contrast, includes the common identity scenario whereby C's act causes A to breach its pre-existing contract with B.

472 F. Supp.2d at 590.

    (2)    **Application of English Law To The Facts To Find The Indemnity Claim Premature**

Judge Kaplan then held:

> Here, plaintiff does not allege that any act by defendant increased plaintiff's potential liability to the Owner. Rather, plaintiff's claim falls squarely within The Caroline P's latter category. This is clear from the allegations of the complaint, which trace the bulk of the monetary claim made against defendant to the damages claimed by the Owner and state plainly that "Defendant is liable to indemnify Plaintiff for all amounts claimed against it by [the Owner]." This claim for indemnity is not ripe under English law. Plaintiff thus has not established the "valid prima facie admiralty claim" required under Aqua Stoli.

472 F. Supp.2d at 591.

**C.**    **SDNY RULE B CASES HOLDING AN INDEMNITY CASE IS "RIPE"**

Staronset Shipping Ltd. v. North Star Nav. Inc., 659 F. Supp. 189 (S.D.N.Y. 1987) represents one of the very few cases in which the Court determined that a contingent indemnity claim was "ripe enough" to sustain an attachment. In Staronset, Judge Knapp held that where the party seeking indemnity had itself been sued (or arbitration brought against it) and where that party had been put to significant expense as a result, such as by being required to post security, then an otherwise premature contingent indemnity claim, upon a balancing of the equities in the

Court's discretion, could be considered "ripe enough" to support an application for a Rule B attachment. Id. At 190-91.

### D. THE ISSUE OF WHETHER EXMAR PLEADED VALID ADMIRALTY CLAIMS MUST BE DECIDED UNDER ENGLISH LAW

There is no dispute, as conceded in the Status Letter, that Exmar claims are governed by English law. As Judge Leise recently decided in Naias Marine S.A. v. Trans Pacific Carriers Co. Ltd., 2008 U.S. Dist. LEXIS 2438* 9-10 (S.D.N.Y. January 9, 2008) "the validity of a prima facie admiralty claim is a substantive issue" and, as the parties agreed that English law would govern the charter in question, the substantive issue would be determined under English law, citing: Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007) (holding that English law, the applicable substantive law of the underlying contract, applies to the Court's consideration of whether plaintiff has demonstrated a valid prima facie admiralty claim); and T& O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310, 314 (S.D.N.Y. 2006) "[t]he law of the contract applies to the question of whether a claim has accrued, but federal law governs the determination of whether an attachment is reasonable."

### E. APPLICATION OF ENGLISH LAW TO EXMAR'S STATED CAUSES OF ACTION UNDER THE MOAS AND CHARTER

Exmar's claims, both *at the time it made its application for a Rule B* attachment and now, were premature.[3]

As stated in the Burgess Declaration:

---

[3] On April 25, 2005, Rule B(1)(a) was amended to clarify, inter alia, that the point in time for measuring whether a plaintiff has met its burden to entitle it to a maritime attachment is as of the time the application for the attachment was made. While the former language was possibly unclear, Rule B presently leaves no room for confusion: "If a defendant is not found within the district *when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed*, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for— in the hands of garnishees named in the process" (emphasis supplied). The amendment came into effect December 1, 2005 and was therefore in effect at the time that BDN made its application on May 15, 2006.

13

28.   Under English common law, the cause of action will only accrue, upon a contract to indemnify a person against a liability to a third party, when the plaintiff has made payment to the third party and not upon the happening of the event that gives rise to the indemnity. See, Reynolds v. Doyle, (1849) 1 M&G 753.

(1) **MOA CLAIMS**

The Burgess Declaration sets out English law on the Claims as follows:

[1] **MOA CLAIMS**

35.   In reality, Exmar's claims against Polar under the Polar/Exmar MOAs can only arise upon the London arbitrators finding an actual liability on the part of Exmar to Sigas under the "Exmar/SIGAS MOAs," which has not occurred, and which is not anywhere close to occurring given no steps at all have been taken in the "Exmar/SIGAS MOAs" arbitrations since the initial appointment of arbitrators.

