BLANK ROME LLP
Attorneys for Defendants
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EXMAR SHIPPING N.V., <br><br> Plaintiff, <br><br> v. <br><br> POLAR SHIPPING S.A., et al., <br><br> Defendants. | 06 CIV 12991(HB) |

## NOTICE OF FOREIGN LAW PURSUANT TO F. R. CIV. P. RULE 44.1

PLEASE TAKE NOTICE THAT, Defendants POLAR SHIPPING S.A., *et al.*, pursuant to F. R. Civ. P. Rule 44.1 intend to raise issue of foreign law, namely of English law, as set out in the attached declaration of Nicholas Burgess dated February 15, 2008 and the exhibits thereto.

Date: New York, New York
February 25, 2008

Respectfully submitted,

BLANK ROME LLP

By: _Jeremy Harwood_
Jeremy J.O. Harwood
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
*Attorneys for Defendants*

129071.00601/6611670v.1

BLANK ROME LLP
Attorneys for Defendants
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK

EXMAR SHIPPING N.V.,                         06 CIV 12991(HB)

                    Plaintiff,

          v.

POLAR SHIPPING S.A., et al.,

                    Defendants.

## DECLARATION OF NICHOLAS BURGESS UNDER ENGLISH LAW

I, NICHOLAS BURGESS, declare under penalty of perjury:

1.     I am a member of the firm of English solicitors, Ince & Co., with offices at
1 St. Katherine's Way, London, England. I was admitted as a solicitor of the Supreme
Court of England and Wales on January 4, 1997.

2.     I submit this declaration of English law based upon my personal knowledge
of the claims alleged by Exmar Shipping N.V. ("Exmar") as stated in (i) its verified
complaint in this matter, dated November 9, 2006 ("Complaint"); (ii) Exmar's U.S.
lawyer's status report letter dated December 20, 2007 ("Status Report") and (iii) my
firm's representation of Polar Shipping S.A. and Polar Shipping Co. Ltd. (individually
and/or collectively "Polar") in the arbitrations described below.

A.    **THE ARBITRATIONS UNDER THE POLAR/EXMAR MOAS**

3.    Exmar's Complaint alleges that it has suffered damages in the total sum of $705,000 plus interest and costs for Polar's alleged breach of two separate memoranda of agreement, both dated September 12, 2006, for the sale by Polar to Exmar of the vessels M/V POLAR BELGICA and M/V POLAR DISCOVERY (the "Polar/Exmar MOAs"). The vessels were sold by Exmar to Sigas on back to back terms pursuant to two further memoranda of agreement, both dated September 12, 2006 (the "Exmar/Sigas MOAs").

4.    As admitted in the Complaint, however, Exmar's alleged "damages" claimed under the Polar/Exmar MOAs of $705,000 arise from the failure of a third party, Eitzen Gas, AS ("Eitzen") to pay Exmar the full amounts owing by way of termination fees under two Tripartite Termination Agreements both dated September 12, 2006 in respect of each vessel.

5.    True copies of the Tripartite Termination Agreements in respect of M/V POLAR BELGICA and in respect of the M/V POLAR DISCOVERY are attached as Exhibits 1 and 2 hereto (respectively "TT Agreement No. 1" and "TT Agreement No. 2"; collectively the "TT Agreements").

6.    As alleged in the Complaint, Eitzen failed to pay Exmar $275,000 under TT Agreement No. 1 and "claimed a deduction" of $430,000 under TT Agreement No. 2. Id., ¶¶ 13, 23.

7.    Specifically Exmar alleges:

Sigas/Eitzen deducted $275,000 from the Termination Fee Eitzen was required to pay to Exmar.

\*    \*    \*

> Sigas/Eitzen have claimed a deduction in the sum of
> $430,000 from the Termination Fee Eitzen was required to
> pay to Exmar.

Id., ¶¶ 13, 23.

8.    Accordingly, it appears from the Complaint that Exmar alleges that Eitzen has deducted $275,000 under TT Agreement No. 1 but that the deduction of $430,000 has not been made, but only "claimed," in respect of the Termination Fee obligation under TT Agreement No. 2.

9.    The Status Report, attached as Exhibit 3 hereto, states that "arbitrators had [sic] been appointed to resolve the EXMAR/SIGAS MOAs dispute concerning the POLAR BELGICA and POLAR DISCOVERY."

10.    The Status Report does not advise whether Exmar has invoked its right of arbitration in respect of Eitzen's unilateral deduction from the "termination fee" under TT Agreement No. 1.

11.    Similarly, the Status Report does not advise whether Eitzen has invoked its right of arbitration against Exmar in respect of its "claimed … deduction" (emphasis added) in respect of TT Agreement No. 2, or vice-versa if a deduction was made by Eitzen.

12.    Moreover, the Status Report gives the impression that arbitrations are under way in respect of the "Exmar/Sigas MOAs," by virtue of the respective appointment of arbitrators by Exmar and Sigas, but does not advise whether the tribunals have yet been

fully constituted by the appointment of third arbitrators , despite the substantial passage of time.

