FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
EXMAR SHIPPING N.V.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900 / Fax: (212) 425-1900
James L. Ross (JR 6411)
Manuel A. Molina (MM 1017)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

EXMAR SHIPPING N.V.,

    Plaintiff,

  -against-

POLAR SHIPPING S.A. and
POLAR SHIPPING CO., LTD.,

    Defendants.

------------------------------------------------------x

**06 CIV 12991 (HB)**

**DECLARATION
OF
<u>STUART DENCH</u>**

   I, STUART DENCH, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

   1.  I am a member of the firm of English Solicitors, Lax & Co. LLP with offices at 78 Cornhill, London, England. I was admitted as a Solicitor of the Supreme Court of England and Wales on 15 September 1998. My field of practice since admission as a Solicitor has been in shipping litigation, primarily dealing with charter party and sale and purchase disputes before the English High Court and London arbitration Tribunals.

   2.  I have read the Declaration of Nicholas Burgess dated February 15, 2008, and have been asked to comment upon the opinion and views expressed in the Declaration.

A.    **THE ARBITRATIONS UNDER THE POLAR/EXMAR MOAS**

3.    I find Mr. Burgess' Declaration is somewhat misleading and disingenuous.  His statement criticizes the December 20, 2007 status report sent to the Court by Freehill Hogan & Mahar on the ground that certain details have been omitted and that the report fails to confirm that the Panel of arbitrators has been "fully constituted by appointment of third arbitrators".  While the status report may omit some details, these omissions are of no legal consequence and the status report accurately represented the status of the claims in arbitration at that time.  In fact, the status report on page 3 states that a third arbitrator has not been appointed.  This was the position in both the Exmar/SIGAS and Polar/Exmar arbitrations concerning the MOA disputes.

4.    As an experienced solicitor, Mr. Burgess knows full well that it is quite common in London arbitration proceedings that a "third" arbitrator is never actually appointed.  The reason for this is that parties are normally happy to save the costs of having a third arbitrator involved if the case can be decided by two appointed arbitrators.  As such, the "third" arbitrator is never actually appointed or if he is appointed, he is only appointed at a very late stage (*e.g.* just before an oral hearing).  Thus it is misleading for Mr. Burgess to try to make a point out of the fact that only two arbitrators have been appointed in each proceeding (Burgess Decl. ¶12).

5.    It is also disingenuous for Mr. Burgess to state that "settlement attempts have not delayed the arbitration between Exmar and Polar, nor the arbitrations between SIGAS and Exmar" (Burgess Decl. ¶15).  All of the parties have exchanged documentation and engaged in settlement discussions in an effort to avoid the costs of pursuing all arbitrations to the point of obtaining a final award.  The progress of London arbitration proceedings conducted under the LMAA terms, such as the ones in question,  is largely of the parties' making.  If Polar was

unhappy with the progress of any of the arbitrations, they could have made an application to any of the arbitration Tribunals for the proceedings to be expedited.

6.       As part of these settlement discussions, all parties namely Polar, Eitzen/SIGAS and Exmar have agreed to attend a formal Mediation hearing on April 22, 2008, in an effort to amicably resolve all of the disputes.  Obviously, there is little point in the parties incurring significant legal costs in progressing each of the arbitrations while attempts to amicably resolve the disputes are ongoing.  Thus, for Mr. Burgess to suggest that the settlement discussions have not "delayed the arbitrations" is disingenuous.  To date, Exmar has incurred approximately GBP 12,000 in defending the MOA and charter party arbitrations of Eitzen/SIGAS.

7.       The Exmar claims against Polar under the MOAS are not indemnity claims.  They are direct claims for breach of those MOA contracts.  The sale of the vessels from Polar to Exmar required the vessels to be free from deficiencies at the time of the sale.  Assuming that there were deficiencies regarding the POLAR BELGICA and POLAR DISCOVERY, this would give rise to a direct claim by Exmar against Polar under their contracts of sale for breach of warranty.  While a similar claim is pending against Exmar by Eitzen/SIGAS, the purchaser of the vessels from Exmar, that claim is subject to a different arbitration proceeding and Exmar could directly sustain its claim against Polar in their arbitration proceeding, regardless of the outcome of the arbitration between Exmar and Eitzen/SIGAS.

**B.       THE HIRE DEDUCTION CLAIM**

8.       The alleged hire deduction claim in the sum of $179,528.45 referred to in Burgess Decl. ¶¶ 16-20 is not relevant to these proceedings.  The reason for this is that $275,000 of funds originally attached in relation to this claim had been released to Polar in exchange for a P & I

Club Letter of Undertaking. Thus, this claim is no longer secured by any of the currently attached funds.

## C.   THE SPEED CLAIMS

9.      I fail to see how Mr. Burgess can state that the December 20, 2007 status report gives a wrong impression (Burgess Decl. ¶¶ 26-27). This report correctly states that "Once the vessel log books are reviewed by Exmar's experts, claim submissions will be served against Polar". In fact, this review has partially been concluded and claim submissions were served by Exmar on Polar regarding the POLAR BELGICA (attached as Exhibit A) and the POLAR ENDURANCE (attached as Exhibit B). Exmar's expert is still reviewing the log books for the POLAR DISCOVERY speed claim and once that review has been completed, claim submissions will then be served in that arbitration reference as well.[1]

In each of the three charter party contracts entered into between Polar and Exmar, Polar made a contractual warranty that the vessel would achieve a "guaranteed speed" of "about 15 knots". The charter party speed claims pending by Exmar against Polar allege a breach of this warranty. While a similar breach of warranty claim has been presented against Exmar by Eitzen/SIGAS, this fact does not convert the claims by Exmar against Polar into "contingent indemnity" claims. The claims are subject to different arbitration proceeding (i.e. Eitzen/SIGAS v. Exmar and Exmar v. Polar) and involve different amounts due to different hire rates and charter party periods. It is quite conceivable that there could be inconsistent results and Exmar can sustain its claim against Polar regardless of the outcome of the arbitration between Exmar and Eitzen/SIGAS.

---

[1] It should also be noted that while Polar may have claimed they had a claim for $400,000 against EXMAR, they have never served any claim submission in the arbitration for this alleged counter-claim and the dollar amount claimed ($400,000) is completely unsupported.

**D.    ENGLISH LAW AS IT RELATES TO ACCRUAL OF A CAUSE OF ACTION FOR INDEMNITY**

10.    As indicated above (¶7 and ¶9), under English law all of the claims under the MOAS and charter parties between Exmar and Polar are direct claims for breach of warranty/contract.  They are clearly not causes of action for indemnity and the complaint filed with the Court does not allege any action for indemnity.  However, since I do not agree with Mr. Burgess on his analysis of English law as it relates to those claims, Freehill Hogan & Mahar have asked that I address his Declaration on these points below.

**I.     UNDER ENGLISH COMMON LAW**

11.    Mr. Burgess cites the decision of *Reynolds v. Doyle*, (1849) 1 M & G 753 (Burgess Decl. ¶28) as authority for the legal position on a contract of indemnity.  Our case does not concern a "contract for indemnity" and therefore the *Reynolds* decision has no relevance.  None of the MOAS or charter parties contain indemnity language and they are certainly not contracts of indemnity.

**II.    EXPRESS AND IMPLIED INDEMNITY UNDER A CONTRACT**

12.    Mr. Burgess' comments on English law in Paragraphs 29 through 32 also deal with contracts for an indemnity and have no relevance to our case.  Our case does not concern "contracts for indemnity".  Under each contract for which Exmar is bringing a claim against Polar, Exmar is seeking damages for breach of contract by Polar.  Thus, Mr. Burgess' comments on "indemnity claims" are completely irrelevant.

13.    Exmar's claims against Polar under both MOAS are claims for breach of contract. The fact that there has been a partial deduction made under one of the TT Agreements by

Eitzen/SIGAS does not change this fact. The deduction only constitutes one element of the measure of damages that Exmar has against Polar for allegedly breaching the MOAS agreements between Polar and Exmar. The charter party speed claims of EXMAR (Burgess Decl. ¶37) against POLAR are also direct claims for breach of contract.

14.    The reference to "indemnity against liability" is also misleading. Mr. Burgess refers to and encloses some pages from the treatise <u>Chitty on Contract</u> (Burgess Exhibit 4), but neglects to attach further pages which I now submit (attached as Exhibit C). These confirm that, under English law, the accrual of a cause of action is at the time of the breach:

> <u>General Rule in Contract:</u> The general rule in contract is that the cause of action accrues, not when the damage is suffered, but when the breach takes place...the gist of an action for breach of contract is the breach, and not any resulting damages which may be occasioned thereby. Consequently, the Act runs from the time when the contract is broken and not from the time at which any damage resulting there from is sustained by the claimant. (Vol. I at 28-032).

15.    In view of the above, the Exmar claims for breach of the MOA contracts and Charter Party contracts between Polar and Exmar accrued and were ripe at the time of the breach and prior to the commencement of the attachment litigation filed on November 30, 2007.

16.    Further, it is clear that under English law (see *Telfare Shipping Corps v. Inersea Carriers, S.A.* (the "CAROLINE P") [1984] 2 Lloyd's Rep. 466 (2.B) Com. Ct.)), that a cause of action based on breach as with the Exmar claims against Polar will run from the date of breach by Polar and not when Exmar is found liable to and pays damages to Eitzen/SIGAS. A copy of the CAROLINE P decision is attached to my Declaration as Exhibit D. The only part of this decision Mr. Burgess refers to is in relation to claims for an implied indemnity. For reasons already submitted that has no relevance to the claims here.

In the CAROLINE P, the claimants only sought an indemnity pursuant to an implied term. They did not pursue a claim for damages based upon breach of contract, like Exmar is pursuing against Polar in this case. A review of the CAROLINE P judgment makes very clear that where an "indemnity" claim is pursued as a breach of contract claim that cause of action arises at the moment of the breach. On page 474 of the judgment, Neill J. states:

> From a consideration of these cases and other authorities to which my attention was directed it seems to me that it is possible to identify at least three ways in which a person (A) who has become liable to (B) may be able to obtain redress from (C).
>
> The first way is by an action for damages for breach of contract (or warranty). In such a case (A) will be in a position to claim that the incurring of his liability to (B) flowed directly from an act of (C) which constituted a breach of contract between (A) and (C) or of a warranty given by (C) to (A). The damages will be assessed in accordance with *Hadley v. Baxendale* principles. The cause of action will date from the date of breach.....

Thus, here, Exmar may be liable to Eitzen/SIGAS under the MOAS and the charter parties executed between them and that liability may arise from Polar's breach of the MOAS and charter parties executed with Exmar. Exmar by virtue of these breaches is entitled to damages from Polar and the measure of the loss and damage which Exmar can recover from Polar will be based in part upon Exmar's liability to Eitzen/SIGAS. However, under English law, Exmar's cause of action under the Exmar/Polar MOAS and charter parties will accrue upon the date of the breach of those contracts and will ***not*** depend upon a final resolution of the underlying claims brought by Eitzen/SIGAS against Exmar. In fact, as explained in Paragraph 19 below, Exmar's claim against Polar will stand or fall on their merits of the Exmar-Polar contracts at issue. This reflects the principle that a cause of action for breach of contract accrues at the date of breach rather that at the date of the loss. The position in our case is that all the claims are founded upon a breach of contract by Polar. The cause of action in each accrues at the date of the breach.

E.    **ENGLISH LAW ON CONSTRUCTION ON THE STATED CAUSE OF ACTION**

17.    While the English Commercial Court will construe a Complaint based upon its factual allegations, the Verified Complaint filed in the United States clearly asserts direct breach of contract causes of action by Exmar against Polar.  None of these actions are for indemnity. The fact that there has been a deduction by Eitzen/SIGAS under other contracts between Exmar and Eitzen/SIGAS only goes to one element of the measure of damages that Exmar suffered due to the breach of contracts by Polar.

F.    **APPLICATION OF ENGLISH LAW TO THE INDEMNITY CLAIMS IN THE AMENDED COMPLAINT**

I.    **THE MOAS CLAIMS**

18.    As mentioned above, under English law, the claims by Exmar against Polar are claims for breach.  Whether or not Eitzen/SIGAS succeed in their arbitrations against Exmar does not prevent Exmar from successfully pursuing their breach of contract causes of action directly against Polar under their MOA contracts.

II.    **THE SPEED CLAIMS**

19.    The same principles referred to in Paragraphs 17 and 18 above apply to the speed claims under the Exmar/Polar charter parties.  None of these claims are "contingent indemnity" claims.  Exmar's claims against Polar under their contracts will stand or fall on their merit without reference to the claims by Eitzen/SIGAS against Exmar under their separate charter party contracts.  Furthermore, the Polar/Exmar charters were for longer periods of time than the Exmar/Eitzen charters (about 11 months longer) and the charter party hire rates were different in the charter parties.  Thus, the Exmar's claims against Polar will be different than the claims pursued by Eitzen/SIGAS against Exmar.

**G.    ENGLISH LAW GOVERNING CHARTERER'S DEDUCTION FROM HIRE FOR CARGO CLAIMS**

20.    As mentioned in Paragraph 8 in my Declaration, the alleged hire deduction claim ($179,528.45) is not relevant to these proceedings because the $275,000 of funds originally attached in relation to this claim had been released to Polar in exchange for P & I Club Letter of Undertaking.

**H.    APPLICATION OF ENGLISH LAW TO THE HIRE DEDUCTION CLAIM**

21.    Once again, for the reasons stated in Paragraphs 8 of this Declaration, there is no relevance to the validity of the cargo claim referred to in Burgess' Declaration (Burgess Decl. ¶43- 47), as there are no attached funds as security for this claim.

DATED:    March 17, 2008
          at London, England

STUART DENCH

# EXHIBIT "A"



# LAX & CO
Solicitors

| TO: | ATTN OF:<br>FAX NO: | Mark Hamsher<br>7702 2520 |
|---|---|---|
| TO: | ATTN OF:<br>FAX NO: | Michael Baker-Haber<br>020 7351 1623 |
| COPY TO: | ATTN OF:<br>REF:<br>COMPANY:<br>FAX NO: | Nick Burgess/Jeremy Biggs<br>NDB/JB/8401/8218<br>Ince & Co<br>020 7481 4968 |

| FROM: | NAME:<br>OUR REF:<br>DATE:<br>NO OF PAGES:<br>(incl. this page) | Stuart Dench<br>SMD/E2244/ 44<br>25th February 2008<br>4 |
|---|---|---|

Dear Sirs

**"POLAR BELGICA" C/P 20/4/2004**

We would appreciate it if the tribunal would accept this fax as Claim Submissions on behalf of our clients, Exmar Shipping NV ("Charterers") in relation to their speed and performance claims against Polar Shipping Co Ltd ("Owners"). The attachments referred to in these submissions have been sent by post.

This vessel was one of three vessels chartered by Owners to Charterers and in turn sub-charterers out to Sub-Charterers Eitzen Gas ("Sub-charterers"). Sub-Charterers have brought speed and performance claims against Charterers and Charterers are themselves bringing speed and performance claims against Owners.

    1. The charterparty (**Attachment No 1**) provided inter alia as follows:-

*"Clause 4 Period Trading*

*Owners agree to let and Charterers agree to hire the vessel for a period of five (5) years plus/minus six (6) months in Charterers' option. Charterers have further option to charter the Vessel for one (1) plus one (1) plus one (1) year; option to be declared in writing by Charterers at the latest two (2) months before the earliest possible expiry date for the current charter period;.....*

*Clause 8 Rate of Hire*

*Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of US$ 364,000 (three hundred and sixty four thousand dollars US currency) per*

Lax & Co LLP  78 Cornhill  London  EC3V 3QQ
Telephone: + 44 (0) 20 7623 9432
Fax: + 44 (0) 20 7623 9431
Website: www.laxlaw.co.uk

Partners: Mike Lax  Stuart Dench  Tom Crampton

Lax & Co LLP is a Limited Liability Partnership registered in England and Wales under registration number OC323970
and is regulated by the Solicitors Regulation Authority

*calendar month, and pro rata for any part of a calendar month, including overtime, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners. Hire for optional years; US$ 380,000 (three hundred and eighty thousand dollars US currency) per calendar month and pro rata for any part of a calendar month including overtime.*

*Clause 12 Instructions and Logs*

*Charterers shall from time to time give the master all requisite instructions and sailing directions, and both the Master and Engineers shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expenses of any such documents which are not provided by the master. In any event the Master shall send abstracts of the logs to the Charterers from each port of call.*

*Clause 24 Detailed Description and Performance*

*24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows:-*

*Guaranteed speed / consumption:*

*Laden: about 15 knot at about 24.00 MT IFO 380 CST per day plus about 1 MT MDO per day.*

*Ballast: about 15 knots at about 22.50 MT IFO 380 per day plus about 1 MT MDO per day.*

*In port: about 5 MT per day IFO 380 CST plus about 2 MT MDO per day.*

*The term "about" means: for speed: plus/minus 0.5 knots, and for consumption: plus/minus 5 per cent.*

*The foregoing bunker consumptions are for all purposes except cargo heating/cooling and tank cleaning and shall be pro-rated between the speeds shown.*

*The service speed of the vessel is 15.0 knots laden and 15.0 knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed.*

*Owners guarantee performance of speed and consumption as per Clause 24 only. Any speed and consumption given at lower speeds is for indication purposes and without guarantee,*

*The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 5 on the Beaufort Scale for more than 12 hours,*

*(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results*

*(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid:*

*(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid*

*The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period.*

*Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.*

*(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers of by Charterers to Owners as the case may require.*

*Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase.*

*Clause 61 Purchase option*

*Charterers shall have an option to purchase the vessel at the end of each year on or after the end of 3rd year throughout the Charter Period......"*

2.    The "POLAR BELGICA" was delivered to Charterers on 24th June 2004 and redelivered to owners at 0300 UTC at Shanghai on 22nd September 2006. The vessel was redelivered early in light of Charterers' exercise of their purchase option under clause 61 of the charterparty.

