UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
EXMAR SHIPPING, N.V.                    :
                                        :
                Plaintiff,      :      06cv12991(HB)
                                        :      **OPINION & ORDER**
  -against-                            :
                                        :
POLAR SHIPPING, S.A. and POLAR          :
SHIPPING CO., LTD.,                     :
                                        :
                Defendants.     :
-----------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**[1]

      On November 7, 2006, Plaintiff Exmar Shipping N.V. ("Exmar"), a Belgian entity, filed a Rule B attachment against Defendants Polar Shipping Co., Ltd. Inc., a Japanese entity, and Polar Shipping S.A., a Panamanian entity, (collectively "Polar") to secure $1,604,540.14[2] of Defendants' assets in New York in connection with the sale of two ships, and breaches of charter parties including speed claims and a cargo damage claim. Defendants move now to vacate Plaintiff's Rule B attachment because they argue that the underlying sale and charter claims arise out of contracts between Exmar and a third party, Eitzen/Sigas, and they are still unresolved; thus Exmar's claims against Defendants are only contingent indemnities and not valid prima facie admiralty claims under Rule B. For the reasons stated below, the motion to vacate the attachment is granted in part and denied in part.

## I. FACTS

**Contracts for the Sale of Ships**

      On September 12, 2006, Plaintiff entered into Memorandum of Agreements ("MOAs") to purchase three ships from Defendants—the Polar Belgica, the Polar Discovery and the Polar Endurance. (Second Amended Verified Complaint ("Sec. Am. Compl.") ¶¶ 7, 17; Burgess FRCP 44.1 Decl. Ex. 3, J. Ross Dec. 20, 2007 Status Letter Update to J. Baer ("Dec. 2007 Status Letter").) On the same date, Plaintiff entered into identical agreements to sell the three ships to a third party, Sigas Pte. Ltd. ("Sigas"), an entity related to Eitzen Gas, A.S. ("Eitzen"), a sub-

---

[1] I would like to thank Laura Asserfea, my Summer 2008 intern of Brooklyn Law School, for her tremendous help in researching the issues in this opinion.
[2] The Plaintiffs in the Second Amended Complaint increased their requested attachment and damages to $2,436,733, though this Court had only approved the $1.6 million.

1

charterer of the three ships. (Sec. Am. Compl. ¶¶ 8, 18.) Polar chartered all three ships to Exmar, and then Exmar sub-chartered them to Eitzen on April 20, 2004. (Sec. Am. Compl. ¶¶ 27, 34; Dec. 20, 2007 Status Letter.) On the same date, Plaintiff, Defendant and Eitzen, entered into three Tripartite Termination Agreements, under which the existing charter parties would terminate and Eitzen would pay the final amount owed to Plaintiff when the ships were delivered to Sigas. (Sec. Am. Compl. ¶¶ 11, 21; Dec. 20, 2007 Status Letter.)

Upon delivery, Sigas' Class Surveyors found "several deficiencies" in the Polar Belgica and Polar Discovery. (Sec. Am. Compl. ¶¶ 12, 22.) Sigas deducted $275,000 from the price of the Belgica and claimed a deduction of $475,408.45[3] from the price of the Discovery. (Id. ¶¶ 12, 13, 15, 23.) Though it originally claimed the same amounts in damages against Polar that Eitzen claimed against Exmar, Exmar increased its Belgica claim against Polar to $362,947.31. (Id. ¶¶13, 15.)

**Cargo Damage Claim**

Plaintiff sub-chartered the Polar Endurance to an unnamed third party. (Id. ¶ 28.) During a voyage between June 16 and July 2, 2004, the ship's cooling system allegedly malfunctioned and the cargo on board was damaged. (Id. ¶ 28.) The third party deducted $179,528.45 from the sum owed to Plaintiff for the charter. (Id. ¶ 29.) Exmar alleges that Polar breached the Exmar-Polar charter party because of the defective compressor and cooling system and claimed damages against Polar in the same amount. (Id. ¶ 31.) Further, while arbitration clauses are in each agreement, this Endurance sub-charterer is unnamed and there has been no effort, at least to my knowledge, to initiate arbitration. (See Hrg. Tr. 23:5-12.)