36.   Exmar's right to indemnity from Polar will only accrue if and when its liability to Sigas has been determined in the arbitrations of the disputes under the "EXMAR/SIGAS MOAs".

II.   **THE SPEED CLAIMS**

37.   Under the same principles as above, Exmar has not incurred any actual liability to Eitzen in respect of its speed claims under its contracts with Eitzen, i.e., the Three Charters.

38.   Unless and until Eitzen prevails on its claims against Exmar Polar has only a contingent indemnity liability to Exmar.

G.   **ENGLISH LAW GOVERNING CHARTERER'S DEDUCTION FROM HIRE FOR CARGO CLAIMS**

\* \* \*

47.   Even if the Polar Charterer's claim for cargo damage is not time-barred and could still be advanced against Exmar, that claim would need to be submitted to arbitration (and contested by Exmar) and the right to an indemnity from Polar could only accrue if and when Exmar's liability to the Polar Charterer has been determined in that arbitration.

14

Accordingly, all of Exmar's claims are indemnity claims which are "not ripe under English law" so that, as in Bottiglieri, Exmar has failed to establish valid prima facie admiralty claims so that the attachment order, obtained under the color of a proper libel in admiralty, should be vacated and the security and substitute security released.

## POINT III

### IF THE ATTACHMENT IN RESPECT OF THE SPEED CLAIMS IS NOT VACATED THEN, IN THE ALTERNATIVE, POLAR IS ENTITLED TO COUNTER-SECURITY UNDER SUPPLEMENTAL RULE E

As acknowledged in Exmar's counsel's Status Letter, Polar has asserted "a sum due POLAR of $400,000 in relation to the three vessels" in respect of which Exmar has claimed and attached a principal sum of $373,850 plus interest and attorneys' fees, etc. See also, Answer and Counter-Claim.

Supplemental Rule E(7) states in material part:

> ... a plaintiff for whose benefit such security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise. Proceedings on the original claim must be stayed until this security is given unless the court directs otherwise direct. (emphasis added)

In ordering countersecurity this Court has frequently held that the amount of countersecurity for counterclaims should not exceed the amount of security posted by the original defendant. Nevertheless, no mechanical formula is mandated by Supplemental Rule E(7).

This Court permitted greater security on a counterclaim than a plaintiff obtained on its main claim in Verton Navigation, Inc. v. Caribica Shipping Ltd., no. 90 Civ. 6940; 1991 U. S. Dist. LEXIS 6722 (S.D.N.Y. May 1, 1991).

In the event the attachment for the Speed Claims and/or Charter Hire Deduction Claim is not vacated then Exmar is entitled to counter-security for its own counter-claims as asserted in its

15

129071.00601/6609696v.2

Answer and Counter-Claim, which arise by way of the same "transaction or occurrence," as follows:

1. Principal amount: $400,000
2. Simple Interest at 6% p.a. for 3 years $ 72,000
3. Awardable Legal Fees, arbitrators' fees and costs $100,000

$572,000

In the event counter-security is not promptly posted attachment of all of Polar's property, not otherwise released, should be vacated.

## CONCLUSION

WHEREFORE, Defendant respectfully requests that the PMAG in respect of all three causes of action be vacated and the case dismissed or, to the extent Exmar's attachment in respect of its "Speed Claims" and/or Charter Hire Deduction Claim is sustained, then Plaintiff be ordered, pursuant to Supplemental Rule E(7) to post a bond or other security satisfactory to the Court in the sum of $572,000 and for such other relief as is fair and equitable and as requested herein.

Date: New York, New York
February 25, 2008

Respectfully submitted,

BLANK ROME LLP

By: _____
Jeremy J.O. Harwood
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

*Attorneys for Defendants POLAR SHIPPING S.A., et al.*

16

129071.00601/6609696v.2