13.     On information and belief, no claim submissions have been served in the arbitrations by and between Sigas and Exmar in respect of the "Exmar/Sigas MOAs" and no other substantive steps of any kind have been taken since the initial appointment of arbitrators.

14.     Further, although Exmar invoked arbitration under the Polar/Exmar MOAs against Polar by the appointment of an arbitrator to which Polar responded by appointing an arbitrator, the tribunals have not yet been fully constituted, no claim submissions have been served by Exmar, and no other substantive steps of any kind have been taken since the initial appointment of arbitrators .

15.     Recent confidential, without prejudice, settlement attempts have not delayed the arbitrations between Exmar and Polar, nor the arbitrations between Sigas and Exmar.

B.     **THE HIRE DEDUCTION CLAIM**

16.     The Complaint alleges a cause of action for cargo damage by which Exmar's unidentified charterer (the "Polar Charterer") deducted the sum of $179,528.45 (the " Hire Deduction Claim") owing to Exmar, as disponent owner, under a charter of the M/V POLAR ENDURANCE dated on or about April 20, 2004 ["April Sub-Charter"].

17.     The Hire Deduction Claim is an entirely separate matter from the Complaint's other claims.

18.     The Status Report states, in material part:

> A cargo claim under the [April Sub-Charter] has been submitted against Exmar in the sum of $179,528.45 for [cargo damage].

19.    The Status Report does not advise whether the Polar Charterer has timely commenced arbitration in respect of its claim by nomination of an arbitrator within any applicable statutory period for cargo claims or whether a time extension has been granted for it to do so.

20.    Unless and until Exmar is found liable to the Polar Charterer for the cargo claim there is no ripe indemnity claim against Polar.

C.    **THE SPEED CLAIMS**

21.    As alleged in the Complaint, Exmar alleges that it chartered, as disponent owner, three vessels under three separate charter parties with Eitzen.  Id., ¶¶ 34, 35 (the "Three Charters").

22.    The Complaint alleges that:

> Eitzen has presented claims to Exmar based on the alleged breach by Exmar of [the Three Charters].

Id., ¶ 37.

23.    The Complaint further alleges "Eitzen's speed claims against EXMAR total the amount of $373,850.00."  Id., ¶ 38.

24.    The Status Report alleges that Eitzen, as sub-charterer, "claims damages in the area of $900,640.07 …" and that "[i]n turn, Exmar has asserted the same claims against Polar under the Three Charters."

25.    The Status Report further alleges in respect of the Speed Claims:

Arbitration Panels have been formed in these arbitrations and log books for each of the three vessels had been provided by POLAR and are being reviewed by EXMAR's experts to determine whether, in fact, all three vessels underperformed. In the EXMAR/POLAR arbitration proceedings, POLAR has made a counter-claim alleging that the vessels actually over-performed and contend that there is a sum due POLAR of $400,000 in relation to the three vessels.

Once the vessel log books are reviewed by EXMAR's experts, claim submissions will be served against POLAR in the arbitrations. POLAR has forwarded to EXMAR their claim for overperformance contending there is a sum due to them of over U.S. $400,000 in relation to the three vessels. POLAR has not yet served any claim submissions against EXMAR for this sum.

26.   The Status Report gives the impression that formal claims and counterclaims have been submitted by the parties. The reality, however, is that Exmar has not served claim submissions in any of the arbitrations against Polar and no other substantive steps of any kind have been taken since the initial appointment of arbitrators.

27.   Recent confidential, without prejudice, settlement attempts have not delayed the arbitrations between Exmar and Polar, nor the arbitrations between Eitzen and Exmar.

D.   **ENGLISH LAW AS IT RELATES TO ACCRUAL OF A CAUSE OF ACTION FOR INDEMNITY**

I.   **Under English Common Law**

28.   Under English common law, the cause of action will only accrue, upon a contract to indemnify a person against a liability to a third party, when the plaintiff has made payment to the third party and not upon the happening of the event that gives rise to the indemnity. See, Reynolds v. Doyle, (1849) 1 M&G 753.

## II.    Express And Implied Indemnity Under A Contract

29.    In the absence of an express contract for indemnity providing otherwise, a cause of action for indemnity accrues when liability to a third party is determined and that liability is discharged by way of settlement or payment of an award or judgment.

30.    As stated in the leading treatise Chitty on Contract Vol. 1, ¶ 28-049, the pertinent pages of which are Exhibit 4 hereto, in respect of these propositions:

> **Indemnity against Liability.** Where a contract of indemnity is to indemnify a person against liability to a third party (eg under a liability insurance policy), the general modern rule is that the limitation period starts to run when the indemnifying party's liability is established by judgment, arbitration or binding settlement. However, that general rule is subject to the construction of the contract of indemnity. This may mean that the indemnifying party is liable as soon as the indemnified party is liable (that is, even before any establishing of that liability by, for example, judgment). At the other extreme, the contract may on its true construction provide that the indemnity is conditional on actual payment by the indemnified party in which case the cause of action will accrue only when such payment has been made. [footnotes omitted]

31.    In Telfair Shipping Corp. v. Inersea Carriers S.A. (The "CAROLINE P"), [1984] 2 Lloyd's Rep. 466 [Q.B. (Com. Ct.)] the Commercial Court considered the issue of the accrual of a shipowner's claim against a vessel charterer for indemnity in respect of a cargo receivers' cargo damage claim.