3.    During the chartered period the vessel failed to perform in accordance with clause 24 of the charterparty and, accordingly, Charterers have suffered loss and damage as a result thereof.

4.    Charterers claim the sum of USD615,468.44 is due from Owners as per the attached calculations (**Attachment No 2**). The handwritten amendments to the calculations correct a consistent error in the calculation of the credit due to the Owners in relation to under consumption of bunkers. When assessing whether there is any under consumption credit due to Owners the charterparty bunker figures are not increased by a 5% "about" allowance. Support for this construction can be found in a recent arbitration award, an extract of which is attached as **Attachment No 3**.

5.    In addition Charterers claim interest plus legal costs.

We look forward to receiving Owners defence submissions within 28 days.


Best regards


**LAX & CO LLP**

|  | Due Charterers | Due Owners |
|---|---|---|
| Year 1 | 71,925.02 (L)* | |
| | 266,302.09 (B)*+ | |
| Year 2 | 97,743.11 (L) * | |
| | 140,854.79 (B)* | |
| Year 3 | | 6768.65 (L)* |
| | 45,412.08 (B) | |
| | ........................ | ........................ |
| TOTAL | 622,237.09 | 6768.65 |
| Balance due Charterers | 615,468.44 | |

*Under consumption claims adjusted on basis of base consumption figures not 105%.

+incorrect bunker figure inserted by Polar

ATTACHMENT
NO 2

27/
 /58

Polar Belgica

Final calculation for
Loaded voyages
June 2004 - June 2005

| | | | | | | |
|---|---|---|---|---|---|---|
| Total milage in loaded/ballast condition RFA/APS | | | | 39,992 | miles | |
| Average speed achieved | | | | | | |
| in good weather conditions | | 13.5 knots for | 2,962.37 | hours or | 123.43210 days | |
| C/P speed required | | 14.50 knots or | 2,758.07 | hours or | 114.91954 days | |
| | | | | time lost | | 8.51256 days |
| | | | | | | |
| Hire US$364,000 pcmpr | | | | | | |
| Daily rate =$364,000 x 12 / 365 or US$ | | | | 11,967.12 | per day | |
| | | | | | | |
| Time lost | | | 8.51256 days or US$ | 101,870.84 | | |
| | | | | | | |
| Bunkers | | | | | | |
| Average daily consumption 23.92 | | | | | | |
| | | | | | | |
| Actual consumption for used days | 23.54 | 123.43210 | 2,905.59 | | | |
| Permitted consumption at 25.2 mtpd | 25.20 | 114.91954 | 2,895.97 | | | |
| for permitted time of | | | 9.62 m/t @ US$ | 188.29 | 1,811.20 | |
| Over consumed | | | | | | |
| | | | | | | |
| Actual consumption for used days | 0.26 | 123.43210 | 32.09 | | | |
| Permitted consumption at 1.05 mtpd | 1.05 | 114.91954 | 120.67 | | | |
| for permitted time of | | | 88.57 m/t @ US$ | 383.40 | -33,958.95 | |
| Under consumed | | | | | | |
| | | | | Due Charterers | 69,723.08 | |

Belgendcalc04loaded

Polar Belgica

Final calculation for
Ballast voyages
June 2004 - June 2005

| | | | | | | |
|---|---|---|---|---|---|---|
| Total mileage in loaded/ballast condition RPA/APS | | | | 29,405 | miles | |
| Average speed achieved | | | | | | |
| in good weather conditions | | | 11.85 knots for | 2,479.34 | hours or | 103.30593 days |
| C/P speed required | | | 14.50 knots or | 2,027.93 | hours or | 84.49713 days |
| | | | | time lost | | 18.80880 days |
| | | | | | | |
| Hire US$354,000 pcmpr | | | | | | |
| Dailyyrate =$354,000 x 12 / 365 or US$ | | | | 11,967.12 | per day | |
| | | | | | | |
| Time lost | | | | 18.80880 days or US$ | 225,087.27 | |
| | | | | | | |
| Bunkers | | | | | | |
| Average daily consumption 23.92 | | | | | | |
| IFO | | | | | | |
| Actual consumption for used days | 22.09 | 103.30593 | | 2,282.03 | | |
| Permitted consumption at 23.625 mtpd | 23.6250 | 84.49713 | | 1,996.24 | | |
| for permitted time | | | | 285.78 mt @ US$ | 118.29 | 33,805.32 |
| Over consumed | | | | | | |
| | | | | | | |
| MDO - 0.40mtpd | | | | | | |
| Actual consumption for used days | 0.5 | 103.30593 | | 51.65 | | |
| Permitted consumption at 0.95 mtpd | 1.05 | 84.49713 | | 88.72 | | |
| for permitted time of | | | | -37.07 mt @ US$ | 383.40 | -14,212.26 |
| Under consumed | | | | | | |
| | | | | Due Charterers | | 244,680.33 |

Belgendcalc04ballast

29/
58

Polar Belgica

Summary of vessels performance over total distances
June 2004 / June 2005

| From | To | Load/Ballast | Distance RFA /POB | |
|------|-----|--------------|-------------------|---|
| Houston | Antwerp | Loaded | 5,016 | |
| Houston | Wilhelmshaven | Loaded | 5,215 | |
| Houston | Antwerp | Loaded | 5,056 | |
| Houston | Tampico | Loaded | 477 | |
| Houston | Tampico | Loaded | 476 | |
| Houston | Al Jubail | Loaded | 9,511 | |
| Al Jubail | Aliaga | Loaded | 3,736 | |
| Al Jubail | Aliaga | Loaded | 3,744 | |
| Ras Lanuf | Ratnagiri | Loaded | 3,826 | |
| Al Jubail | Dahej/Mumbai anch. | Loaded | 1,605 | |
| Al Jubail | Merak / Anniversary | Loaded | 1,330 | |
| | | | 39,992 | |

| | | | | |
|---|---|---|---|---|
| Time taken at | average speed of 13.50 | | 2,962.37 | 123.43210 days |
| Permitted time at | C/P speed of 14.50 kts | | 2,758.07 | 114.91954 days |
| Total time lost | | | 204.30 hours or | 8.51256 days |

| | | | | |
|---|---|---|---|---|
| IFO consumption | at 23.54 mtpd for | 123.43210 days = | | 2,905.59 m/t |
| IFO consumption | at C/P rate of 25.2 mtpd | 114.91954 days = | | 2,895.97 m/t |
| | | IFO overconsumed | | 9.62 m/t |

| | | | | |
|---|---|---|---|---|
| MDO consumption | at 0.26 mtpd for | 123.43210 days = | | 32.09 m/t |
| MDO consumption | at C/P rate of 1.05 mtpd | 114.718393 days = | | 120.67 m/t |
| | | MDO underconsmed | | 88.57 |

Ballast

| Antwerp | Houston | Ballast | 5,118 | |
|---------|---------|---------|-------|---|
| Antwerp | Houston | Ballast | 5,111 | |
| Wilhelmshaven | Houston | Ballast | 5,429 | |
| Antwerp | Houston | Ballast | 5,155 | |
| Tampico | Houston | Ballast | 478 | |
| Tampico | Houston | Ballast | 475 | |
| Aliaga | Al Jubail | Ballast | 3,775 | |
| Aliaga | Piraeus/Ras Lanuf | Ballast | 702 | |
| Ratnagiri/Mumbai | Al Jubail | Ballast | 1,705 | |
| Mumbai | Al Jubail | Ballast | 1,457 | |
| | | | 29,405 | |

| | | | | |
|---|---|---|---|---|
| Time taken at | average speed 11.86 | | 2479.34 | 103.30593 |
| Permitted time at | C/P speed of 14.50 kts | | 2027.93 | 84.49713 |
| Total time lost | | | 451.41 hours or | 18.80880 days |

| | | | | |
|---|---|---|---|---|
| IFO consumption | at 22.09 mtpd for | 103.30593 days | | 2,282.03 m/t |
| IFO consumption | at C/P rate of 23.625mtpd | 84.49713 days | | 1,996.24 m/t |
| | | IFO overconsumed | | 285.78 m/t |

| | | | | |
|---|---|---|---|---|
| MDO consumption | at 0.5 mtpd for | 103.30593 days | | 51.65 |
| MDO consumption | at C/P rate of 1.05 mtpd | 84.49713 days | | 88.72 |
| | | MDO underconsumed | | 37.07 |

| | | | |
|---|---|---|---|
| Summary | Time lost | 27.32136 days | |
| | IFO overconsumed | 285.40 m/t | |
| | MDO underconsumed | 125.64 m/t | |

BalgicaRFAPOB04

30/95

June 2004 - June 2005

| From | To | Loaded/Ballast | Date from | Date to | Distance | Hours | IFO | MDO |
|---|---|---|---|---|---|---|---|---|
| Houston | Antwerp | Loaded | 29-Jul-04 | 04-Aug-04 | 4,819 | 320.6 | 365.00 | 8.80 |
| Houston | Wilhelmshaven | Loaded | 08-Sep-04 | 22-Sep-04 | 3,154 | 212.0 | 295.30 | 7.10 |
| Houston | Antwerp | Loaded | 27-Oct-04 | 11-Nov-04 | 2,704 | 212.0 | 221.50 | 0.40 |
| Houston | Tampico | Loaded | Dec-04 | Dec-04 | 0 | 0.0 | 0.0 | 0.00 |
| Houston | Al Jubai | Loaded | 30-Dec-04 | 30-Jan-05 | 7,801 | 520.0 | 489.20 | 0.60 |
| Houston | Al Jubai | Loaded | 10-Feb-05 | 22-Feb-05 | 3,233 | 217.0 | 227.60 | 3.20 |
| Al Jubai | Abaga | Loaded | 18-Feb-05 | 23-Mar-05 | 2,353 | 140.0 | 147.40 | 3.60 |
| Al Jubai | Abaga | Loaded | 16-Apr-05 | 08-May-05 | 2,473 | 319.0 | 230.50 | 0.01 |
| Ras Lanuf | Ratnagiri | Loaded | 28-Apr-05 | 01-Jun-05 | 932 | 70.5 | 39.00 | 4.50 |
| Al Jubai | Dilsey Mumbai | Loaded | 28-May-05 | 01-Jun-05 | | | | |
| Al Jubai | Mumbai / Auxiliary | Loaded | 26-Jun-05 | 24-Jun-05 | 686 | 47.9 | 44.10 | 0.00 |
| | | | | | 27,855 | 2053.5 | 2024.00 | 22.60 |

Average speed 13.50
Average IFO 23.54
Average MDO 0.26

| Ballast | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Antwerp | Houston | Ballast | 25-Jan-04 | 11-Jul-04 | 1,765 | 146.0 | 166.50 | 6.10 |
| Antwerp | Houston | Ballast | 07-Aug-04 | 24-Aug-04 | 3,156 | 206.0 | 252.90 | 7.00 |
| Wilhelmshaven | Houston | Ballast | 25-Sep-04 | 13-Oct-04 | 4,498 | 306.0 | 353.40 | 10.90 |
| Antwerp | Houston | Ballast | 17-Nov-04 | 05-Dec-04 | 2,696 | 219.0 | 219.00 | 0.90 |
| Houston/Tampico | Houston | Ballast | 07-Dec-04 | 07-Dec-04 | 375 | 24.0 | 23.70 | 0.00 |
| Abaga | Al Jubai | Ballast | 25-Feb-05 | 06-Mar-05 | 717 | 46.0 | 43.40 | 0.00 |
| Abaga | Finokai/Ras Lanuf | Ballast | 01-Apr-05 | 16-Apr-05 | 292 | 72.0 | 24.70 | 0.00 |
| Ratnagiri/Alehobi Al Jubai | Al Jubai | Ballast | 11-May-05 | 23-May-05 | 099 | 140.5 | 81.60 | 1.50 |
| Mumbai | Mumbai | Ballast | 06-Jun-05 | 13-Jun-05 | 1,281 | 93.5 | 93.60 | 1.50 |
| | | | | | 15,909 | 1341.0 | 1234.30 | 27.00 |

Average speed 11.96
Average IFO 22.09
Average MDO 0.50

BelgicaArepostorm

31/38

Poler Belgica

Calculation of average bunker prices

| Port | Date | High | Low | Average | Quantity IFO | Cost | High | Low | Average | Quantity MDO | Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Antwerp (delivery) | 24-Jun-04 | 157.00 | 155.00 | 156.00 | 645.00 | 90,396.00 | | | 290.50 | 73.00 | 21,208.50 |
| Houston | 13-Jul-04 | 168.60 | 166.00 | 167.50 | 297.00 | 49,777.20 | 293.00 | 290.00 | 290.50 | | |
| Antwerp | 21-Jul-04 | 167.60 | 165.00 | 166.90 | 130.00 | 21,580.00 | | | | | |
| Antwerp | 04-Aug-04 | 174.20 | 172.20 | 173.20 | 379.50 | 66,292.70 | 346.00 | 343.00 | 348.50 | 30.00 | 10,365.00 |
| Houston | 05-Sep-04 | 171.00 | 168.00 | 169.50 | 500.00 | 84,250.00 | 388.00 | 370.00 | 377.50 | 40.00 | 15,100.00 |
| Houston | 15-Sep-04 | 230.10 | 224.10 | 227.10 | 421.65 | 95,611.22 | | | | | |
| Antwerp | 16-Oct-04 | 126.90 | 123.10 | 125.10 | 466.00 | 61,160.00 | 370.00 | 365.00 | 367.50 | 48.00 | 17,640.00 |
| Houston | 12-Nov-04 | 166.60 | 159.60 | 162.10 | 440.00 | 55,044.00 | | | | | |
| Houston | 05-Dec-04 | 193.60 | 172.20 | 192.10 | 214.85 | 41,272.64 | | | | | |
| Gibraltar | 24-Dec-04 | 183.25 | 174.85 | 178.55 | 260.00 | 47,034.00 | 425.00 | 420.00 | 422.50 | 30.00 | 12,675.00 |
| Fujairah | 16-Jan-05 | 196.00 | 194.00 | 195.00 | 420.00 | 67,760.00 | | | | | |
| Jeddah WMR | 12-Feb-05 | 213.00 | 211.20 | 212.20 | 171.07 | 36,607.00 | 515.00 | 510.00 | 512.50 | 30.00 | 15,375.00 |
| Fujairah | 03-Mar-05 | 263.00 | 261.00 | 262.05 | 460.95 | 120,728.60 | | | | | |
| Fujairah | 19-Mar-05 | 298.00 | 293.00 | 297.00 | 330.00 | 97,910.00 | 515.00 | 510.00 | 512.50 | 30.00 | 15,375.00 |
| Fujairah | 02-Apr-05 | 290.00 | 285.00 | 288.00 | 260.00 | 73,620.00 | | | | | |
| Fujairah | 22-May-05 | | | | | | | | 512.50 | 38.00 | 19,375.00 |
| Fujairah | 13-Jun-05 | 289.00 | 287.00 | 288.00 | 220.00 | 55,760.00 | | | | 281.00 | 107,738.50 |
| | | | | | 6,176.24 | 1,162,766.66 | | | | | |