**Speed Claims**

Plaintiff alleges that under the charter party agreements, Defendants warranted that all three ships would achieve a guaranteed speed of "about 15 knots." (Sec. Am. Compl. ¶ 34.) Plaintiff guaranteed the same to Eitzen. (Id. ¶ 35.) Eitzen presented speed claims to Exmar, which, when translated into dollars, amounts to $286,850 and Exmar has alleged that two additional speed claims totaling $87,000 were about to be filed by Eitzen for a total of $373,850.

---

[3] In Exmar's original and First Amended Complaint, it alleged that Eitzen claimed damages for the Polar Discovery in the amount of $430,000. (Am. Compl. ¶23.) This amount was increased to $475,408.45 in the March 18, 2008 Second Amended Complaint. (Sec. Am. Compl. ¶23.)

(Id. ¶¶ 37, 38.)[4] In the first Amended Complaint, Plaintiff claimed the same amount of damages against Polar under the underlying charter parties. (First Am. Compl. ¶ 40.) Plaintiff amended again, deleted Eitzen's speed claim damages and alleged Exmar's speed claim damages against Polar in the amount of $1,039,649, for a difference of $665,799.[5] (Sec. Am. Compl. ¶ 39.)

The Plaintiff filed its initial complaint on November 7, 2006 and the Plaintiff secured an attachment in the amount of $1,157,558.29. A supplemental order of attachment was entered on November 9, 2006 securing a total amount of $1,604,540.14. On February 28, 2007, the parties agreed to release $275,000 of the funds pursuant to a Letter of Undertaking by Defendant's P&I Club for the cargo claim.[6] (Ross Aff., Ex. G.) I endorsed the LOU and the case was placed in suspense while the claims were to be arbitrated in London. (See Order, Mar. 6, 2007, Doc. #15.)

Defendants moved to vacate the entire attachment February 25, 2008, or almost one and one-half years after the initial Rule B complaint was filed and simultaneously filed an Answer to assert a counter-claim for counter-security in the amount of $400,000 plus $172,000 in interest, attorney fees and costs for "its own claims that it has asserted in London arbitration against Exmar under the Three Charters." (Answer ¶15.) Plaintiff amended its complaint for the second time, on March 18, 2008. Oral argument was held on May 1, 2008.

All the agreements call for arbitration in London and application of English law. (Sec. Am. Compl. ¶¶ 16, 26, 33.) Plaintiff reported that there were two sets of arbitrations scheduled to be underway: Exmar v. Eitzen/Sigas and Polar v. Exmar. (See Dec. 20, 2007 Status Report.) Two of three arbitrators had been appointed in the Exmar/SIGAS and Polar/Exmar arbitrations. (Dec. 20, 2007 Status Report; Dench Decl. ¶ 3.)

## II. DISCUSSION

Defendant moves to vacate the Supplemental Admiralty Rule B maritime attachment because Exmar's claims are premature and thus not valid prima facie admiralty claims. In order to sustain a maritime attachment, the burden is on the plaintiff to prove that: (1) it has a valid prima facie admiralty claim against the defendant, (2) the defendant is not present in the district, (3) defendant's property can be found within the district, and (4) there is no maritime law or

---

[4] Defendants argue in their memorandum that the vessels in fact over performed. Charter Clause 24 provides for a refund in case the ship overperforms.

[5] Plaintiff amended the Complaint again to "clarify the nature of the original claims set forth in the Amended Complaint and . . . adjust[] the dollar amounts of some of these claims based upon more recent information we received from London." (Dock. #31, Endorsed Ltr. to J. Baer to Request to Amend Complaint.)