32.    The Court held in material part:

> . . . even if the indemnity is to be construed as an indemnity against the incurring of liability such an indemnity could not have been invoked by the owners until they had incurred some actual liability to the receivers.

Id. at 476 (emphasis in original).

### E.   ENGLISH LAW ON CONSTRUCTION OF THE STATED CAUSE OF ACTION

33.   The English Commercial Court will construe a complaint based on its factual allegations not simply on how the plaintiff chooses to label or plead its cause of action, i.e., breach of contract or for indemnity.

### F.   APPLICATION OF ENGLISH LAW TO THE INDEMNITY CLAIMS IN THE AMENDED COMPLAINT

#### I.   THE MOA CLAIMS

34.   As discussed above, Eitzen's failure to pay in full or "claimed ... deduction" from the termination fees owing under the Termination Agreements is a dispute by and between Exmar and Eitzen under those agreements, for which no indemnification liability on the part of Polar arises in respect of the Exmar/Polar MOAs. Even if such a right of indemnity could arise, it would only accrue if and when Exmar's liability to Eitzen has been determined in the arbitrations of the disputes under the Termination Agreements.

35.   In reality, Exmar's claims against Polar under the Polar/Exmar MOAs can only arise upon the London arbitrators finding an actual liability on the part of Exmar to Sigas under the "Exmar/SIGAS MOAs," which has not occurred, and which is not anywhere close to occurring given no steps at all have been taken in the "Exmar/SIGAS MOAs" arbitrations since the initial appointment of arbitrators.

36.    Exmar's right to indemnity from Polar will only accrue if and when its liability to Sigas has been determined in the arbitrations of the disputes under the "EXMAR/SIGAS MOAs".

## II.    THE SPEED CLAIMS

37.    Under the same principles as above, Exmar has not incurred any actual liability to Eitzen in respect of its speed claims under its contracts with Eitzen, i.e., the Three Charters.

38.    Unless and until Eitzen prevails on its claims against Exmar Polar has only a contingent indemnity liability to Exmar.

## G.    ENGLISH LAW GOVERNING CHARTERER'S DEDUCTION FROM HIRE FOR CARGO CLAIMS

39.    The Polar Charterer's deduction from sub-charter hire owing to Exmar in respect of an alleged cargo claim was plainly wrongful.

40.    The obligation to pay hire is an "absolute" one. See, Tankexpress v. Cie. Financime Belge des Pétroles, (1948) 82 LL.L. Rep. 43, 55 [1947] A.C. 76, [1949] L.J.R. 179, [1948] 2 All. E.R. 929 [H.L.].

41.    The English Courts have consistently held that a charterer has no right to set-off cargo damage claims against hire, the only right to set-off against hire being in respect of breaches of charter by the owners which has deprived the charterers of the use of the ship (See e.g. The Nanfri [1978] 1 Lloyd's Rep. 581, The Aliakmon Progress [1978] 2 Lloyd's Rep 499, The Leon [1985] 2 Lloyd's Rep 470).

42.    The Polar Charterer's alleged cargo damage claim plainly did not deprive the Polar Charterer the use of the vessel and the deduction made from sub-charter hire owing to Exmar was therefore plainly unlawful.

H.    **APPLICATION OF ENGLISH LAW TO THE HIRE DEDUCTION CLAIM**

43.    Exmar has a valid claim for the outstanding balance of sub-charter hire against the Polar Charterer for the Polar Charterer's unlawful deduction from sub-charter hire for its cargo claim.

44.    The Polar Charterer's claim for cargo damage has not, by all accounts, been timely submitted by way of arbitration and would therefore appear to be time-barred.

45.    Exmar has a right to demand arbitration against the Polar Charterer for payment of the balance of its sub-charter hire.

46.    The Polar Charterer does not have a right of equitable set-off for its cargo claim.

47.    Even if the Polar Charterer's claim for cargo damage is not time-barred and could still be advanced against Exmar, that claim would need to be submitted to arbitration (and contested by Exmar) and the right to an indemnity from Polar could only accrue if and when Exmar's liability to the Polar Charterer has been determined in that arbitration.

48.    I declare under penalty of perjury of the laws of the United States that the

foregoing is true and correct.