Average price 188.39

| Port | Date | High | Low | Average | Quantity IFO | Cost | High | Low | Average | Quantity MDO | Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Singapore | 06-Jul-05 | 274.00 | 272.00 | 273.00 | 510.79 | 139,421.10 | 515.00 | 510.00 | 512.50 | 40.00 | 20,504.13 |
| Fujairah | 23-Jul-05 | 258.00 | 256.00 | 257.00 | 299.81 | 77,051.17 | | | | | |
| Kortrijk (Telwex) | 14-Aug-05 | 306.00 | 286.00 | 296.00 | 70.01 | 21,263.04 | | | | | |
| Singapore | 20-Aug-05 | 283.00 | 281.00 | 282.00 | 430.00 | 121,316.42 | 533.00 | 520.00 | 530.90 | 55.10 | 29,076.05 |
| Fujairah | 15-Sep-05 | 316.00 | 314.00 | 315.00 | 589.00 | 185,835.44 Page | 500.00 | 565.00 | 530.00 | 50.00 | 27,275.00 |
| Moerdijk (Antwerp) | 08-Oct-05 | 296.00 | 294.00 | 295.00 | 535.33 | 141,987.75 | | | | | |
| Valeta WMR | 28-Oct-05 | 303.00 | 301.00 | 302.00 | 200.00 | 60,400.00 | 560.00 | 555.00 | 557.50 | 30.00 | 16,725.00 |
| Fujairah | 15-Nov-05 | 287.00 | 285.00 | 286.00 | 225.00 | 62,850.00 | 900.00 | 955.00 | 553.50 | 50.00 | 27,875.00 |
| Singapore | 04-Dec-05 | 302.00 | 298.00 | 300.00 | 310.00 | 92,850.00 | | | | | |
| Singapore | 01-Jan-06 | 296.00 | 288.00 | 296.00 | 225.00 | 66,600.00 | 541.00 | 539.00 | 540.00 | 22.31 | 11,909.42 |
| Jebel Ali (Sharjah) WMR | 21-Jan-06 | 323.00 | 319.00 | 321.00 | 373.22 | 119,934.34 | | | | | |
| Kortrijk (Telwex) | 17-Feb-06 | 318.00 | 316.00 | 317.00 | 291.82 | 92,411.94 | | | | | |
| Singapore | 01-Mar-06 | 385.00 | 385.00 | 385.00 | 375.00 | 135,000.00 | 560.00 | 555.00 | 557.50 | 18.00 | 10,035.00 |
| Gibraltar | 18-Apr-06 | 338.00 | 335.00 | 337.00 | 248.92 | 83,222.15 | | | | | |
| Gibraltar | 22-Apr-06 | 338.00 | 335.00 | 338.00 | 357.69 | 120,309.70 | | | | | |
| St Eustatius (W Indies)WMR | 18-May-06 | 328.00 | 314.00 | 340.00 | 230.00 | 78,200.00 | 657.00 | 650.00 | 663.50 | 45.40 | 30,122.90 |
| Belaca | 10-Jun-06 | 343.00 | 349.00 | 345.00 | 230.10 | 100,229.35 | | | | 365.72 | 173,708.48 |
| | | | | | 8,157.95 | 1,902,514.34 | | | | | |

Average price 308.47

| Port | Date | High | Low | Average | Quantity IFO | Cost | High | Low | Average | Quantity MDO | Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gibraltar | 16-Jul-06 | 383.00 | 381.00 | 382.00 | 410.00 | 148,420.00 | | | | 22.00 | (4,432.85) |
| Jeddah | 01-Aug-06 | | 164.00 | 148.00 | 148.00 | 34,952.00 | | | | 49.00 | 26,160.00 |
| Singapore | 10-Aug-06 | 313.00 | 311.00 | 312.00 | 377.00 | 117,624.00 | 630.00 | 625.00 | 627.50 | -33.30 | -14,550.00 |
| Anjer (Indonesia)(S)Cove | 26-Aug-06 | | | 312.00 | 323.00 | 49,871.26 | 530.00 | 626.00 | 627.90 | 38.80 | 24,974.90 |
| Less ROB en index | | | | | 654.00 | 383,704.68 | | | 627.30 | | |

Average price 308.58

Belgie/abonb...

32/
3 8

Polar Belgica

Final calculation for
Loaded voyages
June 2005 - June 2005

| | | | | | | |
|---|---|---|---|---|---|---|
| Total mileage in loaded/ballast condition RFA/APS | | | | 48,530 | miles | |
| Average speed achieved | | | | | | |
| in good weather conditions | | | 13.93 knots for | 3,483.85 | hours or | 145.16033 days |
| C/P speed required | | | 14.50 knots or | 3,348.90 | hours or | 139.45402 days |
| | | | | time lost | | 5.70630 days |
| | | | | | | |
| Hire US$364,000 pcmpr | | | | | | |
| Dailyrate =$364,000 x 12 / 365 or US$ | | | | 11,957.12 | per day | |
| | | | | | | |
| Time lost | | | 5.70630 days or US$ | | 68,288.02 | |
| | | | | | | |
| Bunkers | | | | | | |
| Average daily consumption 23.92 | | | | | | |
| | | | | | | |
| IFO 23.92 | | | | | | |
| Actual consumption for used days | 23.92 | 145.16033 | 3,472.23 | | | |
| Permitted consumption at 25.2 mtpd | 25.20 | 139.45402 | 3,514.24 | 3,514.24 | | |
| for permitted time of | 25 | | -42.01 mt @ US$ | 306.47 | -12,957.71 | X |
| Under consumed | | | | | | |
| | | | | | | |
| MDO - 1.32 mtpd | | | | | | |
| Actual consumption for used days | 1.37 | 145.16033 | 198.87 | | | |
| Permitted consumption at 1.05 mtpd | 1.05 | 139.45402 | 146.43 | | | |
| for permitted time of | | | 52.44 mt @ US$ | 561.66 | 29,458.05 | |
| Over consumed | | | | | | |
| | | | | | | |
| | | | Due Charterers | | 84,786.40 | |
| | | | | | + 12,957.71 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Belgendcalc05 | | | | | | |

no overconsumption
bacos on 25:20
(u + 5%)
but no underconsumption
claim based on
only being based on
2 m not 105%

Polar Belgica

Final calculation for
Ballast voyages
June 2005 - June 2006

33/
75

| | | | | | | |
|---|---|---|---|---|---|---|
| Total mileage in loaded/ballast condition RFA/APS | | | 22,223 | miles | | |
| Average speed achieved | | 12.64 knots for | 1,758.15 | hours or | 73.25620 days | |
| in good weather conditions | | 14.50 knots or | 1,532.87 | hours or | 63.86920 days | |
| C/P speed required | | | | | | |
| | | | time lost | | 9.39700 days | |

Hire US$364,000 pcmpr
Dailyrate =$364,000 x 12 / 365 or US$     11,987.12    per day

Time lost      9.39700 days or US$      112,655.08

Bunkers
Average daily consumption 23.92

IFO 22.71

| | | | | | | |
|---|---|---|---|---|---|---|
| Actual consumption for used days | 22.71 | 73.25620 | 1,663.65 | | | |
| Permitted consumption at 23.625 mtpd | 23.8250 | 63.86920 | 1,508.67 | | | |
| for permitted time | | | | | | |
| Over consumed | | | 154.97 mt @ US$ | 308.47 | 47,805.06 | |

MDO 0.4

| | | | | | | |
|---|---|---|---|---|---|---|
| Actual consumption for used days | 0.4 | 73.25620 | 29.30 | | | |
| Permitted consumption at 1.05 mtpd | 1.05 | 63.86920 | 67.05 | | | |
| for permitted time of | | | 37.75 mt @ US$ | 561.66 | 21,202.48 | |
| Under consumed | | | | | | |

Due Charterers      139,057.66

Belgendcalc05ballast

34/
/98

Polar Belgica

Summary of vessels performance over total distances

June 2005 - June 2006

| From | To | Load/Ballast | Distance RFA/POB | |
|------|-----|-------------|------------------|---|
| Anniversary | Merak | Loaded | 2,758 | |
| Al Jubail | Kaohsiung | Loaded | 5,463 | |
| Al Jubail | Mesaieed | Loaded | 216 | |
| Al Jubail | Moerdijk | Loaded | 6,506 | |
| Flushing | Haizra | Loaded | 6,385 | |
| Al Jubail | Kaohsiung | Loaded | 5,623 | |
| Mesaieed | Jebal Ali | Loaded | 315 | |
| Al Jubail | Kaohsiung | Loaded | 5,599 | |
| MaTaPhut | El Tablazo | Loaded | 11,491 | |
| Point Lisas | Guayaquil | Loaded | 1,923 | |
| Boca grande | Dakar/ Anniversary | Loaded | 2,249 | |
| | | | 48,530 | |
| | | | | |
| Time Taken at | average speed of 13.93 kts | 3,483.85 | | 145.16033 days |
| Permitted time at | C/P speed of 14.5 kts | 3,346.90 | | 139.45402 days |
| Total time lost | | 136.95 hours | | 5.70630 days |
| | | | | |
| IFO consumption | at 23.92 mtpd | 145.16033days = | | 3472.23 |
| IFO consumption | at CP rate of 25.2 mtpd | 139.45402 days = | | 3514.24 |
| | | IFO underconsumed | | 42.01 |
| | | | | |
| MDO consumption | at 1.37 mtpd | 145.16033 days = | | 198.87 |
| MDO consumption | at CP rate of 1.05 mtpd | 139.45402 days = | | 146.43 |
| | | MDO overconsumed | | 52.44 |
| | | | | |
| Ballast | | | | |
| | | | | |
| Merak | Al Jubail | Ballast | 4,441 | |
| Kaohsiung | Al Jubail | Ballast | 5,448 | |
| Mesaieed | Al Jubail | Ballast | 217 | |
| Moerdijk | Flushing | Ballast | 72 | |
| Haizra | Al Jubail | Ballast | 1,451 | |
| Kaohsiung | Bndr Imam Kho/Jeb Al | Ballast | 5,973 | |
| Jebal Ali | Mesaieed | Ballast | 214 | |
| Jebal Ali | Al Jubail | Ballast | 312 | |
| Kaohsiung | MapTaPhut | Ballast | 1,668 | |
| El Tablazo | Point Lisas | Ballast | 1,020 | |
| Guayaqui | Boca Grande | Ballast | 1,407 | |
| | | | 22,223 | |
| | | | | |
| Time Taken at | average speed of 12.64 kts | 1,758.14873 | | 73.25620 |
| Permitted time at | C/P speed of 14.5 kts | 1,532.62069 | | 63.85920 |
| Total time lost | | 225.52804 hours | | 9.39700 days |
| | | | | |
| IFO consumption | at 22.71 mtpd for | 73.25620 days | | 1,663.65 m/t |
| IFO consumption | at CP rate of 23.625 mtpd | 63.85920 days = | | 1,508.67 m/t |
| | | IFO over consumed | | 154.97 m/t |
| | | | | |
| MDO consumption | at 0.40 mtpd | 73.25620 days | | 29.30 m/t |
| MDO consumption | at CP rate of 1.05 mtpd | 63.85920 days = | | 67.05 m/t |
| | | MDO under consumed | | 37.75 m/t |
| | | | | |
| | | | | |
| Summary | Time lost | 15.10330 days | | |
| | IFO overconsumed | 112.97 m/t | | |
| | MDO over consumed | 14.69 m/t | | |

BelgicaRFAPOB0505

Polar Belgica

Final calculation for
Loaded voyages
June 2005 - sale



| Total mileage in loaded/ballast condition RFA/APS | | | | 8,146 | miles | |
|---|---|---|---|---|---|---|
| Average speed achieved | | | | | | |
| In good weather conditions | | 14.25 knots for | | 641.82 | hours or | 26.74269 days |
| C/P speed required | | 14.50 knots or | | 630.76 | hours or | 26.28161 days |
| | | | | time lost | | 0.46108 days |
| | | | | | | |
| Hire US$364,000 pcmpr | | | | | | |
| Daily rate =$364,000 x 12 / 365 or US$ | | | | 11,967.12 | per day | |
| | | | | | | |
| Time lost | | | 0.46108 days or US$ | | -5,517.81 | |
| | | | | | | |
| | | | | | | |
| Actual consumption for used days | 23.30 | 26.74269 | | 623.10 | | |
| Permitted consumption at 25.2 mtpd | 25.20 | 26.28161 | | 662.30 | | |
| for permitted time of | | | | 39.19 mt @ US$ | 306.56 | 12,034.55 |
| Under consumed | | | | | | |
| | | | | | | |
| Actual consumption for used days | 0.39 | 26.74269 | | 10.43 | | |
| Permitted consumption at 1.05 mtpd | 1.05 | 26.28161 | | 27.60 | | |
| for permitted time of | | | | 17.17 mt @ US$ | 627.50 | 10,771.08 |
| Under consumed | | | | | | |
| | | | | | | |
| | | | Due Owners | | 17,288.59 | 22,786.35 22,786.35 |

Belgendcalc96

Polar Belgica

Final calcuation for
Ballast voyages
June 2006 - sale



| | | | | | | |
|---|---|---|---|---|---|---|
| Total milage in loaded/ballast condition RFA/APS | | | | 3,792 | miles | |
| Average speed achieved | | | 11.47 knots for | 330.50 | hours or | 13.77507 days |
| in good weather conditions | | | 14.50 knots or | 281.52 | hours or | 10.89855 days |
| C/P speed required | | | | | | |
| | | | | time lost | | 2.87651 days |
| | | | | | | |
| Hire US$384,000 pcmpr | | | | 11,967.12 | per day | |
| Dailyrrate =$384,000 x 12 / 365 or US$ | | | | | | |
| | | | | | | |
| Time lost | | | 2.87651 days or US$ | | 34,447.53 | |
| | | | | | | |
| Bunkers | | | | | | |
| Average daily consumption 20.07 | | | | | | |
| | | | | | | |
| Actual consumption for used days | 20.07 | 13.77507 | 276.47 | | | |
| Permitted consumption at 25.2 mtpd | 25.20 | 10.89855 | 274.59 | | | |
| for permitted time of | | | 1.87 m/t @ US$ | 306.56 | 576.02 | |
| Over consumed | | | | | | |
| | | | | | | |
| Actual consumption for used days | 1.12 | 13.77507 | 15.43 | | | |
| Permitted consumption at 1.05 mtpd | 1.05 | 10.89855 | 11.44 | | | |
| for permitted time of | | | 16.56 m/t @ US$ | 627.50 | 10,390.53 | |
| Over consumed | | | | | | |
| | | | | | | |
| | | | Due Charterers | | 45,412.96 | |

Belgendcalc06ballast

Polar Belgica

Summary of vessels performance over total distances
June 2005 - sale

37/
38

| From | To | Load/Ballast | | Distance RFA/POB | |
|------|-----|-------------|---|---|---|
| Anniversary | Dakar | Loaded | | 907 | |
| Ras Lanuf | Kaohsiung | Loaded | | 8,239 | |
| | | | | 9,146 | |
| Time taken at average spped of 14.25 kts | | | 641.82456 | | 26.74269 |
| Permitted time at C/P rate of 14.50 kts | | | 630.75862 | | 26.28161 |
| Total time lost | | | 11.06594 hours or | | 0.46108 days |
| | | | | | |
| IFO consumption at 23.30 mtpd for | | 26.74269 days | | 623.10 | |
| IFO consumption at C/P rate of 25.2mtpd | | 26.28161 days | | 662.30 | |
| | | IFO underconsumption | | 39.19 | |
| MDO consumption at 0.39mtpd for | | 26.74269 days | | 10.43 | |
| MDO consumption at C/P rate of 1.05mtpd for | | 26.28161 days | | 27.60 | |
| | | MDO under consumption | | 17.17 | |
| | | | | | |
| Dakar | Ras Lanuf | Ballast | | 3,035 | |
| Kaohsiung | Shanghai | Ballast | | 757 | |
| | | | | 3,792 | |
| Time taken at average speed of 11.47 kts | | | 330.60157 | | 13.77507 |
| Permitted time at C/P rate of 14.50 knots | | | 261.51724 | | 10.89655 |
| Total time lost | | | 69.08433 hours or | | 2.87851 days |
| | | | | | |
| IFO consumption at 20.07 mtpd | | 13.77507 days | | 276.47 | |
| IFO consumption at C/P rate of 23.625 mtpd | | 10.89655 days | | 257.43 | |
| | | IFO over consumed | | 19.03 | |
| MDO consumption at 1.12mtpd for | | 13.77507 days | | 15.43 | |
| MDO consumption at C/P rate of 1.05mtpd for | | 10.89655 days | | 11.44 | |
| | | MDO over consumed | | 3.99 | |
| | | | | | |
| Summary | | | | | |
| | Total time lost | | 3.33959 days | | |
| | IFO under consumed | | 20.16 mt | | |
| | MDO under consumed | | 13.18 mt | | |
| | | | | | |
| BelgicaRFAPOBtodelvry | | | | | |

Summary of vessels actual performance on loaded and ballast voyages
June 2005 - sale

| From | To | Loaded/Ballast | Date from | Date to | Distance | Hours | IFO | MDO |
|------|-----|----------------|-----------|---------|----------|-------|-----|-----|
| Anniversary | Ras Laruf | | | | | | | |
| | Qatar | Loaded | 24-Jun-05 | 26-Jun-05 | 656 | 46.0 | 40.20 | 0.90 |
| | Kaohsiung | Loaded | 27-Jul-05 | 24-Aug-05 | 5,415 | 380.0 | 373.40 | 6.40 |
| | | | | | 9,071 | 426.0 | 413.60 | 7.00 |
| | Average speed loaded | | 14.26 | | | | | |
| | Average IFO | | 23.30 | | | | | |
| | Average MDO | | 0.39 | | | | | |
| Qatar | Ras Laruf | Ballast | 11-Jul-05 | 23-Jul-05 | 1,356 | 130.0 | 99.80 | 3.70 |
| Kaohsiung | Shanghai | Ballast | 28-Aug-05 | 28-Aug-05 | 294 | 24.0 | 20.00 | 3.00 |
| | | | | | 1,652 | 144.0 | 120.42 | 6.70 |
| | Average speed ballast | | 11.47 | | | | | |
| | Average IFO | | 20.07 | | | | | |
| | Average MDO | | 1.12 | | | | | |
| Religication/key | | | | | | | | |

**EXHIBIT "B"**



# LAX & CO
### Solicitors

| TO: | ATTN OF: | Mark Hamsher |
| | FAX NO: | 7702 2520 |
| TO: | ATTN OF: | Michael Baker-Haber |
| | FAX NO: | 020 7351 1623 |
| COPY TO: | ATTN OF: | Nick Burgess/Jeremy Biggs |
| | REF: | NDB/JB/8401/8218 |
| | COMPANY: | Ince & Co |
| | FAX NO: | 020 7481 4968 |

| FROM: | NAME: | Stuart Dench |
| | OUR REF: | SMD/E2244/ 44 |
| | DATE: | 4th March 2008 |
| | NO OF PAGES: (incl. this page) | 4 |

Dear Sirs

**"POLAR ENDURANCE" C/P 20/4/2004**

We would appreciate it if the tribunal would accept this fax as Claim Submissions on behalf of our clients, Exmar Shipping NV ("Charterers") in relation to their speed and performance claims against Polar Shipping Co Ltd ("Owners"). The attachments referred to in these submissions have been sent by post.