[6] This Court ordered $275,000 could be released to Defendants in exchange for a Steamship Mutual Underwriting Association (Bermuda) Ltd. Letter of Undertaking. (See J. Baer Order, Docket #15.)

3

statutory bar to the attachment. Supplemental Admiralty and Maritime Claims Rules B(1)(a), E(2)(a), 28 U.S.C.A, Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006). The validity of a prima facie admiralty claim is a substantive issue to be decided by the Court and the applicable substantive law of the underlying contract controls. Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007). In this case, the parties agree that the charter parties and sale agreements in question are governed by English law and that English law governs the validity of these admiralty claims.

The dispute here centers on whether Plaintiffs have a valid prima face admiralty claim against Defendants as all the other factors for a Rule B attachment are met. Defendants argue that all of Exmar's claims are premature because they are indemnity claims that are contingent on claims asserted by a third party against Plaintiff, and therefore, Plaintiff's cause of action will only accrue when the Plaintiff has made payment to the third party or its liability has been determined in some other fashion. (See generally Def. Mem.; Burgess Decl.) As of oral argument, no liability had been determined in this case since arbitration had not yet begun.

Plaintiff argues that this is not an indemnity case, but a simple breach of contract between Polar and Exmar. (See generally Pl. Opp. Mem.; Dench Decl.) Exmar insists that it suffered damages because the charter parties contain different hire rates and cover different periods. (Dench Decl. ¶ 9.) Plaintiff also argues that even if the Court finds that the claims are indemnities, under equitable principles, the attachments should be maintained because the Defendants have no assets and any arbitration awards would be unsatisfied.[7] (Ross Aff. ¶2.)

**Sale of the Ships**

Contracts for the sale of ships are not cognizable in admiralty. In re The Steamer Eclipse, 135 U.S. 599 (1890); The Ada, 250 F. 194 (2d Cir. 1918); see also Smith v. Mitlof, 198 F. Supp. 2d 492 (S.D.N.Y. 2002). Similarly, a breach of warranty in the sale of a vessel does not state a cause of action in admiralty either. Camper & Nicholsons, Ltd. v. The Yacht "Fountainebleau II", 292 F. Supp. 734 (S.D. Fl. 1968). Here, the Tripartite Termination Agreements terminated the existing charter parties upon the completion of the sale. (Burgess Decl., Ex. 1). The claims for the defective conditions of the ship are clearly tied to the sale of the ship and thus not admiralty claims. The attachment for the defective ship claims must be vacated.

---

[7] Plaintiff further alleged during the hearing that the companies dissolved one week after issuing the Letter of Understanding in 2007. (Hrg Tr. 6:4-7:10; 19:11-18; 12:2-13; 27:17-28:16.)

**Validity of the Hire Deduction and Speed Claims**

The remaining claims are the speed and the cargo damage claims. As stated above, claims for breach of a charter party contract are classic valid prima facie admiralty claims. See Kirno Hill Corp. v. Holt, 618 F.2d 982 (2d Cir. 1980); Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, 485 F. Supp. 2d 399, 403 (S.D.N.Y. 2007). But claims that are "premature" or "unripe" at the time of the attachment are not valid prima facie admiralty claims. See Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d Cir. 1965); Bottligieri Di Na Vigazione Spa v. Tradeline LLC, 472 F. Supp. 2d 588, 591 (S.D.N.Y. 2007). There is a split of authority as to whether indemnity claims can be valid admiralty claims and courts have also failed to define a rule by which to determine whether a claim is a breach of contract or an indemnity.[8]

In response, some courts have looked at the stage of litigation and the general context to determine whether plaintiff's request for security based on its expectation to be sued by third parties is reasonable. See, e.g., Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd., 05cv7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005); Navalmar, 485 F. Supp. 2d at 403 (court found circumstances rendered indemnity claims ripe).