Dated: February 15, 2008
at London, England

NICHOLAS BURGESS

# EXHIBIT 1

Tripartite Termination Agreement
Polar Belgica

This Agreement is entered into on this 12th September 2006, by and between

1)  Polar Shipping Co., Ltd. Japan, of Japan with its registered office at 8-55, Kokubu 1-chome, Imabari City, Ehime, Japan (hereinafter referred to as "Polar")

2)  Exmar Shipping nv, of Belgium, with its registered office at De Gerlachekaai 20, 2000 Antwerpen and with Company Number 0860.978.334 (hereinafter referred to as "Exmar"); and

3)  Eitzen Gas A/S, of Denmark, with its registered office at Smakkedalen 8, DK – 2820 Gentofte, Denmark (hereinafter referred to as "Eitzen")

WHEREAS,

A.  Polar Shipping S.A., of Panama is the registered owner of the LPGC "Polar Belgica" (the "Vessel"), and entered into A INSTALLMENT SALE AGREEMENT dated 27th April, 2004 with Polar;

B.  Exmar, as charterer, entered into a Charter-party dated 20 April 2004 with Polar, as disponent owner, for the chartering of the Vessel for a period of 5 years (the "Head Charter");

C.  Eitzen, as charterer, entered into a Charter-party dated 1 May 2005 with Exmar, as disponent owner, for the chartering of the Vessel up to June 24, 2009 (the "Sub Charter") (the Head Charter and the Sub Charter together are hereinafter referred to as the "Charters");

D.  Polar and Exmar have entered into a Memorandum of Agreement ("the Polar MOA") dated the date hereof, for the sale and purchase of the Vessel by Polar to Exmar;

E.  Exmar and Eitzen have entered into a Memorandum of Agreement ("the Exmar MOA") dated the date hereof, for the sale and purchase of the Vessel by Exmar to Eitzen; (the Polar MOA and the Exmar MOA together are hereinafter referred to as the "MOA's").

IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:

1.  Up on and subject to the fulfillment of the conditions set out in Clause 2 hereof, the Charters shall be terminated with immediate effect;

2.  The termination of the Charters shall be subject to following cumulative conditions:

    a.  the signing by Polar and Exmar of a protocol of delivery and acceptance of the Vessel in accordance with the Polar MOA;

    b.  the signing by Exmar and Eitzen of a protocol of delivery and acceptance of the Vessel in accordance with the Exmar MOA;

    c.  the receipt by Exmar of the sum of USD 3,990,000.- (the "Termination Fee") payable by Eitzen to Exmar as a compensation for the termination of the Sub

Charter, the Termination Fee shall be payable by Eitzen to the account designated by Exmar.

3.    10% of the Termination Fee (the "Deposit") shall be paid within 3 banking days from the date of signing of this Agreement, in an interest bearing joint account.

4.    The balance (90% of the Termination Fee) shall be paid (in full, without any set-off for any outstanding claims) concurrently with the balance of the purchase price under the Exmar MOA, on an account nominated by Exmar.

5.    Notwithstanding anything to the contrary contained herein or in any of the MOA's, so long as the conditions set out in Clause 2 hereof are not fulfilled, the Charters shall continue in full force and effect (including but not limited to the purchase options contained therein) until terminated in accordance with their respective provisions.

6.    The termination of the Charters shall be without prejudice to any rights or obligations of the Parties accrued but not settled under the Charters prior to its termination.

7.    This Agreement shall terminate on 31 October 2006 unless extended by mutual agreement.

8.    This Agreement shall be subject to the Laws of England and the Parties hereto agree to submit all and any disputes arising hereunder to the non-exclusive jurisdiction of an arbitration panel in London, composed and ruling in accordance with the LMAA rules 2006.

In witness whereof the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the date first herein mentioned:

For and on behalf of
Polar Shipping Co. Ltd. Japan

By:

Name:
Title:    *President : Makoto Abe*

For and on behalf of
Eitzen Gas A/S

By: _____

Name:
Title:

For and on behalf of
Exmar Shipping nv

By:

Name: PATRICK DE BRABANDERE
Title: Director

*acknowledged by*

For and on behalf of
Polar Shipping S.A.

By:

Name:
Title:    *President : Makoto Abe*

# EXHIBIT 2

## Tripartite Termination Agreement
## Polar Discovery

This Agreement is entered into on this 12th September 2006, by and between

1) <u>Polar Shipping Co., Ltd. Japan</u>, of Japan with its registered office at 8-55, Kokubu 1-chome, Imabari City, Ehime, Japan (hereinafter referred to as "**Polar**")

2) <u>Exmar Shipping nv</u>, of Belgium, with its registered office at De Gerlachekaai 20, 2000 Antwerpen and with Company Number 0860.978.334 (hereinafter referred to as "**Exmar**"); and

3) <u>Eitzen Gas A/S</u>, of Denmark, with its registered office at Smakkedalen 8, DK – 2820 Gentofte, Denmark (hereinafter referred to as "**Eitzen**")

WHEREAS,

A. Polar Shipping S.A., of Panama is the registered owner of the LPGC "Polar Discovery" (the "**Vessel**"), and entered into A INSTALLMENT SALE AGREEMENT dated 27th April, 2004 with Polar;