1. The charterparty (**Attachment No 1**) provided inter alia as follows:-

*"Clause 4 Period Trading*

*Owners agree to let and Charterers agree to hire the vessel for a period of five (5) years plus/minus six (6) months in Charterers' option. Charterers have further option to charter the Vessel for one (1) plus one (1) plus one (1) year; option to be declared in writing by Charterers at the latest two (2) months before the earliest possible expiry date for the current charter period;.....*

*Clause 8 Rate of Hire*

*Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of US$ 364,000 (three hundred and sixty four thousand dollars US currency) per calendar month, and pro rata for any part of a calendar month, including overtime, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners. Hire for optional years; US$ 380,000 (three hundred and eighty thousand dollars US currency) per calendar month and pro rata for any part of a calendar month including overtime.*

Lax & Co LLP  78 Cornhill  London  EC3V 3QQ
Telephone: + 44 (0) 20 7623 9432
Fax: + 44 (0) 20 7623 9431
Website: www.laxlaw.co.uk

Partners: Mike Lax  Stuart Dench  Tom Crampton

Lax & Co LLP is a Limited Liability Partnership registered in England and Wales under registration number OC323970
and is regulated by the Solicitors Regulation Authority

*Clause 12 Instructions and Logs*

*Charterers shall from time to time give the master all requisite instructions and sailing directions, and both the Master and Engineers shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expenses of any such documents which are not provided by the master. In any event the Master shall send abstracts of the logs to the Charterers from each port of call.*

*Clause 24 Detailed Description and Performance*

*24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows:-*

*Guaranteed speed / consumption:*

*Laden: about 15 knot at about 24.00 MT IFO 380 CST per day plus about 1 MT MDO per day.*

*Ballast: about 15 knots at about 22.50 MT IFO 380 per day plus about 1 MT MDO per day.*

*In port: about 5 MT per day IFO 380 CST plus about 2 MT MDO per day.*

*The term "about" means: for speed: plus/minus 0.5 knots, and for consumption: plus/minus 5 per cent.*

*The foregoing bunker consumptions are for all purposes except cargo heating/cooling and tank cleaning and shall be pro-rated between the speeds shown.*

*The service speed of the vessel is 15.0 knots laden and 15.0 knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed.*

*Owners guarantee performance of speed and consumption as per Clause 24 only. Any speed and consumption given at lower speeds is for indication purposes and without guarantee,*

*The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of*

*speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 5 on the Beaufort Scale for more than 12 hours,*

*(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results*

*(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid:*

*(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid*

*The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period.*

*Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.*

*(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers of by Charterers to Owners as the case may require.*

*Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase.*

*Clause 61 Purchase option*

*Charterers shall have an option to purchase the vessel at the end of each year on or after the end of 3rd year throughout the Charter Period......"*

2.   The "POLAR ENDURANCE" was delivered to Charterers at 0915 UTC on 3/6/04. The vessel was redelivered early at the end of 2006 in light of Charterers' exercise of their purchase option under clause 61 of the charterparty.

3.   During the chartered period the vessel failed to perform in accordance with clause 24 of the charterparty and, accordingly, Charterers have suffered loss and damage as a result thereof.

4.   Charterers claim the sum of USD327,880.64 is due from Owners as per the attached calculations (**Attachment No 2**). The handwritten amendments to the calculations correct a consistent error in the calculation of the credit due to the Owners in relation to under consumption of bunkers. When assessing whether there is any under consumption credit due to Owners the charterparty bunker figures are not increased by a 5% "about" allowance. Support for this construction can be found in a recent arbitration award, an extract of which is attached as **Attachment No 3**.

5.   In addition Charterers claim interest plus legal costs.

We look forward to receiving Owners defence submissions within 28 days.

Best regards

**LAX & CO LLP**

*ATTACHMENT NO 2*

**POLAR ENDURANCE**

| Years | | Due Charterers | Due Owners |
|---|---|---|---|
| Year 1 (04-05) | Laden | | 7708.78 |
| | Ballast | 79,106.76 | |
| Year 2 (05-06) | Laden | | 78,724.87 |
| | Ballat | 169,696.13 | |

Year 3 (06- sale)

Time lost :

| Laden | 1.034 days lost = | 12,397.94 |
|---|---|---|
| Ballast | 8.058 days lost = | 96,431.05 |

Bunkers overconsumed:

| 162.8 MT IFO x USD306.56 = | 49,907.97 |
|---|---|
| 10.78 MT DO x USD627.50 = | 6,764.45 |

| TOTALS | 414,304.30 | 86,433.65 |
|---|---|---|
| Balance due to Charterers | USD 327,880.65 | |

Polar Endurance
Fine calculation for loaded voyages
June 2004 - June 2005



| | | | | |
|---|---|---|---|---|
| Total mileage in Loaded condition | | | 49,701 | |
| | | | | |
| Time taken at average speed of | | 14.41 | 143.71096 days | |
| Permitted time at c/p speed of | Average IFO | 14.50 | 142.81897 days | |
| Total time lost | | | 0.8920 days | |
| | | | | |
| Hire US$ | 364,000 pcmpr | | 11,967.12 | |
| Daily hire | | | | |
| Time lost | | 0.89200 | | |
| Hire lost | | | | 10,674.56 |
| | | | | |
| IFO consumption at | average rate of | 25.10 | 3607.15 | |
| IFO consumption at | in permitted time at c/p rate of | 25.20 | 3599.04 | |
| IFO over consumed | | | 8.11 | |
| IFO average price | | 193.60 | | |
| Over consumed | | | | 1,569.57 |
| | | | | |
| MDO consumption at | average rate of | 0.62 | 89.10 | 142·82 |
| MDO consumption at | in permitted time at c/p rate of | 1.05 | 149.95  60.85 | 53·12 |
| MDO under consumed | → 142·8 a days | | | |
| MDO average price | | 371.24 | | 22,563.24 $19,943.01 |
| Under consumed | | | Due Owners | 10,368.18 ($7708.78) |
| | | | | |
| Endendcp04loaded | | | | |

(25.2   (+ 5%))

laden   24 m-r         ifo          1 m-t mdo
ballast  22.50 m-t     ifo          1 m-t mdo

23.625%   (+ 5%)

Polar Endurance
Fina calculation for ballast voyages
June 2004 - June 2005

6/38

| | | | |
|---|---|---|---|
| Total milage in ballast condition | | | 11,182 |
| | | | |
| Time taken at average speed of | | 12.32 | 37.75027 days |
| Permitted time at c/p speed of | | 14.50 | 32.07471 days |
| Total time lost | | | 5.67556 days |
| | | | |
| Hire US$ | 364,000 pcmpr | | 11,967.12 |
| Daily hire | | | |
| Time lost | | 5.67556 | |
| Hire lost | | | 67,920.10 |
| | | | |
| IFO consumption at | average rate of | 20.660 | 787.47 |
| IFO consumption | in permitted time at c/p rate of | 23.625 | 757.77 |
| IFO over consumed | | | 29.71 |
| IFO average price | | 193.60 | |
| Over consumed | | | 5,751.00 |
| | | | |
| MDO consumption at | average rate of | 1.26 | 48.32 |
| MDO consumption | in permitted time at c/p rate of | 1.05 | 33.68 |
| MDO under consumed | | | 14.64 |
| MDO average price | | 371.24 | |
| Over consumedUnder consumed | | | 5,435.66 |
| | | Due Charterers | 79,106.76 |
| | | | |
| Endendcal04ballast | | | |

7/38

Polar Endurance
Summary of vessels performance over total distances
June 2004 - June 2005

| From | To | Loaded / Ballast | Distance RFA/POB | |
|------|-----|------------------|----------|--|
| Pajaritos | Antwerp | Loaded | | 5,396 |
| Sture | Houston | Loaded | | 5,079 |
| Houston | Anyer | Loaded | | 14,080 |
| Al Jubail | Kaohsiung | Loaded | | 5,982 |
| Ma Ta Phut | Antwerp | Loaded | | 9,058 |
| Brindisi / Priolo | Antwerp | Loaded | | 2,717 |
| Antwerp | Houston via Sines | Loaded | | 5,826 |
| Aratu | Santa Calra | Loaded | | 1,490 |
| Houston | Neches | Loaded | | 63 |
| | | | | 49,701 |

| | | | | |
|------|-----|------|----------|--|
| Time taken at average speed of | | 14.41 | 143.71096 days | |
| Permitted time at c/p s Average IFO | | 14.50 | 142.81897 days | |
| Total time lost | | | 0.8920 days | |
| | | | | |
| IFO consumption at | average rate of | 25.10 | 3607.15 | |
| IFO consumption at | c/p rate of | 25.20 | 3599.04 | |
| IFO over consumed | | | 8.11 mt | |
| | | | | |
| MDO consumption at | average rate of | 0.62 | 89.10 | |
| MDO consumption at | c/p rate of | 1.05 | 149.95 | |
| MDO under consumed | | | -60.86 mt | |

| Ballast | | | | |
|---------|-----|---------|----------|--|
| Freeport | Pajaritos | Ballast | | 1,694 |
| Antwerp | Sture | Ballast | | 592 |
| Antwerp | Brindisi | Ballast | | 2,671 |
| Anyer | Al Jubail | Ballast | | 3,975 |
| Kaohsiung | Ma Ta Phut | Ballast | | 1,738 |
| Neches | Galveston | Ballast | | 66 |
| Hstn/Galv. | Aratu | Ballast | | 426 |
| | | | | 11,162 |

| | | | | |
|------|-----|------|----------|--|
| Time taken at average speed of | | 12.32 | 37.75129 days | |
| Permitted time at c/p s Average IFO | | 14.50 | 32.07557 days | |
| Total time lost | | | 5.6757 days | |
| | | | | |
| IFO consumption at | average rate of | 20.86 | 787.49 | |
| IFO consumption at | c/p rate of | 23.63 | 757.79 | |
| IFO over consumed | | | 29.71 mt | |
| | | | | |
| MDO consumption at | average rate of | 1.28 | 48.32 | |
| MDO consumption at | c/p rate of | 1.05 | 33.68 | |
| MDO over consumed | | | 14.64 mt | |

EndRFAPOB04

8/38

Summary of vessels actual performance on loaded and ballst voyages
June 2004 - June 2005

| From | To | Load/Ballast | Date from | Date to | Distance | Hours | IFO | MDO |
|---|---|---|---|---|---|---|---|---|
| Peijartos | Antwerp | Loaded | 17-Jun-04 | 02-Jul-04 | 4,674 | 335.0 | 381.67 | 1.90 |
| Store | Houston | Loaded | 20-Jul-04 | 03-Aug-04 | 4,523 | 319.0 | 257.25 | 28.00 |
| Houston | Anyer | Loaded | 21-Aug-04 | 11-Oct-04 | 11,601 | 628.0 | 799.50 | 14.00 |
| Al Jubail | Isacheiung | Loaded | 09-Nov-04 | 26-Nov-04 | 4,476 | 307.0 | 435.80 | 6.30 |
| Ma Ta Phut | Antwerp | Loaded | 06-Dec-04 | 05-Jan-05 | 8,004 | 604.0 | 578.60 | 18.70 |
| Phob | Antwerp | Loaded | 24-Jan-05 | 30-Jan-05 | 1,813 | 140.0 | 187.40 | 1.00 |
| Antwerp | Houston via Sines | Loaded | 08-Feb-05 | 03-Mar-05 | 5,232 | 385.0 | 350.50 | 5.10 |
| Arelia | Santa Catra | Loaded | 24-May-07 | Anniversary | 1,082 | 72.0 | 68.40 | 1.20 |
| | | | | | 42,435 | 2844.0 | 3079.22 | 75.00 |
| | Average speed | | 14.41 | | | | | |
| | Average IFO | | 25.10 | | | | | |
| | Average MDO | | 0.62 | | | | | |
| Ballast | | | | | | | | |
| Freeport | Pejartos | Ballast | 04-Jun-04 | 11-Jun-04 | 1,000 | 73.0 | 62.50 | 4.00 |
| Antwerp | Store | Ballast | 17-Jul-04 | 19-Jul-04 | 272 | 21.0 | 22.80 | 0.20 |
| Antwerp | Brindisi | Ballast | 08-Jan-05 | 18-Jan-05 | 2,556 | 240.0 | 178.10 | 11.80 |
| Anyer | Al Jubail | Ballast | 20-Oct-04 | 01-Nov-04 | 3,328 | 243.0 | 203.30 | 23.30 |
| Isacheiung | Ma Ta Phut | Ballast | 30-Nov-04 | 06-Dec-04 | 1,300 | 97.0 | 98.30 | 2.00 |
| HavsGlav. | Arelia | Ballast | 03-Mar-07 | 08-May-05 | 4,170 | 359.0 | 301.60 | 3.60 |
| | | | | | 12,725 | 1033.0 | 863.60 | 64.00 |
| | Average speed | Ballast | 12.32 | | | | | |
| | Average IFO | | 260.08 | | | | | |
| | Average MDO | | 1.28 | | | | | |