Here, the agreements do not contain any specific language of indemnification. (Pl. Mem. 7; Dench Decl. ¶ 12; Hrg. Tr. 9:13-22.).[9] The only promises are the warranties of performance. (Dench Decl. Ex. A.) Exmar alleges that the claims against it by the third party are distinct from claims between Exmar and Polar because the original charter party guaranteed performance of the ship by Polar. It never uses the term "indemnity" in its pleadings. When Exmar sub-chartered the Endurance and the cargo was damaged in voyage, the sub-charterer deducted, or withheld hire, of $179,528.45 from the sum it owed to Exmar.[10] But with Polar's LOU in hand, Exmar has not instituted arbitration. Polar demands a return of the security in the form of the

---

[8] Judge Hellerstein collected a number of cases reflecting the divergence of treatment in Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd., 485 F. Supp. 2d 399, 405 (S.D.N.Y. 2007). English case law, upon which several of these cases rely, is equally split. See, e.g., Cathiship S.A. v. Allanasons Ltd. (The "Catherine Helen"), [1998] 2 Lloyd's Rep. 511, 517; Telfair Shipping Corp. v. Intersea Shipping Corp. v. Intersea Carriers S.A. (The "Caroline P"), [1984] 2 Lloyd's Rep. 466, 474-75; Bosma v. Larsen, [1966] 1 Lloyd's Rep. 22.
[9] Unlike several cases in this District, namely Bottiglieri, 472 F. Supp. 2d 588, Sonito, 478 F. Supp. 2d 532, and T&O Shipping Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310 (S.D.N.Y. 2006), the parties agree that the charter parties here were not subject to the Inter-Club Agreement, which apportions the allocation of risk among the various charter party contractors. (Hrg Tr. 9:6-21.) The relevant provision of the ICA in those cases ordered that the party filing for an indemnity first pay the claims before seeking indemnification.
[10] Withholding of hire is prohibited in admiralty, even if it is made in response to a breach. Navalmar, 485 F. Supp. 2d at 400 & n.1 (citing 2A-XVII Benedict on Admiralty § 176.)

LOU since it argues that Exmar's cargo claim is a contingent indemnity (Def. R. Mem. at 8-9); without any outstanding suit, this claim is speculative.

Exmar argues that the speed claims are also direct claims against Polar because Polar guaranteed performance under its charter party with Exmar. (Dench Decl. ¶ 9.) Moreover, Plaintiff argues the charter parties have different time periods and hire rates leading to distinct injuries. (Pl. Opp. Mem. 7.) Defendants argue that Exmar's complaints focused on tracing the chain relationship of the back-to-back charter parties and that reliance upon the damages/claims alleged by Eitzen prove that these allegations are truly indemnities. (Burgess Decl. ¶¶ 11-12.) But there are two very troubling issues. Why did Polar wait almost two years to challenge the attachment? Presumably the arbitrators would not even permit claims to be submitted or the arbitration to proceed in the latter panel if the claims are truly contingent on the outcome of the Eitzen-Exmar arbitrations.

Arbitration is underway, though slowly, for almost all the claims, thus, Exmar holds a reasonable belief that they face potential liability. Exmar alleged Polar's direct breaches of the charter parties at the outset of the case. Thus it has sustained its burden to prove that it has valid prima facie admiralty claims for the speed claims. The cargo claim is not being pursued by anyone, and I see no reason to maintain the LOU on this issue, since its resolution is so speculative and two years late. The request for counter-security is denied. There will be no increase in the amount attached for the speed claims.

### III. CONCLUSION

Based on the foregoing, Defendants' motion to vacate the attachment in this case is GRANTED in part and DENIED in part. The portion of the attachment linked to the sale of the ships is vacated because these are not valid prima facie admiralty claims. The attached funds related to these claims totals $705,000 not including 6% interest and fees and costs. The LOU on the cargo claim may be returned. The attachment tied to the speed claims is maintained. The Clerk of the Court is instructed to close this case and any open motions, and remove it from my docket.

**SO ORDERED**
New York, New York
August 27, 2008

_____
U.S.D.J.

6