B. Exmar, as charterer, entered into a Charter-party dated 20 April 2004 with Polar, as disponent owner, for the chartering of the Vessel for a period of 5 years (the "**Head Charter**");

C. Eitzen, as charterer, entered into a Charter-party dated 1 May 2005 with Exmar, as disponent owner, for the chartering of the Vessel up to June 24, 2009 (the "**Sub Charter**") (the Head Charter and the Sub Charter together are hereinafter referred to as the "**Charters**");

D. Polar and Exmar have entered into a Memorandum of Agreement ("the Polar MOA") dated the date hereof, for the sale and purchase of the Vessel by Polar to Exmar;

E. Exmar and Eitzen have entered into a Memorandum of Agreement ("the Exmar MOA") dated the date hereof, for the sale and purchase of the Vessel by Exmar to Eitzen; (the Polar MOA and the Exmar MOA together are hereinafter referred to as the "**MOA's**").

IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:

1. Up on and subject to the fulfillment of the conditions set out in Clause 2 hereof, the Charters shall be terminated with immediate effect;

2. The termination of the Charters shall be subject to following cumulative conditions:

   a. the signing by Polar and Exmar of a protocol of delivery and acceptance of the Vessel in accordance with the Polar MOA;

   b. the signing by Exmar and Eitzen of a protocol of delivery and acceptance of the Vessel in accordance with the Exmar MOA;

   c. the receipt by Exmar of the sum of USD 3,820,100.- (the "**Termination Fee**") payable by Eitzen to Exmar as a compensation for the termination of the Sub



Charter; the Termination Fee shall be payable by Eitzen to the account designated by Exmar.

3.   10% of the Termination Fee (the "Deposit") shall be paid within 3 banking days from the date of signing of this Agreement, in an interest bearing joint account.

4.   The balance (90% of the Termination Fee) shall be paid (in full, without any set-off for any outstanding claims) concurrently with the balance of the purchase price under the Exmar MOA, on an account nominated by Exmar.

5.   Notwithstanding anything to the contrary contained herein or in any of the MOA's, so long as the conditions set out in Clause 2 hereof are not fulfilled, the Charters shall continue in full force and effect (including but not limited to the purchase options contained therein) until terminated in accordance with their respective provisions.

6.   The termination of the Charters shall be without prejudice to any rights or obligations of the Parties accrued but not settled under the Charters prior to its termination.

7.   This Agreement shall terminate on 31 October 2006 unless extended by mutual agreement.

8.   This Agreement shall be subject to the Laws of England and the Parties hereto agree to submit all and any disputes arising hereunder to the non-exclusive jurisdiction of an arbitration panel in London, composed and ruling in accordance with the LMAA rules 2006.

In witness whereof the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the date first herein mentioned:

For and on behalf of
Polar Shipping Co. Ltd, Japan

By:
Name:
Title:     *President : Makoto Abe*

For and on behalf of
Eitzen Gas A/S

By: _____
Name:
Title:

For and on behalf of
Exmar Shipping nv

By:
Name: PATRICK DE BRABANDERE
Title: Director

*acknowledged by*

For and on behalf of
Polar Shipping S.A.

By:
Name:
Title:     *President : Makoto Abe*

**EXHIBIT 3**

GEORGE O. FREEHILL
WILLIAM L. JUSKA, JR.
JAMES L. ROSS*
ERIC E. LENCK
JOHN J. WALSH*
PATRICK J. BONNNR*
PETER J. GUTOWSKI
MARK F. MULLER
WAYNE D. MEEHAN*
DON P. MURNANE, JR ∆
THOMAS M. RUSSO
THOMAS M. CANEVARI*
MICHAEL FERNANDEZ*
JOHN F. KARPOUSIS*∆
MICHAEL E. UNGER*
WILLIAM J. PALLAS*
GINA M. VENEZIA*∆
BARBARA G. CARNEVALE*
MANUEL A. MOLINA
LAWRENCE J. KAHN*
JUSTIN T. NASTRO*
PAMELA L. SCHULTZ*
DANIEL J. FITZGERALD*∆
JILL A. TAFT
MICHAEL C. ELLIOTT*

* ALSO ADMITTED IN NEW JERSEY
† ALSO ADMITTED IN CONNECTICUT
∆ ALSO ADMITTED IN WASHINGTON, D.C.
✦ ALSO ADMITTED IN LOUISIANA

**LAW OFFICES OF**
**FREEHILL HOGAN & MAHAR LLP**
**80 PINE STREET**
**NEW YORK, N.Y. 10005-1759**

TELEPHONE (212) 425-1900
FACSIMILE (212) 425-1901
E-MAIL: reception@freehill.com
www.freehill.com