EndAveoMWBpatform

9/38

| Port | Date | High | Low | Average | Quantity IFO | Cost | High | Average | Quantity MDO | Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| Freeport (Delivery) WBR | 20-Jun-04 | *1.00 | 281.00 | 281.00 | 355.40 | 98,462.40 est | 310.00 | 310.00 | 310.00 | 51.00 | 15,810.00 |
| Houston | 09-Jun-04 | 2.60 | 159.60 | 191.60 | 350.00 | 56,560.00 | 309.60 | 304.60 | 307.10 | 18.30 | 5,927.02 |
| Antwerp | 03-Jul-04 | 158.00 | 156.80 | 157.50 | 422.36 | 66,313.56 | 338.00 | 303.00 | 305.50 | 24.93 | 7,618.12 |
| Houston | 09-Aug-04 | 179.60 | 178.60 | 178.30 | 401.77 | 71,555.34 | 335.00 | 334.00 | 334.50 | 45.00 | 15,052.50 |
| Hoogvliet (delivered) | 10-Sep-04 | 200.00 | 200.00 | 200.00 | 425.49 | 85,098.00 | 355.00 | 350.00 | 352.50 | 45.36 | 15,954.15 |
| Map Ta Phut (B'kok) WBR | 07-Oct-04 | 210.00 | 205.00 | 208.00 | 490.00 | 95,200.00 100/cargo | 470.00 | 465.00 | 467.50 | 30.00 | 14,025.00 |
| Fujairah | 31-Oct-04 | 196.00 | 183.00 | 185.50 | 399.38 | 76,159.06 | 455.00 | 445.00 | 442.50 | 30.00 | 6,650.00 |
| Singapore | 18-Nov-04 | 178.00 | 176.00 | 177.00 | 264.53 | 46,874.81 | 388.00 | 388.00 | 397.00 | 20.03 | 7,931.91 |
| Ma Te Phut (B'kok)WBR | 09-Dec-04 | 208.00 | 203.00 | 205.50 | 550.00 | 113,025.00 180/mgo | 452.00 | 444.00 | 448.00 | 20.00 | 8,950.00 |
| Suez | 25-Dec-04 | 179.00 | 177.00 | 178.00 | 102.00 | 71,200.00 | 475.00 | 470.00 | 472.50 | 20.00 | 9,450.00 |
| Antwerp | 05-Jan-05 | 146.00 | 141.00 | 142.50 | 120.00 | 17,100.00 |  |  |  |  |  |
| Antwerp | 06-Jan-05 | 151.00 | 140.00 | 1405.00 | 230.00 | 34,155.00 |  |  |  |  |  |
| Antwerp | 01-Feb-05 |  |  |  |  |  | 380.00 | 370.00 | 375.00 | 30.00 | 11,250.00 |
| Houston | 03-Feb-05 | 165.00 | 162.00 | 163.50 | 450.00 | 73,575.00 |  |  |  |  |  |
| Sines (Lisbon) WBR | 15-Feb-05 | 185.00 | 183.00 | 184.00 | 100.00 | 18,400.00 |  |  |  |  |  |
| Houston | 05-Mar-05 | 210.60 | 209.60 | 209.60 | 450.00 | 94,320.00 |  |  |  |  |  |
| Aceta (Salvador)WBR | 08-May-05 | 204.00 | 203.00 | 203.50 | 284.47 | 77,892.85 |  |  |  |  |  |
|  |  |  |  |  | 5,059.32 | 1,095,928.14 |  |  | 371.24 | 325.52 | 120,646.71 |
| **Average price** |  |  |  | 163.00 |  |  |  |  |  |  |  |
| Salvador WBR | 20-Jun-05 | 286.00 | 284.00 | 284.50 | 292.70 | 88,291.85 mgo | 634.00 | 628.00 | 630.00 | 23.85 | 14,999.50 |
| Salvador WBR | 06-Jul-05 | 306.00 | 305.00 | 305.00 | 300.03 | 91,659.17 mga | 678.00 | 608.00 | 672.00 | 24.61 | 16,537.02 |
| (India (hfo)) | 27-Jul-05 | 281.00 | 255.00 | 265.50 | 300.00 | 77,850.00 |  |  |  |  |  |
| Houston | 16-Aug-05 | 275.00 | 273.00 | 274.00 | 300.00 | 82,200.00 |  |  |  |  |  |
| (Puerto La Cruz)N (Cabo)WC | 02-Oct-05 | 348.00 | 347.00 | 348.00 | 400.70 | 139,443.90 | 647.00 | 640.00 | 649.50 | 45.20 | 39,301.60 |
| Santa Blanca WBR | 29-Oct-05 | 319.00 | 315.00 | 317.00 | 437.00 | 138,814.30 |  |  |  |  |  |
| Port of Spain estimated | 13-Nov-05 | 330.00 | 320.00 | 320.00 | 150.30 | 49,509.00 |  |  |  |  |  |
| Houston | 22-Nov-05 | 271.35 | 296.95 | 309.15 | 435.89 | 115,240.13 |  |  |  |  |  |
| Houston | 13-Dec-05 | 308.85 | 292.83 | 302.23 | 318.50 | 93,460.69 |  |  |  |  |  |
| Aliaga (Istanbul) | 16-Jan-06 | 504.00 | 301.00 | 302.50 | 471.00 | 142,748.75 | 601.00 | 590.00 | 508.50 | 45.00 | 28,022.50 |
| Houston | 04-Feb-06 | 327.95 | 321.15 | 324.39 | 470.00 | 152,688.60 |  |  |  |  |  |
| Colelisco (Valparaiso)WBR | 28-Mar-06 | 355.00 | 351.00 | 352.00 | 401.39 | 141,268.28 mgo | 581.00 | 579.00 | 580.00 | 30.33 | 26,650.40 |
| Guayaquil | 23-Mar-06 |  |  |  | 250.11 | 82,036.05 |  |  |  |  |  |
| Panama (Balboa) | 30-Mar-06 | 328.00 | 327.00 | 528.00 | 308.00 | 107,309.00 |  |  |  |  |  |
| Aratu (Salvador) est. | 18-Apr-09 | 350.00 | 345.00 | 347.50 | 310.00 | 107,570.00 180/mgo | 682.00 | 690.00 | 681.00 | 20.00 | 13,620.00 |
| Capetown WBR | 14-May-06 | 345.00 | 346.00 | 347.00 | 310.00 | 1,010,100.64 |  |  |  | 168.79 | 138,942.12 |
|  |  |  |  |  | 5,150.33 |  |  |  | 738.37 |  |  |
| **Average price** |  |  |  | 212.61 |  |  |  |  |  |  |  |
| Singapore | 08-Jun-06 | 325.00 | 323.00 | 324.00 | 497.00 | 131,699.00 | 715.00 | 707.00 | 711.00 | -50.00 | 21,320.00 |
| Aratu (Salvador) est | 05-Jul-06 | 345.00 | 340.00 | 342.50 | 350.00 | 123,200.00 | 700.00 | 700.00 | 700.00 | 25.00 | 17,250.00 |
| Fujairah | 18-Jul-06 | 346.00 | 346.00 | 346.00 | 286.00 | 101,460.00 |  |  |  |  |  |
| Singapore | 16-Aug-06 | 313.00 | 311.00 | 311.00 | 403.00 | 126,736.00 | 796.00 | 732.00 | 734.00 | 49.00 | 29,360.00 |
| Fujairah | 12-Sep-06 | 288.00 | 282.00 | 283.00 | 450.00 | 127,350.00 | 675.00 | 670.00 | 672.50 | 16.80 | 12,643.00 |
| Fujairah | 20-Sep-06 | 266.00 | 265.00 | 266.00 | 121.50 | 32,318.00 |  |  |  |  |  |
| Colombo estimated | 20-Sep-06 | 280.00 | 280.00 | 280.00 | 150.00 | 63,450.00 | 635.00 | 635.00 | 635.00 | 20.00 | 12,700.00 |
| Less ROB on resid |  |  |  | -290.00 | -173.46 | -50,286.00 |  |  | -535.00 | -23.90 | -15,170.50 |
|  |  |  |  |  | 2,013.10 | 635,267.00 |  |  | 712.98 | 109.00 | 78,356.50 |
| **Average price** |  |  |  | 315.97 |  |  |  |  |  |  |  |
| Enhancedpriceilers |  |  |  |  |  |  |  |  |  |  |  |

Polar Endurance
Final calculation for loaded voyages
June 2005 - June 2005

10/38

| | | | | 48,252 | | | |
|---|---|---|---|---|---|---|---|
| Anniversary | | | | | | | |
| Time taken at average speed of | | | 14.11 | 142.51713 days | | | |
| Per̲ ̲ted time at c/p speed of | Average IFO | | 14.50 | 138.68391 days | | | |
| T̲ ̲ne lost | | | | 3.83322 days | | | |
| Hire US$ | | 364,000 pcmpr | | | | | |
| Daily hire | | | | 11,967.12 | | | |
| Time lost | | | 3.83322 | | | | |
| Hire lost | | | | | | -45,872.61 | |
| IFO consumption at | average rate of | | 22.06 | 3,142.50 | 3 3 28·41 | | |
| IFO consumption at | in permitted time at c/p rate of | | 252 24 | 3,494.83 | | | |
| IFO over consumed | | | | 352.33 mt | | | 58,117·32 |
| IFO average price | 1~130·683%,6% | | 312.61 | 183·91 | 110,242.63 | | |
| Under consumed | | | | | | | |
| MDO consumption at | average rate of | | 0.33 | 47.03 | | | |
| MDO consumption at | in permitted time at c/p rate of | | 1.05 1·00 | 145.62 138·64 | | | 68,280·14 |
| MDO under consumed | | | | 98.59 mt | | | |
| MDO average price | | | 725.37 | 91·65 | 71,612.98 | | (78,724·87) |
| Under consumed | | | | | 138,788.22 | | |
| | | | Due Owners | | | | |
| Endendcal05loaded | | | | | | | |

Polar Endurance
Final calculation for ballast voyages
June 2005 - June 2006

11/38

Ballast voyage

|  |  |  |  | 18.429 |  |  |
|---|---|---|---|---|---|---|
|  |  |  | 11.83 | 58.43125 days |  |  |
| taken at average speed of |  |  | 14.5 | 55.83046 days |  |  |
| ...mitted time at c/p speed of | Average IFO |  |  | 12.60079 days |  |  |
| Total time lost |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| Hire US$ |  | 384000 pcmpr |  |  |  |  |
| Daily hire |  |  | 12.60079 | 11,957.12 |  |  |
| Time lost |  |  |  |  | 150,795.21 |  |
| Hire lost |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| IFO consumption at | average rate of |  | 20.62 | 1,404.21 |  |  |
| IFO consumption at | in permitted time at c/p rate of |  | 25.7 | 1,406.63 |  |  |
| IFO under consumed |  |  |  | 2.76 mt |  |  |
| IFO average price |  |  | 312.81 | 85.22 | 850.30 |  |
| Under consumed |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| MDO consumption at | average rate of |  | 0.66 | 45.16 |  |  |
| MDO consumption at | in permitted time at c/p rate of |  | 1.05 | 58.63 |  |  |
| MDO under consumed |  |  |  | 13.48 mt |  |  |
| MDO average price |  |  | 725.37 |  | 9,780.63 |  |
| Under consumed |  |  |  |  |  |  |
|  |  |  | Due Charterers |  | 141,081.73 |  |

Endendcal0506ballast

12/38

**Polar Endurance**
**Summary of vessels performance over total distances**
**June 2005 - June 2006**

| From | To | Load/Ballast | | Distance RFO/POB |
|------|-----|------|------|------|
| Aratu | Rio de Janeiro | Loaded | | 755 |
| Aratu | Stade | Loaded | | 4,993 |
| Dunkirk | Houston | Loaded | | 5,058 |
| Bahia Blance | Houston | Loaded | | 7,070 |
| Jose | Houston | Loaded | | 2,159 |
| Houston | Leghorn | Loaded | | 5,769 |
| Aliaga | Houston | Loaded | | 6,630 |
| Houston | Guyaquil | Loaded | | 2,403 |
| Quintero | Guyaquil | Loaded | | 1,927 |
| Quintero | San Vincente | Loaded | | 263 |
| San Vincente | Quintero | Loaded | | 264 |
| Quintero | Guayaquil | Loaded | | 1,963 |
| Aratu / Capetown | Gresik | Loaded | | 9,008 |
| Anniversary | | | | 48,262 |
| | | | | |
| Time taken at average speed of | | | 14.11 | 142.51713 days |
| Permitted time at c/p spe Average IFO | | | 14.50 | 138.68391 days |
| al time lost | | | | 3.83322 days |
| | | | | |
| IFO consumption at | average rate of | | 22.05 | 3,143 |
| IFO consumption at | c/p rate of | | 25.2 | 3,495 |
| IFO under consumed | | | | 352.33 mt |
| | | | | |
| MDO consumption at | average rate of | | 0.33 | 47.03 |
| MDO consumption at | c/p rate of | | 1.05 | 145.62 |
| MDO under consumed | | | | 98.59 mt |
| | | | | |
| Ballast | | | | |
| Santa Clara | Aratu | Ballast | | 1,499 |
| Rio de Janiro | Aratu | Ballast | | 755 |
| Stade | Dunkirk | Ballast | | 370 |
| Houston | Puerto La Cruz | Ballast | | 2,117 |
| Puerto La Cruz | Bahia Blance | Ballast | | 4,952 |
| Houston | Jose | Ballast | | 2,159 |
| Leghorn | Aliaga | Ballast | | 1,156 |
| Guyaquil | Quintero | Ballast | | 1,927 |
| Guyaquil | Aratu | Ballast | | 4,494 |
| | | | | 19,429 |
| | | | | |
| Time taken at average speed of | | | 11.83 | 68.43125 days |
| Permitted time at c/p spe Average IFO | | | 14.5 | 55.83046 days |
| Total time lost | | | | 12.60079 days |
| | | | | |
| IFO consumption at | average rate of | | 20.52 | 1,404.21 |
| IFO consumption at | c/p rate of | | 25.200 | 1,406.93 |
| IFO under consumed | | | | 2.72 mt |
| | | | | |
| MDO consumption at | average rate of | | 0.66 | 45.16 |
| MDO consumption at | c/p rate of | | 1.05 | 58.62 |
| MDO under consumed | | | | 13.46 mt |

Endave0508

13/38

Summary of vessels actual performance on loaded and ballast vr... *s

June 2005 - June 2006

| From | To | Load/Ballast | Date from | Date to | Distance | Hours | IFO | MDO | |
|---|---|---|---|---|---|---|---|---|---|
| Aratu | Rio de Janeiro | Loaded | 20-Jun-05 | 22-Jun-05 | 367 | 24 | 21.40 | 0.70 | |
| Aratu | Stade | Loaded | 03-Jul-05 | 22-Jul-05 | 4,221 | 284 | 283.20 | 3.70 | |
| Dunkirk | Houston | Loaded | 31-Jul-05 | 13-Aug-05 | 3,719 | 247 | 220.40 | 5.00 | |
| Bahia Blanco | Houston | Loaded | 29-Oct-05 | 19-Nov-05 | 6,183 | 459 | 441.30 | 6.00 | |
| Jose | Houston | Loaded | 06-Dec-05 | 13-Dec-05 | 1,767 | 122 | 100.60 | 1.40 | |
| Houston | Loghorn | Loaded | 24-Dec-05 | 10-Jan-06 | 3,359 | 226 | 200.70 | 3.60 | |
| Aliaga | Houston | Loaded | 18-Jan-06 | 06-Feb-06 | 982 | 73 | 68.60 | 1.30 | |
| Houston | Guyaquil | Loaded | 17-Feb-06 | 24-Feb-06 | 991 | 72 | 72.00 | 1.60 | |
| Quintero | Guyaquil | Loaded | 19-Mar-06 | 24-Mar-06 | 0 | 0 | 0.00 | 0.00 | all bad weather |
| Aratu | Greslik | Loaded | 02-May-06 | 02-Jun-06 | 3,108 | 235 | 222.40 | 1.10 | |
| Anniversary | | | | Totals | 24,717 | 1752 | 1609.60 | 24.40 | |
| | | | | | | | | | |
| Average performance | | | | | 14.11 | | 22.05 | 0.33 | |
| | | | | | | | | | |
| Ballast | | | | | | | | | |
| Santa Clara | Aratu | Ballast | 11-Jun-05 | 16-Jun-05 | 305 | 24 | 17.90 | 1.00 | |
| Rio de Janeiro | Aratu | Ballast | 02-Jul-05 | 03-Jul-05 | 307 | 24 | 21.40 | 0.50 | |
| Stade | Dunkirk | Ballast | 25-Jul-05 | 27-Jul-05 | 306 | 24 | 21.50 | 0.30 | |
| Houston | Puerto La Cruz | Ballast | 23-Sep-05 | 30-Sep-05 | 1,888 | 166.5 | 154.30 | 11.00 | |
| Puerto Le Cruz | Bahia Blanco | Ballast | 02-Oct-05 | 29-Oct-05 | 3,653 | 312 | 257.40 | 2.60 | |
| Houston | Jose | Ballast | 26-Nov-05 | 03-Dec-05 | 0 | 0 | 0.00 | 0.00 | all bad weather |
| Loghorn | Aliaga | Ballast | 13-Jan-06 | 17-Jan-06 | 0 | 0 | 0.00 | 0.00 | all bad weather |
| Guyaquil | Quintero | Ballast | 01-Mar-06 | 08-Mar-06 | 511 | 48 | 39.20 | 0.00 | all bad weather |
| Guyaquil | Aratu | Ballast | 28-Mar-06 | 13-Apr-06 | | | 0.00 | 0.00 | all bad weather |
| | | | | Totals | 7,080 | 5905.5 | 511.70 | 18.40 | |
| | | | | | | | | | |
| Average performance | | | | | 11.83 | | 20.52 | 0.66 | |
| | | | | | | | | | |
| Endavaperform05 | | | | | | | | | |

# EXHIBIT "C"

effective date of termination or within such further period as the tribunal considers reasonable in a case where it is satisfied that it was not reasonably practicable for the complaint to be presented within the period of three months.[116] Short periods of limitation are further provided for proceedings where an employer has not provided an employee with a statement of terms of employment[117] and in respect of guarantee payments.[118]

28–029      Legal proceedings by the employer of a worker in retail employment for the recovery from the worker of any amount in respect of a cash shortage or stock deficiency cannot be instituted after the end of a period of 12 months beginning with the date when the employer established the existence of the deficiency or (if earlier) the date when he ought reasonably to have done so, unless he has within that period made a statutory demand for payment in respect of that amount.[119] An employment tribunal cannot entertain a complaint in respect of unauthorised deductions from the wages of a worker or an unlawful payment to an employer unless it is presented within the period of three months from the date of payment of the relevant wages or the date of the receipt of the payment by the employer or within such further period as the tribunal considers reasonable in a case where it is satisfied that it was not reasonably practicable for the complaint to be presented within the period of three months.[120]

28–030      The Equal Pay Act 1970,[121] the Sex Discrimination Act 1975,[122] the Race Relations Act 1976[123] and the Disability Discrimination Act 1995[124] also establish time limits within which proceedings must be brought.

## 2. Accrual of the Cause of Action

28–031      **Meaning of cause of action.** Section 5 of the Limitation Act 1980 provides that the action "shall not be brought after the expiration of six years from the date on which the cause of action accrued." The ascertainment of this date is often a question of some difficulty. There is no definition of the term "cause of action" in the Act, and therefore the old law is still applicable. In 1888 it was defined by Lord Esher as "every fact which it would be necessary for the plaintiff to prove, if traversed, in order to support his right to the judgment of the court."[125] In 1891 Lindley L.J. said "it has always been held that the statute runs from the earliest

---

[116] *ibid.* s.111(2). But see s.111(3)(4). See Vol.II, para.39–236.
[117] *ibid.* s.11(4) (three months); Vol.II, para.39–040.
[118] *ibid.* s.24(2) (three months); Vol.II, para.39–086.
[119] *ibid.* s.20(5); see Vol.II, para.39–094.
[120] *ibid.* s.23(2)–(4); see Vol.II, para.39–092.
[121] s. 2(5) (as amended).
[122] s.76 (as amended).
[123] s.68.
[124] Sch.3, Pt.I, para.3.
[125] *Read v Brown* (1888) 22 Q.B.D. 128, 131. See also *Cooke v Gill* (1873) L.R. 8 C.P. 107, 116; *Coburn v Colledge* [1897] 1 Q.B. 702, 706, 707; *Central Electricity Board v Halifax Corp.* [1963] A.C. 785, 800, 806. *Letang v Cooper* [1964] 1 Q.B. 232, 242; *Paragon Finance v Thakerar & Co* [1999] 1 All E.R. 405.