NEW JERSEY OFFICE
550 BERGEN AVENUE
JERSEY CITY, N.J. 07306
TELEPHONE (973) 623-5514
FACSIMILE (973) 623-3813

CONNECTICUT OFFICE
23 OLD KINGS HIGHWAY SOUTH
DARIEN, CT 06820-4539
TELEPHONE (203) 921-1913
FACSIMILE (203) 358-8377

December 20, 2007

OUR REF: 527-06/ROSS

**VIA FAX NO: 212 805-7901**

The Honorable Harold Baer, Jr.
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 2230
New York, NY 10007

Re:   Exmar Shipping N.V.  v. Polar Shipping S.A. and Polar Shipping Co., Ltd.
06-cv-12991(HB)

Dear Judge Baer:

This letter is to provide the Court with a status report on the captioned matter, which involved a Rule B attachment of $1,604,540.14 relating to several maritime claims by the Plaintiff against the Defendant. As evident from the Amended Verified Complaint, the facts and surrounding circumstances are fairly complex. The claims involve four (4) parties and thirteen (13) independent maritime contracts, each of which call for London arbitration. Unlike New York arbitration, which allows for consolidated arbitrations involving maritime contracts/disputes being heard by one Panel, English law does not allow arbitrators to consolidate different arbitration references unless there is the agreement of all the parties to such consolidation. Arbitrators have been appointed by all the parties in each of the references being dealt with in London arbitration. There is not yet any agreement to consolidate all the references so at present each reference is proceeding separately. Before providing you with a status on the

NYDOCS1/295575.1

NO.296  P003

December 20, 2007
Page 2

claims, we believe it would be helpful to provide you with a brief outline of the parties, maritime contracts and pending claims relating to these contracts.

## THE PARTIES

Defendant Polar Shipping S.A. ("POLAR") was the owner of the vessels POLAR BELGICA, POLAR DISCOVERY and POLAR ENDURANCE.

Plaintiff Exmar Shipping N.V. ("EXMAR") was the charterer of the above three vessels and purchaser of the three vessels from POLAR.

Eitzen Gas, A.S. ("EITZEN") was the sub-charterer of the three vessels from EXMAR.

Sigas (Singapore) Pte. Ltd. ("SIGAS") was a related company to EITZEN and the purchaser of the three POLAR vessels from EXMAR.

## THE MARITIME CONTRACTS

In conjunction with the sale of the three vessels from POLAR to EXMAR and from EXMAR to SIGAS, there existed three Memorandum of Agreements ("MOAs") reflecting the terms and conditions of the sale. There were three MOAs (one for each vessel) between POLAR and EXMAR and three MOAs having the same terms between EXMAR and SIGAS. It was contemplated that the three vessel sales from POLAR to EXMAR and EXMAR to SIGAS were to be completed on the same day.

At the time of the sales, charter party agreements were in place between POLAR and EXMAR relating to each vessel and charter party agreements having the same terms were in place between EXMAR and EITZEN, the sub-charterer of the three vessels.

NYDOCS1/295575.1

December 20, 2007
Page 3

The sale of the three vessels from POLAR to EXMAR and from EXMAR to SIGAS contemplated a termination of the aforementioned charter party agreements between POLAR and EXMAR and EXMAR and EITZEN. Consequently, POLAR, EXMAR and EITZEN entered into a Tripartite Termination Agreement ("TTA") which terminated the six charter parties. Under the TTA, EXMAR was to be paid a termination fee for each vessel by EITZEN.

## BREACH OF MOA CONTRACTS

The sale terms of the POLAR vessels required each vessel to be free from deficiencies at the time of the sale. However, surveyors employed by the Vessel Classification Society and SIGAS the ultimate buyer, found deficiencies with regard to the POLAR BELGICA and POLAR DISCOVERY. Consequently, this was viewed as a breach of the MOA agreements. Under the circumstances, EITZEN, a related company of SIGAS, withheld part of the termination fees on both vessels which were due EXMAR under the TTA. These amounted to roughly $705,000, as alleged in the Amended Verified Complaint. In turn, EXMAR claimed this sum from POLAR under their MOAs.

## STATUS OF THE MOA CLAIMS

We have been advised by London counsel for EXMAR that arbitrators had been appointed to resolve the EXMAR/SIGAS MOAs dispute concerning the POLAR BELGICA and POLAR DISCOVERY. In turn, EXMAR and POLAR had appointed their arbitrators under their MOAs relating to the same vessels and claims, but the third arbitrator in these two MOA disputes has not yet been selected. Given the fact that these arbitrations will prove costly, we understand that settlement discussions are ongoing among London counsel representing all of the parties.

NYDOCS1/295575.1

NO.296    P005

## BREACH OF C/P CONTRACTS RELATING TO
## SPEED AND PERFORMANCE CLAIMS

In addition to the MOA arbitrations, there are separate arbitrations pending regarding speed and performance claims under each of the charter parties. In each charter party, there was a warranty that the vessel would achieve a "guaranteed speed" of "about 15 knots". Under the sub-charter parties EITZEN claims damages in the area of $900,640.07 against EXMAR on the ground that the three vessels underperformed. In turn, EXMAR has asserted the same claims against the vessel Owners POLAR under their charter party agreements.