Case 1:00-cv-12896-HB Document 30-1 Filed 03/16/2006 Page 3 of 4

time at which an action could be brought."[126] And in 1927 Lord Dunedin defined cause of action to mean "that which makes action possible."[127] There must also be in existence at this moment a competent claimant and a competent defendant.[128] There is no competent defendant if, *e.g.* he enjoys diplomatic privilege[129] or, being a corporation, it has been dissolved in the country of its incorporation.[130] On the other hand, the mere fact that the defendant cannot be traced, so that in practice the claimant cannot start proceedings, does not prevent the cause of action from accruing.[131] Where a claim arises at or after the death of an intestate and not before (*e.g.* for a debt payable after the death of the creditor or debtor) it appears to be the rule that there is no competent claimant or defendant, as the case may be, in the interval between the death and the grant of letters of administration so that the cause of action does not accrue until the grant of letters.[132] This is because the title of an administrator is derived from the grant and he cannot sue or be sued until a grant is made. There is also some authority for saying that if at the time when the cause of action would have accrued the potential claimant and defendant were one and the same person, so that the hand to pay and the hand to receive were the same, the cause of action does not accrue and time does not begin to run.[133] It should be noted that what is said above about competent parties refers only to the accrual of the cause of action. It does not refer to the suspension of the statute once time has begun to run.[134]

**General rule in contract.** The general rule in contract is that the cause of 28–032 action accrues, not when the damage is suffered, but when the breach takes place.[135] "In an action of assumpsit, the Statute of Limitations begins to run not from the time when the damage results from breach of the promise, but the time when the breach of promise takes place."[136] The gist of an action for breach of

[126] *Reeves v Butcher* [1891] 2 Q.B. 509, 511.

[127] *Board of Trade v Cayzer, Irvine & Co* [1927] A.C. 610, 617. See also *Letang v Cooper* [1965] 1 Q.B. 232, 242.

[128] *Thomson v Lord Clanmore* [1900] 1 Ch. 718, 728–729 (Vaughan Williams L.J.).

[129] *Musurus Bey v Gadban* [1894] 2 Q.B. 352.

[130] *Re Russo-Asiatic Bank* [1934] Ch. 720, 738.

[131] *R.B. Policies at Lloyd's v Butler* [1950] 1 K.B. 76; Goodman (1966) 29 M.L.R. 366. *cf. Clark v Forbes Stuart (Thames Steel) Ltd* [1964] 1 W.L.R. 836; Limitation Act 1980, ss.14(1)(c), 14(1A)(c), 14A(8)(c).

[132] *Jolliffe v Pitt* (1715) 2 Vern. 694; *Murray v East India Co* (1821) 5 B. & Ald. 204; *Douglas v Forrest* (1828) 4 Bing. 686, 704; *Pratt v Swaine* (1828) 8 B. & C. 285; *Burdick v Garrick* (1870) L.R. 5 Ch.App. 233, 241; *Chan Kit Sam v Ho Fung Ham* [1902] A.C. 257; *Meyappa Chetty v Supramanian Chetty* [1916] 1 A.C. 603, 610. But there is some doubt about whether this rule can stand subsequent to RSC Ord.15, r.6A—now CPR r.19.8—which was made by virtue of s.2 of the Proceedings against Estates Act 1970 (now repealed). There are also statutory limitation provisions for particular causes of action which presumably override any such rule, *e.g.* Limitation Act 1980, ss.11(5), 12(2). See also s.26 of the Limitation Act 1980 (recovery of land). For accrual after date of death where there is an executor, see *Webster v Webster* (1804) 10 Ves.Jun. 93; *Flood v Patterson* (1861) 29 Beav. 295; *Knox v Gye* (1871) L.R. 5 H.L. 656; *Lovett v Ambler* (1876) 3 Ch.D. 198; *Meyappa Chetty v Supramanian Chetty*, above, at 608.

[133] *Binns v Nichols* (1866) L.R. 2 Eq. 256; *Re Pardoe* [1906] 1 Ch. 265.

[134] As to this, see below, paras 28–065—28–066.

[135] *Gould v Johnson* (1702) 2 Salk. 422; *Battley v Faulkner* (1820) 3 B. & Ald. 288; *Short v M'Carthy* (1820) 3 B. & Ald. 626; *Howell v Young* (1826) 5 B. & C. 259; *Walker v Milner* (1866) 4 F. & F. 745; *Gibbs v Guild* (1881) 8 Q.B.D. 296, 302.

[136] *Howell v Young* (1826) 5 B. & C. 259, 265.

con-
nably
three
where
ploy-

or the
stock
nning
or (if
within
[19] An
rised
loyer
ment
loyer
where
to be

Race
stab-

vides
date
ten a
tion"
ed by
rove,
1891
rliest

, 116;
1963]
& Co

contract is the breach, and not any resulting damage which may be occasioned thereby. Consequently, the Act runs from the time when the contract is broken, and not from the time at which any damage resulting therefrom is sustained by the claimant. Therefore, although such damage may occur within six years before the action is brought, the action will be barred if the contract was broken before that period. For example, in an action for breach of warranty or condition against a seller of goods, the cause of action accrues when the goods are delivered, and not when the defect is discovered.[137]

28–033    **Concurrent liability in tort.** It is, however, well established that in the tort of negligence the cause of action arises when the damage is suffered and not when the act or omission complained of occurs. If, therefore, a claimant has, independently of or in addition to any cause of action in contract, a cause of action in tort for negligence, time will not begin to run in respect of his claim in tort until the damage is sustained. In a number of cases it was held that an action for negligence against, for example, a solicitor[138] or architect[139] was contractual in nature, so that the cause of action accrued when his negligent act or omission took place.[140] But more recent cases have held that the existence of a contractual relationship between the parties does not necessarily exclude a concurrent or independent cause of action in tort.[141] So an action may be brought in tort for negligence in respect of professional services rendered, for example, by a solicitor,[142] insurance broker,[143] architect[144] or engineer[145] within six years of the date when the claimant first sustains damage.[146]

---

[137] *Battley v Faulkner,* above; *Lynn v Bamber* [1930] 2 K.B. 72, 74.
[138] *Short v M'Carthy,* above; *Brown v Howard* (1820) 2 Brod. & B. 73; *Howell v Young,* above; *Bean v Wade* (1885) 2 T.L.R. 157; *Wood v Jones* (1889) 61 L.T. 551; *Groom v Crocker* [1939] 1 K.B. 194; *Somers v Erskine* [1944] Ir.R. 368; *Clark v Kirby-Smith* [1964] Ch. 506. See also *Cook v Swinfen* [1967] 1 W.L.R. 457; *Heywood v Wellers* [1976] Q.B. 446; *Rowe v Turner Hopkins & Partners* [1980] N.Z.L.R. 550.
[139] *Bagot v Stevens Scanlon & Co Ltd* [1966] 1 Q.B. 197.
[140] *Clark v Kirby-Smith,* above; *Bagot v Stevens Scanlon & Co Ltd,* above.
[141] *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145. See above, paras 1–105—1–147, 28–010—28–012.
[142] *Midland Bank Trust Co Ltd v Hett, Stubbs & Kemp* [1977] Ch. 384; *Forster v Outred & Co* [1982] 1 W.L.R. 86; *D. W. Moore & Co Ltd v Ferrier* [1988] 1 W.L.R. 267; *Bell v Peter Browne & Co* [1990] Q.B. 495; *Khan v Falvey & Co* [2002] EWCA Civ 400; [2002] P.N.L.R. 28; *McCarroll v Statham Gill Davies* [2002] EWCA Civ 425; [2003] P.N.L.R. 25.
[143] *Iron Trades Mutual Insurance Co Ltd v Buckenham Ltd* [1989] 2 Lloyd's Rep. 85; *Islander Trucking Ltd v Hogg Robinson & Gardner Mountain (Marine) Ltd* [1990] 1 All E.R. 826; *Punjab National Bank v De Boinville* [1992] 1 W.L.R. 1138; *Knapp v Ecclesiastical Insurance Group plc* [1998] P.N.L.R. 172. See also *Société Commerciale de Reassurance v Eras International Ltd* [1992] 1 Lloyd's Rep. 570 (insurance management agreement); *Henderson v Merrett Syndicates Ltd,* above (Lloyd's underwriting agents).
[144] *Kensington and Chelsea and Westminster Area Health Authority v Western Composites Ltd* [1985] 1 All E.R. 346; *London Congregational Union Inc. v Harriss & Harriss* [1988] 1 All E.R. 15; *Wessex Regional Health Authority v HLM Design* (1994) 10 Const. L.J. 165; *New Islington & Hackney Housing Assn Ltd v Pollard, Thomas and Edwards Ltd* [2001] Build L.R. 74.
[145] *Pirelli General Cable Works Ltd v Oscar Faber and Partners* [1983] A.C. 1; *Wessex Regional Health Authority v HLM Design,* above.
[146] For extension of the period in cases of latent damage in the tort of negligence, see above, paras 28–010—28–012.

# EXHIBIT "D"

19 of 20 DOCUMENTS

Telfair Shipping Corporation v Inersea Carriers SA (The **"Caroline P"**)

Queen's Bench Division (Commercial Court)

*[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466*

**HEARING-DATES:** 13, 14, 15, Feb, 3 July 1984

3 July 1984

**CATCHWORDS:**

Arbitration -- Award -- Indemnity -- Limitation of time -- Iraqi Court find in favour of receivers against owners -- Whether owners' claim against charterers time barred -- Whether owners entitled to be indemnified by charterers -- Whether indemnity covered legal costs and expenses and bank charges -- Whether indemnity included sums payable in respect of negligent discharge

**HEADNOTE:**

By a charter-party dated Nov 5, 1974, the owners let their vessel **Caroline P** to the charterers for a time chartered trip. On Nov 11, 1974, the charterers sub-let the vessel to Trans-American Steamship who themselves sub-let the vessel on a voyage charter to Tradax SA.

The charter between the owners and the charterers was in the New York Produce Exchange form and by cl 8 provided that --

. . . Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain .
. .

In due course **Caroline P** was ordered to Houston where she loaded a cargo of about 14,600 tonnes of rice in bags. Two bills of lading dated Dec 31, 1974 and Jan 12, 1975 were issued; and typed in after the port of discharge were the words "Free Out".

The vessel arrived at Surabaya, the first port of discharge on Mar 8, 1975, and sailed from there to Basrah where she berthed on or about Mar 31.

The cargo was discharged during the course of the next three weeks, discharge being completed at 00 40 hours on Apr 21, 1975. As the discharge proceeded it was found that many of the bags had been badly damaged. The receivers brought proceedings against the owners in the Iraqi Court at Basrah.

On Dec 11, 1978, the Court of first instance gave judgment against the owners for 79,490.444 Iraqi dinars plus legal fees and expenses. The owners appealed to the Basrah Court of Appeal who on May 8, 1979, reduced the damages to 57,107.609 Iraqi dinars. That sum was however increased to 79,341.412 Iraqi dinars by the Cassation Court on the owners' further appeal and the receivers' cross-appeal.

The owners sought to recover their losses by bringing proceedings in arbitration against the charterers. Mr John Potter was appointed sole arbitrator on Mar 30, 1981, which date was accepted as the relevant date for the purpose of calculating the limitation period.

The arbitrator found in favour of the owners and awarded them the sums claimed and a declaration that the charterers were to indemnify the owners for all further sums and expenses reasonably paid in connection with the cargo claim.

The charterers appealed against that award, the issues for decision being: (1) What was the nature of the indemnity to be implied when an owner's agent was required under the terms of the charter to sign bills of lading "as presented"? (2) At what point did time begin to run for the purpose of a period of limitation where the person who had the benefit of such an indemnity sought to enforce it? (3) What was the extent of the indemnity and in particular did it cover such

matters as legal costs and expenses and bank charges? (4) Did the indemnity include sums payable to receivers in respect of claims arising from negligent discharge notwithstanding that the bills were marked "Free Out"?

Held, by QB (Com Ct) (Neill, J), that (1) the owners were entitled to an implied indemnity which indemnified them against the consequences of the master signing the bills of lading and such an indemnity did not become enforceable by action until at the earliest the liability of the owners to the receivers had been ascertained by the Court of first instance in Basrah (see p 476, col 1);

(2) even if time began to run for the purposes of the indemnity from the moment when the owners first incurred a liability to the receivers, the receivers could not have brought their claim before the completion of the discharge or at the very earliest at the commencement of the discharge and since discharge had commenced on Apr 2, 1975, the appointment of the arbitrator on Mar 30, 1981, was just in time; no actual liability was incurred to the receivers before Apr 2, 1975 (see p 476, cols 1 and 2);

(3) even if the indemnity was to be construed as an indemnity against the incurring of liability such an indemnity could not have been invoked by the owners until they had incurred some actual liability to the receivers and the arbitrator was correct in his decision that the owners' claim was not time barred (see p 476, col 2);

(4) once it had been established that the owners were entitled to an indemnity that indemnity should be an adequate indemnity and the owners were entitled to the relief which they obtained from the arbitrator (see p 476, col 2);

(5) it was uncertain how far the effect of the words "Free Out" in the bills of lading were canvassed in the Iraqi Courts, and on the facts of this case the Court could not reopen the issue of the liability of the owners to the receivers; there was no ground for interfering with the decision of the arbitrator on this point and the appeal would be dismissed (see p 476, col 2).

**CASES-REF-TO:**

Bosma v Larsen, [1966] 1 Lloyd's Rep 22; County & District Properties Ltd v C Jenner & Son Ltd and Others, [1976] 2 Lloyd's Rep 728; Dawson Line Ltd v Aktiengesellschaft Adler Fuer Chemische Industrie of Berlin, (CA) (1931) 41 Ll.L Rep 75; [1932] 1 KB 433; Elder Dempster & Co v CG Dunn & Co Ltd, (1909) 15 Com Cas 49; Forster v Outred & Co, (CA) [1982] 1 WLR 1982; Green (RH) & Silley Weir Ltd v British Railways Board and Kavanagh (Third Party), (1980) 17 BLR 94; Hadley v Baxendale, (1854) 9 Exch 341; Littlewood v George Wimpey & Co Ltd (and British Overseas Airways Corporation), (CA) [1953] 1 QB 501; M'Gillivray v Hope and Another, [1935] AC1; Moel Tryvan Steam Ship Co Ltd v Kruger & Co Ltd, (HL) [1907] AC 272; (CA) [1907] 1 KB 809; Richardson In Re, [1911] 2 KB 705; Robinson v Harkin [1896] 2 Ch 415; Strathlorne Steamship Co Ltd v Andrew Weir & Co, (1934) 50 Ll.L Rep 185; Toplis v Grave (1839) 5 Bing (NC) 636; Wolmerhausen v Gullick, [1893] 2 Ch 514.

**INTRODUCTION:**

Appeal. This was an appeal by the charterers, Telfair Shipping Corporation from the arbitration award made in favour of the owners, Inersea Carriers SA in which the arbitrator held that the charterers were liable to indemnify the owners for the sums awarded against the owners by the Basrah Court of Appeal in the action brought by the receivers against the owners for damage to a cargo of rice in bags.

The further facts are stated in the judgment of Mr Justice Neill

**COUNSEL:**

Mr J Cooke for the charterers; Mr J Hirst for the owners

**JUDGMENT-READ:**

Judgment was reserved. Tuesday, July 3, 1984

**PANEL:** Mr Justice Neill

**JUDGMENTBY-1:** Mr Justice NEILL

**JUDGMENT-1:**

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

Mr Justice NEILL: The appellants (whom I shall call the "charterers") bring this appeal pursuant to the order giving leave to appeal made by Mr Justice Parker on Nov 26, 1983. The appeal is against the award of Mr John L Potter dated Sept 13, 1983. The appeal raises difficult questions as to the nature and extent of an implied indemnity.

By a charter-party dated and concluded in London on Nov 5, 1974, on a New York Produce Exchange form, the present respondents (whom I shall the "owners") chartered their motor vessel **Caroline P** to the charterers for trading for a time charter trip on the terms and conditions set out in the charter-party. On Nov 11, 1974, the charterers concluded a sub-charter on similar terms with another company who themselves further sub-let the vessel on a voyage charter-party to Tradax SA.

The charter-party between the owners and the charterers provided in cl 8, as follows:

That the Captain shall prosecute his voyages with the utmost despatch and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's Receipts without prejudice to this Charter-party.

In due course **Caroline P** was ordered to Houston where she loaded a cargo of about 14,600 tonnes of rice in bags. Two bills of lading dated respectively Dec 31, 1974, and Jan 12, 1975, were issued and signed by the agents for the charterers on behalf of the master. Both bills of lading had typed in after the name of the discharge port, the words "FREE OUT". According to the arbitrator's reasons the vessel arrived at Surabaya, the first discharge port, on Mar 8, 1975, and sailed from there to Basrah where she berthed on or about Mar 31. The cargo was discharged during the course of the next three weeks, discharge being completed at 00 40 hours on Apr 21, 1975. On p 10 of his reasons the arbitrator stated that --

. . . in all probability no rice [which was the cargo with which the arbitration was concerned] was discharged before 2nd April.