Arbitration Panels have been formed in these arbitrations and log books for each of the three vessels had been provided by POLAR and are being reviewed by EXMAR's experts to determine whether, in fact, all three vessels underperformed.    In the EXMAR/POLAR arbitration proceedings, POLAR has made a counter-claim alleging that the vessels actually over-performed and contend that there is a sum due POLAR of $400,000 in relation to the three vessels.

Once the vessel log books are reviewed by EXMAR's experts, claim submissions will be served against POLAR in the arbitrations.    POLAR at present deny that there is any underperformance in relation to all three vessels. POLAR has forwarded to EXMAR their claim for overperformance contending there is a sum due to them of over U.S.$400,000 in relation to the three vessels. POLAR has not yet served any claim submissions against EXMAR for this sum.

NYDOCS1/295575.1

NO.296    ᑭ001

December 20, 2007
Page 5

## CARGO CLAIM
### RE: POLAR ENDURANCE

2007 DEC 20  PM 1 26

A cargo claim under the charter party had been submitted against EXMAR in the sum of $179,528.45 for alleged loss/damage of ethylene. This claim was then asserted by EXMAR against POLAR as reflected in the Amended Verified Complaint. As POLAR apparently had P & I insurance covering this claim, EXMAR agreed to accept a P & I Letter of Undertaking (LOU) as substitute security for $275,000 in attached funds. Consequently, by Order of this Court, the $275,000 were released and EXMAR was provided with the aforementioned LOU.

We understand that the parties are looking into the possibility of an amicable resolution in order to avoid the time and inherent costs for proceeding with all of the arbitrations. As alleged in the Rule B Amended Verified Complaint (¶44(e)) which we had filed in Court, we anticipate the arbitration proceedings could take three years. Needless to say, we are hopeful that these various disputes involving substantial sums of money can be amicably resolved short of taking each dispute to a final award.

Respectfully submitted,
FREEHILL HOGAN & MAHAR, LLP

James L. Ross

ROSS:lu

cc:    Blank Rome, LLP
       Attorneys for Defendants
       405 Lexington Avenue
       New York, New York 10174
       Attention: Jeremy J. O. Harwood, Esq.
       **Fax: 212 885-5001**

# EXHIBIT 4

**Principal and surety.** Unless otherwise agreed in the contract of guarantee, **28–046**
the liability of the surety to the creditor arises on the principal debtor's default,
so that time begins to run in favour of both of them at that moment.[190] If the
surety undertakes to pay on demand, a demand is a condition precedent to
liability and the creditor's cause of action accrues only when a demand is made
and not complied with:[191] Where it was agreed that the guarantee should be a
continuing one and should apply to the balance that was then or might at any time
thereafter be owing, it was held that this was a guarantee of each debit balance
as it was constituted, so that the cause of action accrued not when each advance
was made to the principal debtor, but when the debit balance in question was
constituted.[192]

Unless otherwise agreed, the surety's implied right to an indemnity from the **28–047**
principal debtor accrues when the surety's liability to the creditor is ascertained,
and time runs from that moment.[193] If a surety pays a statute-barred debt, he
cannot recover the amount from the principal debtor.[194]

As between co-sureties, the right to contribution of one who has paid more **28–048**
than his share accrues at the time of such payment,[195] and of one who has been
called upon to pay the whole of the debt at the time the claim of the creditor
against him is established.[196] It is immaterial that, at the time of the action for
contribution, time has run out between the creditor and the co-surety.[197]

**Indemnity against liability.** Where a contract of indemnity is to indemnify a **28–049**
person against liability to a third party (eg under a liability insurance policy), the
general modern rule is that the limitation period starts to run when the indemnify-
ing party's liability is established by judgment, arbitration or binding settle-
ment.[198] However, that general rule is subject to the construction of the contract
of indemnity.[199] This may mean that the indemnifying party is liable as soon as
the indemnified party is liable (that is, even before any establishing of that

---

[190] *Parrs Banking Co v Yates* [1898] 2 Q.B. 460.

[191] *Re Brown's Estate* [1893] 2 Ch. 300; *Bradford Old Bank v Sutcliffe* [1918] 2 K.B. 833; *Esso Petroleum Co Ltd v Alstonbridge Properties Ltd* [1975] 1 W.L.R. 1474; *Bank of Baroda v Patel* [1996] 1 Lloyd's Rep. 390.

[192] *Wright v New Zealand Farmers' Co-operative Association* [1939] A.C. 439. *cf. Hartland v Jukes* (1863) 1 H. & C. 667.

[193] *Wolmershausen v Gullick* [1893] 2 Ch. 514; *Re Richardson* [1911] 2 K.B. 705, 709.

[194] *Coneys v Morris* [1922] 1 Ir.R. 81.

[195] *Davies v Humphreys* (1840) 6 M. & W. 153; *Re Snowdon* (1881) 17 Ch.D. 44.