As the discharge of the rice proceeded it was found that many bags had been badly damaged and subsequently a substantial amount of re-bagging took place. The damage to the bags and the resulting shortages led to claims being made by the receivers and proceedings were instituted before the Court of first instance in Basrah against the owners' agents.

On Dec 11, 1978, the Court of first instance gave judgment against the owners' agents in the sum of Iraqi Dinars 79,490.444 plus legal fees and expenses of Iraqi Dinars 500. The owners appealed to the Basrah Court of Appeal who, on May 8, 1979, reduced the damages payable to Iraqi Dinars 57,107.609, but on the owners' further appeal to the Cassation Court and on the charterers' cross-appeal the damages were increased to Iraqi Dinars 79,341.412.

The judgment of the Cassation Court was given on June 5, 1981. All the Courts held that the loss and damage were due to bad stowage. According to the surveyor who attended on board the vessel on the instructions of the Court of first instance in Basrah, however, the damage was caused by a number of factors as set out at the bottom of p 4 of the reasons.

It is now common ground that of these factors four concerned loading or stowage, one concerned discharge and the sixth factor could be connected with loading or discharge.

Faced with the judgment of the Court of Appeal in Basrah, the owners decided to make a claim against the charterers. The parties agreed to Mr John Potter acting as sole arbitrator and his appointment was perfected on Mar 30, 1981. On July 22, 1981, the owners served their points of claim, claiming the sum awarded by the Basrah Court of Appeal. On Nov 8, 1982, the points of claim were amended to increase the sum claimed to correspond with the figure awarded by the Cassation Court in Baghdad.

In par 7 of their pleading, the owners put their claim as follows:

By clauses 2 and 8 of the Time Charter, the responsibility for bad stowage is upon the Charterers and there is to be implied from Clause 8 that the Charterers will indemnify the Owners in respect of any liability incurred by the Owners under Bills of Lading in respect of matters for which the Charterers are responsible under the Charterparty.

The charterers served a defence which was later amended in which they raised a number of defences including a defence that the claim was time barred. In par 3 of the amended defence, it was pleaded as follows:

Page 4

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

Further the Charterers received notice of the appointment of the Owners' Arbitrator on 9th April 1981. As discharge of the cargo at Basrah took place in March 1975 the appointment was made more than six years after the claim arose. In the premises the Owners' claim is time-barred.

Despite this plea, however, it is now accepted that the relevant date for the purpose of calculating the limitation period is Mar 30, 1981.

The matter came on for hearing before the arbitrator on Aug 15, 1983. By that stage the owners had subdivided their claim under four headings as follows:

(a) £22,808.56, being the sum which was equivalent to the amount they had to provide in Iraqi Dinars under a guarantee plus interest.

(b) US $1,378 for legal expenses in Baghdad.

(c) £2,852.01, being the bank charges incurred in servicing the guarantee until 19th July 1983 plus interest.

(d) A declaration that they should be indemnified by the charterers in respect of all further sums and expenses reasonably paid in connection with the cargo claim.

The reason why a declaration was sought was that although the Cassation Court had given judgment in June, 1981, it was still hoped that negotiations might result in a settlement at a lower figure than that awarded. By his award, the arbitrator awarded the owners the sums claimed and made the declaration which they sought. He also adjudged that the charterers should pay the owners' costs of the reference and of the award.

In the course of the hearing before the arbitrator he was referred to some of the authorities to which my attention has been drawn and in particular he had to consider conflicting submissions as to the date when the cause of action on the indemnity arose. At p 9 of his reasons, he expressed his opinion as follows:

The cases are difficult to reconcile but on the time-bar point it seems to me that I need go no further than finding that the earliest date for the cause of action arose on completion of discharge of the damaged cargo, for only then can it be said the facts came into existence to create the liability. . . In the present case a liability was not established against the Owners under the bill of lading until the judgment of the Iraqi Court in December, 1978 and logically, in my view, it cannot be said that before then a liability had been established against the Owners in excess of those undertaken in the charterparty contract.

I cannot accept the Charterers' contention that the cause of action arose when the breach occurred. Clearly, all the damage complained of was not wholly attributable to the method of stowage but if it were, the existence of any breach regarding that method of stowage would only become apparent at the time of discharge. The Charterers' argument on this point appeared to me to be artificial.

Accordingly, the arbitrator found that the claim by the owners was not barred by effluxion of time because discharge was not completed until Apr 21, 1975, whereas his appointment had been perfected a little less than six years later, on Mar 30, 1981.

In the course of the argument before me a number of questions were raised which I can summarise as follows: (1) What is the nature of the indemnity to be implied when an owners' agent is required under the terms of the charter-party to sign bills of lading "as presented"? (2) At what point does time begin to run for the purpose of a period of limitation where the person who has the benefit of such an indemnity seeks to enforce it? (3) What is the extent of the indemnity and in particular does it cover such matters as legal costs and expenses and other expenses including bank charges? (4) Does the indemnity in the present case include sums payable to receivers in respect of claims arising from negligent discharge of the cargo notwithstanding the fact that the bills of lading were marked "FREE OUT"? I shall deal with the first two questions together.

It was common ground that the bills of lading dated Dec 31, 1974 and Jan 12, 1975, imposed obligations on the owners which were more onerous than those stipulated in the charter-party. Thus, by cl 8 of the charter-party, the charterers were responsible for loading, stowing, trimming and discharge. It was also common ground that though the charter-party contained no express indemnity, the owners were entitled to the benefit of an implied indemnity. There was an issue between the parties, however, as to the nature and extent of this implied indemnity.

On behalf of the charterers it was contended that the indemnity was against liability, whereas on behalf of the owners it was contended that the indemnity was against the consequences of signing mor onerous bills of lading. The dis-

tinction, which at first sight may appear academic, is of importance when one comes to examine the time at which the period of limitation began to run.

Mr Jeremy Cooke, on behalf of the charterers, placed great reliance on the language used in the speeches in the House of Lords in Moel Tryvan Steam Ship Co Ltd v Kruger & Co Ltd, [1907] AC 272, and in Elder Dempster & Co v CG Dunn & Co (Ltd), (1909) 15 Com Cas 49. It is necessary to consider these cases in turn.

In the Kruger case, the charter-party contained a clause exempting the owners from liability for stranding and other accidents of navigation even when occasioned by the negligence of the master. It also contained a clause to the effect that the master was to sign clean bills of lading without prejudice to the charter. By mistake the master signed bills of lading presented by the charterers which did not give the owners the exemption provided for in the charter-party. Subsequently owing to the negligent navigation of the master, there was a total loss of the cargo and the holders of the bills of lading recovered damages against the owners. It was held that the owners were entitled to be indemnified by the charterers. It is important, however, to examine what was said as to the basis for this entitlement.

In the Court of Appeal both the President, Sir Gorell Barnes, and Lord Justice Farwell based the indemnity on the fact that the charterers had been in breach of the contract. At the end of his judgment in Moel Tryvan Ship Co Ltd v Kruger & Co Ltd, [1907] 1 KB 809 the President used these words at p 825:

. . . I base my judgment on this broad ground, that there was a breach of contract on the part of the charterers which has resulted in the loss to the ship owner . . .

and at p 828 Lord Justice Farwell said this:

. . . Now in the present case the bill of lading tendered is entirely different from the charterparty, and the charterer has therefore committed a breach of contract in preparing and tendering and obtaining the execution of such a contract as that.

Lord Justice Buckley, however, held that the owners were also entitled to recover on the basis that the charterers had requested the owners' agent to sign the bills and the owners were therefore entitled to an indemnity. At p 832 he said:

The right in law seems to me to follow from this, that he requests him to do an act, and then the law implies that if liability results from the act there will be an indemnity given by one party to the other.

Mr Cooke submitted that in the House of Lords the right to an indemnity appears to have been based on a breach of contract. I should set out the relevant passages:

(a) Lord Loreburn, LC at p 276:

When bills of lading are given they may give rise to rights in persons other than the charterers and on conditions other than those contained in the charterparty; and therefore it is the duty of the charterers who have to present these bills, to provide that they shall not expose the shipowners to risks from which by contract they are to be exempt. . . It is not a case of warranty. It is a case in which, by contract, the shipowners undertook to carry a cargo on the footing that they were not to be liable for the master's negligent navigation, and the charterers have made them so liable by the bills of lading. Hence arises a duty to give adequate indemnity.

(b) The Earl of Halsbury at p 277:

. . . I agree with Sir Gorell Barnes that the defendants were bound by their contract to tender a bill of lading if they thought proper to do so, and that such bill of lading ought to have incorporated in terms what has been called the negligence clause. I think it is their breach of contract that has occasioned the loss. I think there was a contract by them that if the master signed a bill of lading at their request it should not be in the form of a contract which would strike out the negligence clause. . . as different reasons have been discussed and assigned for the ground upon which the charterers ought to be made liable, I wish to say, inasmuch as I do not concur in some of the reasons given, that I am of opinion that the liability arises from the contract relations between the shipowners and the charterers . . .

(c) Lord James of Hereford at p 281:

. .. By contract and by course of business the charterers undertook that the bills of lading they presented to the master should be in accordance with teh charterparty. They failed in this respect, and by that failure the respondents were rendered liable for the loss occasioned by the negligence of the master.

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

Lord Atkinson at p 282 concurred.

Having considered these passages I have come to the conclusion that Mr Cooke's submission is well-founded. I shall return later to consider the significance of this conclusion. Before I do so, however, I must examine some of the later cases starting with Elder, Dempster, & Co v CG Dunn & Co Ltd, (1909) 15 Com Cas 49.

In the Elder, Dempster case, as in the Kruger case, the House of Lords was concerned with a vessel chartered under a voyage charter-party. The charter-party provided that the charterers were "to load, stow and trim the cargo at their own expense, under the direction of the Master" and that the master should "sign bills of lading as presented, without prejudice" to the charter-party. At the conclusion of the loading in a port in Texas of the cargo consisting of bales of cotton the charterers presented bills of lading to the master for signature. Some of the bales which had been loaded, however, were not marked in a way which corresponded with the terms of the bills of lading. On arrival at Le Havre some of the consignees refused to accept the wrongly marked bales and claimed their value from the owners. As by French law the bills of lading constituted conclusive evidence against the owners of the receipt of the goods by them, the owners paid the claims and sought to recover what they had paid from the charterers.

They put the case in two ways: (a) they asserted that the charterers, by presenting the bills of lading with the marks specified in them, requested the master to sign them and therefore that the charterers were liable to indemnify the owners "from the consequent liability incurred by them"; (b) in the alternative, they asserted that by presenting the bills the charterers "represented and warranted" to the master that the marks specified therein correctly specified the marks on the bales, and they made this representation and warranty intending that the master should sign the bills and that the owners "should thereby incur liabilities thereunder". The speeches in the House of Lords were very short. Lord Loreburn LC said that in his opinion both the relevant paragraphs were fully proved. The Earl of Halsbury concurred with the judgment of the Lord Chancellor, but appears to have founded his decision mainly on the fact that it was the duty of the charterers under the charter to have loaded the vessel and taken care that the proper marks were there. Lord Gorell expressed his concurrence, but then went on to say that he thought that the evidence established the cause of action "set out in paragraph 11 of the Points of Claim", that is, the cause of action based on a representation and warranty. Lord Shaw, too, seems to have taken the view that the charterers were in breach of their obligations under the charter-party relating to the loading of the vessel.Lord Atkinson merely concurred.

I should turn next to the decision of the Court of Appeal in Dawson Line Ltd v Aktiengesellschaft Adler Fuer Chemische Industrie of Berlin, (1931) 41 Ll.L Rep 75; [1932] 1 KB 433. This was another voyage charter case where the charter-party required the master to sign the bill of lading as presented by the charterers. The bills of lading which were signed by the master understated the weight of the cargo and the question which arose in the subsequent arbitration was whether the charterers, who, under the charter-party, would ordinarily been entitled to pay freight "on bill of lading weight less 2 per cent in lieu of weighing", were entitled to deduct 2 per cent from the outturn weight.

At pp 78 and 438, Lord Justice Scrutton referred to the Elder, Dempster and the Kruger cases in his judgment, and continued at pp 78 and 439:

. . . In those cases I was counsel for the successful parties, and I remember that considerable discussion took place as to the lines upon which the claim to indemnity should be put. Some of the judges and law lords said that the charterers were liable on two grounds. The first of these was that a right to indemnity followed from the terms of the charterparty, because it required the master to sign bills of lading in a particular form, and consequently that the charterers must be liable if loss followed in consequence of presenting inaccurate bills of lading. The second ground -- and this has nothing to do with the charterparty but turns upon the principle stated in Sheffield Corporation v Barclay [1905] AC 392, and Birmingham and District Land Co v London and North Western Ry Co, [1886] 34 Ch D 261, 272 -- that a mere request from the charterers, involving, as it did, the shipowners in a liability in which otherwise they would not have been involved, raised the implication of an indemnity against those consequences. Some of the judges and law lords took one view, some the other, and some both. In this case it is sufficient to say that as the master was required to sign the bill of lading as presented to him, the charterers were bound to present an accurate bill of lading as to the weight shipped. The shippers were the charterers' agent to supply the cargo and present the bill of lading; they presented an inaccurate bill of lading with consequent loss. The charterers must therefore make good that loss.

At pp 79 and 440, Lord Justice Greer put the matter as follows:

. . . I regard the two cases (Elder Dempster and Kruger) as meaning this and no more, that if the charterer or some person for whom he is responsible, presents a bill of lading to the master which the latter is bound to sign as part of the

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

terms of the contract, there may be implied from the act in presenting the bill of lading, taken together with the terms of the contract, a warranty of the correctness of the figures, description, or marks stated in the bill of lading.

Lord Justice Slesser agreed with the reasons given by Lord Justice Greer.

I come next to Strathlorne Steamship Co, Ltd v Andrew Weir & Co, (1934) 50 Ll.L Rep 185. In this case the owners had chartered the vessel to the charterers under a time charter-party. By cl 16 of the charter-party, the charterers agreed:

... to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading by the orders of charterers or of their agents, or in otherwise complying with the same...

The charterers sub-chartered the vessel by a voyage charter-party for a voyage from Rangoon to China. On arrival in China some of the goods were delivered without the production of the bills of lading but against letters of guarantee. This was done on the instructions of the charterers' agents. In proceedings in Scotland the owners were found liable to the pledges of the bills of lading for misdelivery and they claimed an indemnity from the charterers. The owners relied on cl 16 of the charter-party, but they also based their case on a right to an indemnity at common law, relying on a letter dated Aug 5, 1924, from the charterers' agents instructing the master to deliver against bills of lading or in the absence of bills against guarantees. The points of claim included these words:

As the said goods ... were released or delivered by the master on the orders or directions or at the request of the respondents' (charterers') agents, the respondents (charterers) were and are bound to pay the said claim and to indemnify the owners against the same.

Lord Hanworth MR considered the claim based on the letter of Aug 5 and applied the words of Chief Justice Tindal in Toplis v Grave, (1839) 5 Bing (NC) 636:

... when an act has been done by the plaintiff under the express directions of the defendant which occasions an injury to the rights of third persons, yet if such an act is not apparently illegal in itself, but is done honestly and bona fide in compliance with the defendant's directions, he shall be bound to indemnify the plaintiff against the consequences thereof.

Lord Justice Slesser agreed and cited the same passage from the judgment of Chief Justice Tindal. He added at p 194:

... as it seems to me, in the facts of this case all the constituents of an implied promise to indemnify arise.

Lord Justice Romer agreed too, but he also considered the matter on the basis that the ship's agents had wrongly delivered the cargo at the instigation of the charterers. He said this, at p 195:

... Now, if the agents for the ship do a wrong to their own principals at the instigation of the time charterers, then plainly in accordance with the principle which was applied in the case of Kruger & Co Ltd v Moel Tryvan Ship Co Ltd, [1907] AC 272, the time charterers became liable to indemnify the principals against the consequences of the agents acting on their direction. For these reasons, as well as those given by the other members of the Court, I think this appeal fails.

Finally I come to three cases decided in the last 20 years in which the Court gave specific consideration to the question whether a claim under an indemnity was statute-barred. In each of these cases the indemnity was an express indemnity.

The first of these cases, and the one on which Mr Cooke placed particular reliance, is Bosma v Larsen, [1966] 1 Lloyd's Rep 22. In this case the owners chartered a motor vessel to the charterers on time charter. Clause 9 of the charter-party provided:

9 ... The Master to be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers to indemnify the Owners against all consequences or liabilities arising from the Master ... signing Bills of Lading or other documents or otherwise complying with such orders ...

Subsequently a bill of lading was signed by agents on behalf of the master and as ordered by the charterers. On arrival, part of the cargo was found to be damaged. It was accepted for the purpose of the action that under the bill of lading the owners were liable to the receivers for this damage but that they were not liable under the terms of the charter-party.