[196] *Wolmershausen v Gullick*, above; *cf. Robinson v Harkin* [1896] 2 Ch. 415 (contribution between co-trustees).

[197] *Wolmershausen v Gullick*, above.

[198] *County & District Properties Ltd v C. Jenner & Son Ltd* [1976] 2 Lloyd's Rep. 728 (Swanwick J.); *R. H. Green & Silley Weir v British Railways Board* [1985] 1 W.L.R. 570 (Dillon J.); *Telfair Shipping Corp. v Inersea Carriers SA* [1985] 1 W.L.R. 553 (Neill J., who distinguished an indemnity against liability from a general indemnity, express or implied); *Bradley v Eagle Star Insurance Co Ltd* [1989] A.C. 957; *North Atlantic Insurance Co Ltd v Bishopsgate Insurance Co Ltd* [1998] 1 Lloyd's Rep. 459; *City of London v Reeve & Co Ltd* [2000] Build. L.R. 211, 215.

[199] *Telfair Shipping Corp. v Inersea Carriers SA* [1985] 1 W.L.R. 553, 566; *Firma C-Trade S.A. v Newcastle Protection and Indemnity Association* [1991] 2 A.C. 1; *Total Liban SA v Vitol Energy SA* [1999] 2 Lloyd's Rep. 700.

liability by, for example, judgment).[200] At the other extreme, the contract may on its true construction provide that the indemnity is conditional on actual payment by the indemnified party in which case the cause of action will accrue only when such payment has been made.[201]

**28–050**      **Non-liability insurance.** Under a non-liability insurance policy, a cause of action would appear to accrue, in the case of insurance against loss, when the casualty causing the loss occurs[202]; and in the case of life or accident insurance, upon the occurrence of the event which gives rise to the claim.[203] But regard must be had to the terms of the policy; on its true construction it may be that the liability of the insurer will not arise unless and until a claim is made or certain other conditions are satisfied.[204]

**28–051**      **Civil Liability (Contribution) Act 1978.** In respect of the special two-year period of limitation[205] for claiming contribution under s.1 of the Civil Liability (Contribution) Act 1978, the right of action to recover contribution accrues on the date on which judgment is given or an arbitral award made.[206] In the absence of any judgment or award, if the person entitled to recover contribution in respect of any damage makes or agrees to make any payment to one or more persons in respect of that damage (whether he admits any liability in respect of the damage or not), time begins to run from the earliest date on which the amount to be paid by him is agreed between him (or his representative) and the person (or each of the persons, as the case may be) to whom the payment is to be made.[207]

**28–052**      **Sale of goods.** In a contract of sale of goods, the property in which has passed to the buyer,[208] the seller's right of action for the price accrues at the time for payment specified in the contract or, if no time is specified, when the seller informs the buyer that he is ready and willing to deliver the goods.[209] If the sale is upon credit, the right of action accrues upon the expiry of the period allowed.[210] The buyer's right of action for breach of the implied term as to title accrues at the time of sale or (in the case of an agreement to sell) at the time when

---

[200] *Bosma v Larsen* [1966] 1 Lloyd's Rep. 22.
[201] *Firma C-Trade SA v Newcastle Protection and Indemnity Association* [1991] 2 A.C. 1.
[202] *Chandris v Argo Insurance Co Ltd* [1963] 2 Lloyd's Rep. 65, approved in *Castle Insurance Co Ltd v Hong Kong Islands Shipping Co Ltd* [1984] A.C. 226. See also *Scott Lithgow v Secretary of State for Defence* (1989) 45 Build. L.R. 1, HL; *Firma C-Trade SA v Newcastle Protection and Indemnity Association* [1991] 2 A.C. 1, 35; *Bank of America National Trust and Savings Assn v Chrismas* [1994] 1 All E.R. 401; *Callaghan v Dominion Insurance Co Ltd* [1997] 2 Lloyd's Rep. 541; *Universities Superannuation Scheme Ltd v Royal Insurance (UK) Ltd* [2000] 1 All E.R. (Comm) 266.
[203] *Re Haycock's Policy* (1876) 1 Ch.D. 611; *London & Midland Bank v Mitchell* [1899] 2 Ch. 161. See also *Virk v Gan Life Holdings plc* (2000) 52 B.M.L.R. 207.
[204] *Virk v Gan Life Holdings plc* (2000) 52 B.M.L.R. 207.
[205] Limitation Act 1980, s.10(1); above, para.28–014.
[206] s.10(2), (3).
[207] s.10(2), (4). In *Knight v Rochdale Healthcare NHS Trust* [2003] EWHC 1831 (QB); [2003] 4 All E.R. 417 it was held that time ran from the date of the agreement even though that agreement was later embodied in a consent order: that is, s.10(4) of the Limitation Act 1980 applied, not s.10(3).
[208] Sale of Goods Act 1979, s.49(1). But see s.49(2).
[209] *ibid.* s.28.
[210] *Helps v Winterbottom* (1831) 2 B. & Ad. 431.