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

In these circumstances the owners claimed to be indemnified by the charterers for the sum they had to pay. The charterers admitted that the indemnity in cl 9 applied to the case but set up the defence that the claim was barred by statute under the Limitation Act, 1939.

I should refer to parts of the judgment of Mr Justice McNair. At p 25 he said this:

Admittedly the cause of action for an indemnity under Clause 9 of the charterparty is an action founded on simple contract. The writ having been issued on Mar 12, 1965, the defence succeeds if the cause of action accrued before Mar 12, 1959. If as the plaintiff contends the cause of action accrued after that date, it fails. In summary, the plaintiff contends that the cause of action accrued at the earliest when judgment was entered against him on Mar 10, 1962, or alternatively on Dec 17, 1963, when he paid under the compromise settlement. The defendant on the other hand contends that the cause of action accrued at the latest when the goods were discharged damaged at Naples in July, 1956, and therefore accrued at a date outside the six-year limitation period. . . as it seems to me, the material question in the case is: When, on the facts stated above, did a factual situation arise which, subject to the effect of the Limitation Act, 1939, would have entitled the plaintiff to have obtained from the Court a judgment against the defendant in respect of the indemnity relied on?

Mr Justice McNair then referred to some of the authorities to which his attention had been drawn, and at p 27 he continued:

Accordingly, in my judgment, the first task of the Court is to construe the document and it is not proper or consistent with the authorities to apply a label to an obligation in a document and then to deduce from that label the legal consequences which may flow from other contracts to which the same label can be attached. . . . Accordingly the issue in this case which I have to decide depends on my view of the proper construction of Clause 9 . . . Though the range of the protection afforded by clauses of this nature to the shipowners has not yet been fully worked out by the decisions of the Courts there have been a number of decisions on the question which are noted in Scrutton on Charterparties, . . . which have established certain instances of incidents which are within or without the protection of the Clause; but so far as I know it has never been held that payment by the shipowner of a claim or determination of his liability by a judicial decision was a condition precedent to the shipowner's rights of recovery. It seems to me that the plain meaning of the expression to indemnify against "all liabilities" is that is imposes the obligation to indemnify against the incurring of a liability, not the discharge of that liability by payment or the determination of that liability by judicial process. Indemnity against liability seems to me to be different from reimbursement against sums paid in pursuance of a legal liability. The shipowner is damnified as soon as he comes under a liability. The damnification contemplated by the Clause is the incurring of the liability not the payment . . . I accordingly conclude that on the agreed facts of this case the plaintiffs' cause of action under Clause 9 of the charter-party arose at the date when the facts came into existence which created their liability to the cargo-owners and their insurers which facts came into existence before the date when the six-year period of limitation began and was not dependent upon either the determination of liability by the Italian Court on Mar 10, 1962 or the plaintiffs' payment under the compromise settlement on Dec 17, 1963.

The Judge then considered an argument that since the fusion of law and equity the cause of action on a true indemnity arises as soon as there comes into existence a right to seek equitable relief. The Judge expressed no concluded opinion on this point.

In 1974, Bosma V Larsen was considered by Mr Justice Swanwick in County & District Properties Ltd v C Jenner & Son Ltd And Others, [1976] 2 Lloyd's Rep 728. In this case Mr Justice Swanwick was concerned with express indemnities contained in contracts between building contractors and their sub-contractors. By the relevant clause, subcontractors agreed to indemnify and save harmless the contractors against and from:

(i) any breach non-observance or non-performance by the subcontractor his servants or agents of the said provisions of the main contract or any of them;

(ii) any act or omission of the subcontractor, his servants or agents which involves the contractor in any liability to the employer under the main contract;

(iii) any claim damage loss or expense due to or resulting from any negligence or breach of duty on the part of the subcontractor his servants or agents.

There was an additional sub-cl (iv) to which I do not need to refer.

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

Work on the building site was completed on Oct 28, 1964. In 1969 the building owners brought proceedings against the main contractors claiming damages for breach of contract. In May, 1971, the main contractors issued third party notices against the sub-contractors. The sub-contractors contended that the claims by the main contractors were barred because six years had elapsed since the completion of the work. At p 732, Mr Justice Swanwick summarized the arguments of Counsel:

It was common ground that the claim of the defendants against all third parties was for an indemnity under a simple contract; that the period of limitation was therefore six years from when the cause of action first accrued; that this must be the date when there arose . . . "A factual situation, the existence of which entitles one person to obtain from the Court a remedy against another person . . ." and that this stage would be reached when the defendants were damnified.

Mr Justice Swanwick next referred to the argument on behalf of the main contractors:

. . . Counsel . . . contends firstly that at common law the damnification of a person indemnified under a contract never occurred until he had had to pay, and had paid, money. He submitted that in equity the rule was relaxed to the extent that time started to run when the fact and extent of the liability of the person to be indemnified was ascertained or established.

The Judge then considered the authorities to which he had been referred and the arguments put forward on behalf of the sub-contractors including an argument that, because equity could grant relief by means of a declaration or the setting up of a fund, the cause of action arose immediately upon a breach by the sub-contractor. At p 734 Mr Justice Swanwick continued:

These authorities satisfy me that . . . the general rule in cases of indemnity is that while equity will safeguard the position pending the ascertainment of the fact and extent of liability of the person to be indemnified, he has no cause of action until such ascertainment. There is thus a strong body of authority not only in favour of [the main contractors'] proposition as to when the cause of action for an indemnity arises at common law as modified by equity but also to the effect that these rules . . . are universal.

The Judge then turned his attention to the decision in Bosma v Larsen, which he described as the only authority which had been cited to him which was contrary to the rule which he had just formulated. At p 735, he continued:

From this case, as I understood it, all the third parties invited me to deduce the principle that the propositions put forward by [the main contractors'] were not of general, and certainly not of universal, application and that every contract of indemnity should be scrutinized to determine from its wording whether . . the event to be indemnified is a loss or damage or expense, . . . or a breach of contract act or omission of the indemnifier, . . . If I were untrammeled by authority, I could see some attractions in this distinction; I can also see some dangers, for it could mean a multiplicity of writs in respect of defects observed by the contractor, which might or might not result in a claim againt him . . . Having regard to the authorities to which I have referred, I do not feel at liberty to accept the distinction contended for by the third parties; it may be that the case of Bosma v Larsen can be distinguished on its special facts; if not, I fear that I must differ from it, and reaffirm the principles for which [the main contractors] contend. After all, an indemnity against a breach, or an act, or an omission, can only be an indemnity against the harmful consequences that may flow from it, and I take the law to be that the indemnity does not give rise to a cause of action until those consequences are ascertained.

The third of the three cases in which a limitation defence was considered is RH Green & Silley Weir Ltd v British Railways Board and Kavanagh (Third Party), [1980] 17 BLR 94. In this case the third parties carried out tipping in 1970 and 1971 in a railway cutting owned by the BRB. The work was done under an agreement whereby (inter alia) the third parties agreed to indemnify the BRB:

. . . from and against all liability for personal injury (whether fatal or otherwise) loss of or damage to property and any other loss, damage, costs and expenses which might arise in consequence of the grant or existence of the agreement or of anything done as a result of its grant or existence . . .

In 1974 adjoining landowners brought an action against the BRB complaining of damage. The action made slow progress but eventually, in 1979, the BRB joined the third parties. The third parties asserted that the claim was time-barred. On the trial of a preliminary issue Mr Justice Dillon held that the relevant clause in the agreement constituted a general indemnity in favour of the BRB and that time did not run against the BRB until liability, if any, of the BRB to the plaintiffs in the action had been established and ascertained. Mr Justice Dillon supported the decision of Mr Justice Swanwick in the Jenner case and declined to follow Bosma v Larsen.

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

From a consideration of these cases and other authorities to which my attention was directed it seems to me that it is possible to identify at leat three ways in which a person (A) who has become liable to (B) may be able to obtain redress from (C).

The first way is by an action for damages for breach of contract (or warranty). In such a case (A) will be in a position to claim that the incurring of his liability to (B) flowed directly from an act of (C) which constituted a breach of a contract between (A) and (C) or of a warranty given by (C) to (A). The damages will be assessed in accordance with Hadley v Baxendale principles. The cause of action will date from the date of breach.

The second way is by a claim on an express indemnity. In such a case extent of the indemnity and the time at which the cause of action arises will depend on the construction of the contract. If the indemnity is an indemnity against liability, as it was held to be in Bosma v Larsen, the cause of action will come into existence when (A) incurs a liability to (B). It may be that in certain circumstances a liability may be incurred for this purpose when the liability is still merely contingent: see Forster v Outred & Co, [1982] 1 WLR 86. If, however, the indemnity is a general indemnity, as the relevant clause was held to be in RH Green & Silley Weir Ltd v British Railways Board and Kavanagh (Third Party), then time will not begin to run against (A) for the purpose of pursuing his indemnity against (C) until (A)'s liability to (B) has been established and ascertained: see below. One may notice in passing that, as the arbitrator pointed out in his reasons, Mr Justice McNair did not deal separately with the words "or consequences" in the contractual indemnity in Bosma v Larsen.

The third way in which (A) may claim against (C) in respect of sums which he has had to pay to (B) is under an implied indemnity. As I understand the matter, such an implied indemnity would prima facie be a general indemnity of the kind recognised by the common law. The rules relating to what I have described as a general indemnity were explained by Lord Justice Fletcher Moulton in Re Richardson [1911] 2 KB 705 at p 712 as follows:

If, for instance, B was bound to pay a sum to A and C was bound to indemnify B, . . . then B could not sue C unless he could aver payment to A. It was the same thing whether it was a case of suretyship, indemnity, or contribution. In all cases before you can make a guarantor pay you must prove that you had actually paid the money. No better example of this could be given than the case of Collinge v Heywood (1839) 9 A & E 633. That was a contract to indemnify a plaintiff against costs, and it was decided that the cause of action arose when he paid the costs, not when the costs were incurred or the attorney's bill was delivered to him; and it happened that it was a point of cardinal importance in that case to decide the moment when the cause of action arose, because it was a question there of the date from which the Statute of Limitations began to run. There the Court applied the well-known common law principle that before you can avail yourself of your right of indemnity you must show that you have paid the money . . . the rule in Chancery was somewhat different, and yet, to my mind, it emphasises the fundamental principle that you must have paid before you have a right to indemnity, because the remedy which equity gave was a declaration of a right. You could file a bill against the principal debtor to make him pay the debt so that you would not be called upon to pay it, and then you obtained a declaration that you were entitled to an indemnity. You could in certain cases have a fund set aside in order that you might be indemnified, to avoid the necessity of your having to pay and then to sue for the money you had paid, which perhaps would not repair your loss and credit even if it discharged the debt. But I do not think that equity ever compelled a surety to pay money to the person whom he was surety before the latter had actually paid. He might be ordered to set a fund aside, but I do not think that he could be ordered to pay.

It seems clear, however, that even in equity time does not begin to run for the purposes of any limitation period until the liability of the person to be indemnified has been ascertained. I can see no satisfactory distinction on this point between claims on an indemnity and claims between sureties or trustees: cf Wolmershausen v Gullick, [1983] 2 Ch 514; Robinson v Harkin, [1896] 2 Ch 415; Littlewood v George Wimpey & Co Ltd (and British Overseas Airways Corporation), [1953] 2 QB 501, 519.

With this introduction I return to the facts of the instant case.

It will be remembered that in par 7 of the points of claim in the arbitration the indemnity was put forward as an indemnity against liability to be implied from cl 8 of the charter-party -- in other words an implied contractual indemnity against liability. Before me, however, the arguments as to the true basis of the indemnity were wide-ranging and I do not propose to decide the matter on any point of pleading.

The owners' right to recover can, as I see it, be formulated in a number of different ways as follows:

(a) As a claim on a breach of an implied term of the charter-party, the breach consisting of the presentation of the bills of lading for signature. On this basis the cause of action arose at the moment of breach.

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

(b) As a claim based on an implied indemnity against liability. On this basis the cause of action arose when a liability to the receivers was incurred. Mr Cooke argued that a contingent liability to the receivers was incurred as soon as the bills of lading were signed and he relied on Forster v Outred (sup). If such a contingent liability is not enough it seems clear that, as to the majority of the claim at any rate which was a claim for shortages, the cause of action did not arise until the cargo was discharged in the period between Apr 2 and 21, 1975.

(c) As a claim based on an implied general indemnity. Such an indemnity would, as Mr Hirst put it, indemnify the owners from the "consequences" of the master signing the bills of lading in terms which were more onerous than the charter-party.

I have had to consider whether or not the true view of this case is that the charterers were in breach of an implied term of the charter-party in putting the bills of lading before the master for signature and that the subsequent losses suffered by the owners flowed from that breach. Such a solution would not seem out of line with some of the speeches in the Kruger case. But the case has been argued on the basis of an implied indemnity, the issue being as to the nature of such indemnity. Furthermore, it appears that where a person is entitled to rely on an implied indemnity he can make a claim on such an indemnity in addition to making a claim based on some express provision of his contract with the indemnifier or (semble) a claim for damages for breach of contract. I turn therefore to the implied indemnity.

It seems to me that there is great force in the argument that as a matter of principle an indemnity which is to be implied from the terms of a contract or from the conduct of the potential indemnifier should be an indemnity against the incurring of liability. But a long line of cases established that at common law a person who is entitled to an indemnity cannot enforce it until he has made a payment to the third party. In M'Gillivray v Hope and Another, [1935] AC 1, Lord Tomlin set out the common law rule succinctly at p 10:

. . . where one who is liable to pay a sum of money to another is entitled against a third party to be indemnified in whole or in part against what he has so to pay, he cannot recover on the indemnity against this third party where he himself has made no payment in respect of his own liability (see Collinge v Heywood) . . .

This common law rule has now been modified because in equity the person to be indemnified can seek relief as soon as his liability has been ascertained: cf Littlewood v George Wimpey & Co Ltd & Ors (sup) and the cases there cited.

I have therefore come to the conclusion, through not without hesitation, that the implied indemnity to which the owners are entitled in the present case is of the kind suggested by Mr Hirst, namely, an indemnity against the consequences of the master signing the bills of lading and that such an indemnity did not become enforceable by action until at the earliest the liability of the owners to the receivers had been ascertained by the Court of first instance in Basrah in December, 1978.

In reaching this conclusion I have not overlooked an argument that the owners might have been entitled to invoke the assistance of a Court of equity to obtain declaratory relief or the setting up of a fund before the Iraqi Court had reached its decision. I very much doubt, however, on the facts of this case whether a Court of equity would have given any relief before December, 1978. But even if it had, I do not consider that such an action would have affected the time at which the cause of action for the recovery of any moneys from the charterers would have begun to run: see above.

I should, however, also express a view on the alternative hypothesis that time began to run for the purposes of the indemnity from the moment when the owners first incurred a liability to the receivers. As Mr Hirst pointed out, the major part of the claims by the receivers was in respect of shortages. I do not see how the receivers could have brought a claim in respect of these shortages before the completion of the period of discharge or, at the very earliest, at the commencement of the discharge. Discharge commenced on Apr 2, 1975, and even on the basis the appointment of the arbitrator was just in time. Moreover, even in respect of the damaged bags, the claim by the receivers would have been formulated as a claim in respect of the bags discharged in a damaged condition. Accordingly, as I see it, no actual liability was incurred to the receivers before Apr 2, 1975.

It will be remembered, however, that Mr Cooke argued that, for the purpose of a claim under the implied indemnity, the relevant date was the date when a contingent liability to the receivers was incurred. This date, or these dates, were in December, 1974, or January, 1975, when the bags were badly stowed and when the bills of lading were signed. I see the force of the argument on this point based on the decision of the Court of Appeal in Forster v Outred (sup), but I have come to the conclusion that even if the indemnity is to be construed as an indemnity against the incurring of liability, such an indemnity could not have been invoked by the owners until they had incurred some actual liability to the receivers.

[1985] 1 All ER 243, [1984] 1 WLR 553, [1984] 2 Lloyd's Rep 466

For these reasons I am satisfied that the arbitrator was correct in his decision that the claim by the owners was not time-barred.

I can deal with the two remaining arguments very shortly.

It seems to me that once it is established that the owners are entitled to an indemnity then that indemnity should be an adequate indemnity. The owners were found liable by the Iraqi courts in the sums and to the extent claimed in the arbitration. It has not been suggested that the owners failed to conduct the case properly in Iraq and it is to be observed that the case was taken on appeal to the Cassation Court.

In my judgment they are entitled to the relief which they obtained from the arbitrator. It is to be observed that in the "Strathlorne" case the express indemnity was held to cover claims for costs including the costs of the claimants' own solicitors: see Strathlorne Steamship Co, Ltd v Andrew Weir & Co, (1934) 50 Ll.L Rep 185 at p 187.

The final argument concerned the effect of the words "FREE OUT" in the bills of lading. It is uncertain how far this point was canvassed before the Iraqi Courts. It seems to me, however, on the facts of this case that the Court cannot reopen the issue of the liability of the owners to the receivers. I see no ground for interfering with the decision of the arbitrator on this point.

**DISPOSITION:**

For these reasons I have come to the conclusion that this appeal must be dismissed

**SOLICITORS:**

Richards, Butler & Co; Clyde & Co